IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

DAVID WASHINGTON,

                Defendant.
_____

**<u>NOTICE OF OBJECTIONS TO REPORT</u>**
**<u>RECOMMENDATION AND ORDER</u>**
20-cr-00029-RJA

    PLEASE TAKE NOTICE that in accordance with 28 U.S.C. § 636, Fed. R. Crim. P. 59 and

L.R.Crim.P. 59, the defendant, David Washington, by his attorney, Mark A. Foti, hereby makes

and submits the attached objections to the Report and Recommendation and Order of Magistrate

Judge Hon. H. Kenneth Schroeder, Jr. dated February 15, 2022, at Docket Entry # 352.

Dated: April 5, 2022

                                    Respectfully submitted,

                                    Mark A. Foti, Esq.
                                    The Foti Law Firm, P.C.
                                    *Attorneys for David Washington*
                                    16 West Main Street, Suite 100
                                    Rochester, New York 14614
                                    mark@fotilaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

DAVID WASHINGTON,

                       Defendant.
_____

**OBJECTIONS TO REPORT,
RECOMMENDATION AND ORDER**
20-cr-00029-RJA

      The defense objects to the Magistrate's Report, Recommendation and Order, dated February 15, 2022, at Docket Entry # 352. Pursuant to statute, this Court shall make a de novo determination on the issues in controversy. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation.")

      The Local Rules require that "Any party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments or identifying the new arguments and explaining why they were not raised to the Magistrate Judge." L. R. Crim. P. 59(c)(3). The defense certifies that these objections do not raise new legal/factual arguments.

## BACKGROUND

      David Washington (hereinafter referred to as "Washington" or "the defendant") is charged along with seven other co-defendants in a Superseding Indictment with violations of Title 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). *See* Dkt. # 24.

Washington was arraigned on February 21, 2020. At that time, he entered a plea of not guilty. *See* Minute Entry entered on February 24, 2020.

I was subsequently retained by Washington to represent him in the above-captioned matter. *See* Dkt. # 65.

Approximately, seven months into this case, having received no information regarding the search of the Ford Ranger, the defense made multiple inquires, both formally and informally, regarding whether there was a warrant or some other basis to search the vehicle.

On September 24, 2020, the defense sent a letter to the Government which identified the search of the Ford Ranger and requesting "the warrant, if any" and "documentation related to the search of that vehicle."  Dkt. # 119-3

On October 6, 2020, the Government sent an e-mail to three agents from the Department of Homeland Security, including Thomas Webb, Frank Zabawa, and Michael Fantuzzo. FBI Agent Thomas Weis (hereafter "Weis") was carbon copied. The Government requested "help locating the following" followed by a paragraph informing them that "Washington's attorney is claiming that a Ford Ranger was searched at 69 BVT. We did not get a SW for that, nor did I see any signed consent forms for it. Can you confirm?" [Ex. 11] .

On October 9, 2020, the Government sent another e-mail, which appears to be sent directly to Weis, at which time the AUSA states "There was a Ford Ranger parked at 69 BVT which was searched. I remember you telling me that the keys to the vehicle were inside 69 BVT, but I cannot remember whether you obtained consent to search the vehicle or otherwise obtained lawful entry to it. Remind me?" [Ex. 11].

On October 10, 2020, Weis e-mailed the Government stating "I'm waiting for the search team leader to confirm, however, there was cash in plain view on the backseat of the vehicle. This

3

prompted the agents at this location to obtain verbal consent to search from the female at the residence who had the vehicle keys in her possession. Again, I'm still waiting to hear back from the agent in order to confirm." [Ex. 11].

On October 13, 2020, the Government sent the defense an e-mail indicated that it was still working on getting more information regarding the "Ford Ranger searched at 69 Bennett Village Terrace" and suggested that it was still unknown whether the search warrant was authorized by a warrant, consent, or any other basis. Dkt. # 190-1 at 29.

On November 16, 2020, the Court directed the Government to complete discovery by December 31, 2021. *See* Dkt. Minute Entry (entered on 11/17/2020 at 12:39 PM EST). On December 3, 2020, the defense sent another letter to the Government that indicated, among other things, that "I am still requesting all documentation related any vehicle search… it does not appear that I have received a warrant or other documentation related to those searches at this point." Dkt. # 190-3. As of the discovery deadline, nothing was provided.

On January 6, 2021, following a conversation with the defense, the Government sent an email to Weis and stated in pertinent part: "I understand [the Ford Ranger was] searched during the course of the execution of the search warrants in February. Can you provide a description of the legal basis for the search[]?" The email also notes that the Government was not involved in drafting a search warrant for the vehicle. [Ex. 12].

That same day, Weis responded, vaguely stating "agents on scene were given verbal consent to search the vehicle." The Government replied, asking who gave consent. Weis did not provide an answer. [Ex. 12].

On February 7 and February 15, 2021, the defense sent follow-up emails to the Government asking for an update on the Ford Ranger. Dkt. # 190-1 at 30.

On February 24, 2021, the Government again contacted Weis noting that the defense was still asking "[w]hat as the legal basis to search the 2019 Ford Ranger bearing VIN 1FTER4FH4KLA51499." [Ex. 12].

That day, Weis responded "for the Ford Ranger, the female that was at 69 BVT had the keys in her possession and gave verbal consent to search it. There wasn't a report on that, I'm working on getting the agents that were present to write it up." [Ex. 12].

Two days later, on February 26, 2021, the Government e-mailed the defense and stated that "The Ford Ranger was searched on verbal consent from a female at 69 Bennett Village Terrace who provided law enforcement with the keys to the car." Dkt. # 190-1 at 30.

On March 12, 2021, the Government contacted Weis asking him for report related to consent. That day, he replied with an email, attaching a pdf of a 302, drafted that day. [Ex. 12]. The 302 acknowledged that Washington was the renter of the vehicle, and for the first time, it was alleged that Washington had provided verbal consent to search the vehicle. [Ex. 10].

That day, the Government sent a copy of the pdf to the defense. The Government's e-mail stated: "Apparently it was not the female, but instead David Washington himself."

The defense responded to the email asking, among other questions, "Was [the agent who drafted the 302] the one who had originally indicated to you that it was a female that gave consent and the keys or was that someone else, and if so, who?" The Government acknowledged receipt of the email, but it did not provide a response to the questions. *Id*.

On April 28, 2021, the defense filed a pretrial motions, which included a motion to suppress evidence seized as a result of a warrantless search of a Ford Ranger located outside the home of 69 Bennett Village Terrace, Buffalo, NY, on February 21, 2020. *See* Dkt. # 190.

The Government did not oppose a hearing to resolve the motion.

At an appearance on August 12, 2021, the Government indicated, for the first time, that "Agent Jason Galle was the one who received consent from Mr. Washington for the search of the Ford Ranger on February 20th, 2020." (Aug 12, 2021 Transcript at 43). The Government did not allege that Agent Clinton Winters or anyone else had received consent to search.

Days prior to the hearing, Agent Clinton Winters informed the Government that he had located an email draft, in which he had claimed to have obtained consent from Washington, even though he never sent the email to anyone. Winters claimed for the first time that he had obtained consent from Washington. On August 25, the Government provided the draft email to the defense. [Ex. 9].

The hearing proceeded on August 27, 2021. The Government called three witnesses: (1) Jason Galle (hereafter "Galle"); (2) Clinton Winters (hereafter "Winters"); and (3) Thomas Weis (hereafter "Weis").

The defense filed a post-hearing arguments on November 17, 2021. *See* Dkt. # 300. That memorandum is attached and as Exhibit A. The arguments contained therein are adopted as part of these objections.

On February 15, 2022, the Magistrate issued a Report, Recommendation and Order (hereafter referred to as "the R&R") recommending denial of the defendant's motion. *See* Dkt. # 352.

The defense requested extensions of time to file objections. The objections are as follows:

## OBJECTIONS TO THE REPORT, RECOMMENDATION AND ORDER

The Magistrate recommends that the defendant's motion be denied. The defendant objects to that recommendation and maintains that there are multiple grounds to suppress the evidence contained in the Ford Ranger, including: (1) Mr. Washington did not give consent to search the

6

vehicle; (2) even if Mr. Washington had discussed consent to search, the testimony did not sufficiently establish the specifics of that consent; (3) any alleged consent would be involuntary under these circumstances; and (4) the alleged consent to search would not have authorized a seizure under the Fourth Amendment in this case, because the items seized were not contraband.

### 1.   Washington did not give Consent to Search

After almost nearly eight months without an explanation for the search, the Government would ultimately claim that Washington gave consent to search the vehicle.[1] Had Washington factually given consent, that information should have been available on February 21, 2020, and any date thereafter. Instead, it was not until October 10, 2020, that the case agent, Weis, purportedly informed the US Attorney's Office, for the first time, that verbal consent to search was obtained "*from the female at the residence* who had the vehicle keys in her possession." [Ex. 11] (emphasis added). The allegation that a female gave consent appears to have been undisputed for another five months. It was reiterated in another email by Weis, months later [Ex. 12], and the Government eventually disclosed the allegation to the defense, only to later change the narrative in March 2021, over a year after the search had occurred.

On August 12, 2021, the Government, for the first time, identified Galle as "the one" who obtained consent and that Winters would testify as being a witness to that consent. By the time the hearing commenced, approximately two weeks later, the Government was now presenting a claim that Winters had also obtained consent.

---

[1] Washington would have had no reason to consent to the search of the vehicle. He had already been woken up to members of law enforcement breaking down his door. He had already been arrested at gunpoint. He had already been handcuffed and removed from the residence, without shoes on while it was still dark out on a brutally cold February morning. There was absolutely no reason for him to provide consent to search a vehicle in addition to the search that was already underway, unless it was based on coercion (discussed *infra*).

Conveniently, there was no documentation prepared by either of the agents who claim to have been involved in obtaining consent from Washington. There is not a single 302 or a single ROI. Throughout the entire hearing, there was no legitimate explanation offered for why something as important as consent for a warrantless search a vehicle would not documented *anywhere* other than in what was purported to be a draft e-mail. The R&R appears to accept the credibility of these witnesses without addressing the fact that something as important as verbal consent should have been documented in an official report somewhere, but it never happened.

Moreover, the FBI utilizes the FD-26, a written form to document consent, including the scope of the consent. *See* Dkt. # 300-1. Galle and Winters both acknowledged that the form exists and acknowledged its purpose, but they both testified that they did not use it, because they did not have one readily available. The R&R appear to accept this excuse: "Special Agent Galle, as a member of the SWAT team, did not have a written consent to search form with him and therefore was not able to have the defendant execute such a form authorizing the search of the Ford Ranger vehicle." *R&R*, Dkt. # 352 at 3-4.

This defense maintains that this excuse was absurd in light of the testimony that the parties were briefed on the vehicle the day before the search, and Winters was actually tasked with locating the vehicle that morning, along with members of the Buffalo Police Department; they had located the vehicle approximately an hour before the search team arrived. There is absolutely no legitimate explanation for why the agents would not have a FD-26 form available if they were going to seek consent to search.[2]

---

[2] The counterpoint is the speculative theory that the agents did not initially intend to search the vehicle, but after allegedly viewing cash through a tinted window in a bag in the backseat, they became interested in searching the vehicle. The claim that cash was viewable through the window is not believable for reasons discussed *infra*.

In addition to the lack of documentation or written consent, the R&R acknowledges that "there appears to have been a great deal of confusion on the part of the FBI agents involved in this case on the issue of consent" (R&R, Dkt. # 352 at 9) based on the facts discussed above in the Background to these objections. The confusion is demonstrated in inconsistencies and incredible testimony that do not support a factual finding that Washington ever provided consent in any form.

*Government Witness and Case Agent Weis Contradicted the Narratives of Galle and Winters*

The Government's narrative as presented through Galle and Winters was contradicted through the sworn testimony of their case agent, Weis.

Weis made observations that he confidently testified about that contradicts the vague testimony from Galle. For example, a significant fact surrounds how the keys were obtained. Galle testified "I continued to search around the dining room area and found them, I believe in a jacket pocket, a jacket or like a sweatshirt pocket, something that was in the kitchen." (Transcript at 51). Weis continued to maintain, under oath at the hearing, that he personally observed "Galle walking over to the female who was seated at the table at the time. He had her stand up and then that's where the keys were retrieved from her pocket." (Transcript at 171-172).

The R&R takes the position that this amount to "minor discrepancies" and "these inconsistencies are insignificant and do not relate to the issue of whether the defendant gave voluntary consent to the agents to search his vehicle." *R&R*, Dkt. # 352 at 3-4.

However, Weis, the Government's case agent, felt his observations were significant enough to make representations that the female who provided the keys was the person who gave consent. This representation made, to the US Attorneys' office, was uncontradicted for several months.

The R&R appears to note that a 302 prepared by Weis includes an incorrect date, and while the defense would agree that the date was incorrect, and is generally exhibitive of sloppiness by the case agent, it only amounts to a typo which is far different that the substantive representations made as to how consent was obtained to search the vehicle.

Furthermore, although the R&R found referred to Weis's testimony "that he was not present when the defendant gave his consent for the search of his vehicle to Special Agent Winters and Special Agent Galle" (R&R, Dkt. # 352 at 14), the fact that Weis was present when the keys were obtained would mean that he necessarily would have been present during the timeframe when the consent was allegedly being obtained from Washington.

Weis also renders Winters second narrative unbelievable. Weis and Winters were both at Bennet Village on February 21, 2021, and they were both together afterwards. They were both responsible for interviewing Washington, during which Winters never brought up the Ford Ranger once, and during the "significant" number of interactions that Weis had with Winters that day, they never spoke about anything related to the Ford Ranger at all. (Transcript at 186). Notably, if Winters actually wrote a one-paragraph draft email, by his testimony, it would not have happened until the afternoon, after all of these interactions with Weis during which he never mentioned this alleged consent to search the Ford Ranger.

*Galle's Narrative is Not Credible*

Weis contradicted the portion of Galle's testimony related to where he obtained keys, but there is one portion of Galle's testimony that nobody was present to contradict; Galle claims that he had walked out to the Ford Ranger and made observations of cash in plain view inside a bag, through the window. Although, this detail cannot be contradicted by another witness, it was illogical and it is contradicted by the photographic evidence.

10

The photographic evidence contained in the hearing exhibits demonstrates that Galle could not have observed what he claims to have seen through the window. When asked if he made observations inside of the vehicle, front and back, he stated the following:

> I did. From the rear I think what drew my attention was a small backpack.It was partially zipped up. The top was not zipped and I could observe U.S. currency. But more specifically than just U.S. currency, it appeared to be manicured money; that is, money that was counted. And I noted like a bank, bank style wrap around at least one of them. Just from my position I could only see that it was U.S. currency.

> (Transcript at 32).

The Government then showed Galle Exhibit 7J and he indicated "That's that I saw in the back, various bags but that is one of the bags that I observed in the back" and he confirmed that the contents seen in the exhibit are the way they appeared when he looked through the window. (Transcript at 32-33).

Exhibit 7J depicts the Ford Ranger with the door entirely open, which is significantly different from Galle's testifying to looking through a tinted window at what would be approximately 6:15 – 6:20 a.m., before twilight. His ability to observe the interior of the vehicle would not be as nearly as clear as the photographic depiction in Exhibit 7J. That said, even if the window was down during daylight, he would not be able to observe what he claimed to have seen. There was no way to see cash from that angle, as evident from Exhibit 7J.



Excerpt from [Ex. 7J]

There is no cash visible from the top of the book bag, even with the door wide open, in full

day light. Moreover, there is even clearer evidence in the close-up photo of the interior of the bag

contained in Exhibit 7K.

The cash was located at the bottom of the bag and can only be viewed when the bag is held

wide open. There was no logical way for the cash to be visible from the angle that Galle claims he

saw it through the window.



Excerpt from [Ex. 7K]

The claim by Galle that he saw cash in plain view is clearly contradicted by the photographic evidence.

The R&R appears to accept that the testimony regarding alleged observation by Galle: "He looked into the windows of the vehicle and observed a 'small backpack' that was 'partially zipped up, the top was not zipped and [he] observe[d] U.S. currency.' T. 28-30. The U.S. currency 'appeared to be manicured money, that is, money that was counted like a bank, bank style wrap around at least one of them.' T. 31-32; see also Government Exhibit 7J." *R&R*, Dkt. # 352 at 2-3.

Although the R&R cites Exhibit 7J, it does not address the fact that the photographic evidence contradicts Galle's testimony.

It is also noteworthy that if Galle fabricated the claim that he could make observations of cash in the backseat, it would not be the first time that claim has been fabricated by a Federal agent in this case. In October 10, 2020, Weis sent an email that claimed "there was cash in plain view on the backseat of the vehicle" [Ex. 11]. That email was sent before he had any conversations with Galle about the Ford Ranger in early 2021. When under oath at the hearing, Weis admitted that claim was not based on anything other than information obtained following the search of the Ford Ranger.

> Q: In the email where you indicated there was cash in plain view on the back seat of the vehicle. Do you recall where that information came from?
>
> A: That just came from after, once we were back, I remember some of the members of the search team saying where they had found some of the pieces of evidence.
>
> Q: Okay. All right. So, so -- after the search is over, there's a debriefing where the evidence collected at Bennett Village was discussed?
>
> A: Yes.
>
> Q: And among the items that were discussed was any currency that was seized through the search?

A: That's correct.

Q: And at that time you were informed that currency had been seized from the back seat of the Ford Ranger, correct?

A: Yes.

Q: In terms of the cash being in plain view, nobody specifically told you that they, they saw the cash prior to the search?

A: No.

(Transcript at 180-181)

Like Weis, Galle never made a claim that cash was observed in the backseat in the vehicle until after the vehicle had been unlawfully searched. Like Weis, Galle never documented this alleged observation. Like Weis, Galle only made this allegation only after the Government sought an explanation for a warrantless search. Like Weis, Galle's claims are inaccurate, especially when reviewing the photographic exhibit.

*Winter's Narrative is Also Not Credible*

While Weis's testimony discredits Winters' narrative, there are other common-sense reasons that his testimony is incredible. Winters claimed that on February 21, 2020, he told other members of law enforcement that he had obtained consent to search the Ford Ranger, but it did not appear that he could confidently identify a single person who he had actually said that to, other than perhaps Galle. Galle, on the other hand, never claimed to have been told that Winters obtained consent from Washington. Galle even goes as far as to testify that Winters had a limited role on that date.

> My understanding is Special Agent Winters was merely there to assist on that day and that the interview and/or transport, the documentation would likely occur by someone else. So I guess -- it would be difficult for me to say that I anticipated -- Special Agent Winters, I'll tell you this: If he transported him, interviewed him, et cetera, him or another person who participated in that would document a 302.

(Transcript at 90)

Galle did not testify in that manner that suggest he believes that Winters had obtained consent. He stated that if that happened, Winters, or another person who participated, would have had to document a 302. As we know, no 302 documenting such a conversation does not exists.

<u>Neither Galle nor Winters Describe Clear and Unequivocal Consent</u>

It is a long-standing principle that "to be voluntary, a consent must have been unequivocal, specific, and intelligently given." *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965); *United States v. Smith*, 308 F.2d 657, 663 (2d Cir. 1962).

Had the agents actually attempted to obtain consent to search the Ford Ranger, and had they used a FD-26, the form would have laid out the specifics of what the defendant was consenting to. In this case, even Galle and Winters' testimony were to be believed, they still did not provide any substantive testimony as to what Washington would have been consenting to.

In regard to Galle, he during direct exam, he stated that he asked if Washington would allow "us" to look in there. (Transcript at 41). He later confirmed, on cross exam, that he did not remember the exact language he used. (Transcript at 97). Obviously, a person can "look in" a vehicle through a window without a full-blown search encroaching on Fourth Amendment protections. There is no testimony to support a finding that unequivocal, specific, and intelligent consent could have been given to actually enter and search the vehicle.

Galle also acknowledged that he would not have specified who he was referring to when he would have used the term "we" or "us." He acknowledged that he and Winters were the only individuals involved in this conversation, and neither were involved in the subsequent search of the Ford Ranger. (Transcript at 98). So, if Galle asked Washington if he would allow "us" to look

in the vehicle, there is nothing to suggest that Washington would have understood that to mean any member of law enforcement without limitation.

The R&R determines otherwise, finding that "[c]onsidering the totality of the circumstances, it was objectively reasonable for Special Agent Galle and Special Agent Winters to conclude that the defendant had given a general consent to each of them that would allow for a search of his vehicle…" *R&R*, Dkt. # 352 at 17.

However, not only does Winters admit that he does not "recall the exact words" of Mr. Washington that would have allegedly constituted consent (Transcript at 110), during cross examination, Winters could not offer *anything* in terms of what language he used to attempt to secure consent. When asked about the specifics of what was Washington may have said, the most Winters could offer is that "I know he didn't say I couldn't search the vehicle." (Transcript at 140).

While there may be circumstances under which consent may be implied, there is nothing in this case to indicate that consent was derived from anything other than alleged verbal exchanges, where there is no testimony of what was supposedly said.

Thus, there is nothing that can be gleamed from the testimony of Galle or Winters to establish that they could have elicited consent that was unequivocal, specific, and intelligent.

<u>If Washington had verbalized consent to search, it would be involuntary under these circumstances</u>

The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004). In addition to the defendant's objections to the R&R's factual findings that credit the testimony of Galle and Winters, the defendant also objects to the finding that consent would be voluntary, because the circumstances of this case would not support that Washington was able to voluntarily consent to a search of his property.

The R&R acknowledged some of the "Aggravating circumstances such as the handcuffing of the defendant, the presence of numerous law enforcement officers and the placing of the defendant in custody," but determines that they "do not automatically cause the search of his Ford Ranger vehicle to be invalid." *R&R*, Dkt. # 352 at 6.

The R&R goes on to say that the "demeanor" and the "credibility" of the witnesses were considered (*R&R*, Dkt. # 352 at 7), but the credibility and/or demeanor of the witnesses do not provide how the aggravating circumstances, referred to above, are mitigated by any other facts that would suggest the alleged consent would be voluntary.

Furthermore, the aggravating factors considered only refer to the facts that Washington was arrested and taken into custody in the presence of numerous law enforcement; that is the tip of the iceberg in terms of aggravating facts and circumstances that would render the alleged consent ambiguous.

Washington was woken up to members of law enforcement having surrounded his home and SWAT team members *ramming in his door*. He had was arrested *at gunpoint*. (Transcript at 50). Members of the SWAT team were armed with *multiple guns*, including handguns and rifles that were completely visible to him. (Transcript at 44-45). *Guns were pointed at Washington until he complied with orders*. (Transcript at 51). The *guns still generally remained visible*.

Washington was turned around, *handcuffed*, and *removed from his residence without proper clothing for the cold* February temperatures. There were at least four SWAT members present in the back of Bennet Village (Transcript at 24-25). Washington had *no shoes on*. He was *walked, barefooted, to a police vehicle and detained inside of the vehicle with handcuffs still on*. Washington, who would likely still be disoriented from waking up to these circumstances, was questioned in the police vehicle. During that questioning, *no Miranda warning were given*.

According to Winters, that questioning led to some sort of verbal consent to search the Ford Ranger.

Voluntariness of consent "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In addition to the aggravating circumstances referenced in the R&R, almost all of the circumstances here contravene a finding of voluntariness including that Washington was woken up at the early hours in the morning, before twilight, he had his door busted in, he had several guns pointed at him, he was taken into custody, he was handcuffed, he was forced outside into the cold weather without proper clothing or shoes, he was placed in a vehicle with an armed agent who did not advise him of his *Miranda* rights or any other rights. Perhaps each of these circumstances, taken alone, would not be sufficient to overcome a finding of voluntariness, but when considered in totality, the evidence does not support that the defendant could give voluntary consent under these circumstances.

## If Washington had verbalized consent to search, it would not have included permission to seize property absent a warrant

"A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 456 U.S. 128, 133 (1990) (*citing United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). While an area may be searched pursuant to lawful consent, it does not mean that any item that may be seized without there being an exception to the Fourth Amendment's prohibitions on unreasonable seizures. *See Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62 (1992); *Schneckloth*, 412 U.S. at 219.

When Federal agents utilize the FD-26, in addition to the authorization given to search, there is a line authorizing agents "to take any items which they determine may be related to their investigation." There was no claim that there was anything discussed that could be interpreted as permission to seize any items that the agents deem to have relevant value.

Notably, there was *no contraband* seized from the vehicle. There was cash seized from the interior of a bag inside the vehicle, credit/debit cards, some cell phones, and a t-shirt. [Ex. 3]. There was no drugs or weapons or other contraband found in the car, and although, some of the items ultimately recovered from the search of the Ford Ranger may arguably have some evidentiary value, the Government provided no evidence or testimony to explain what authority existed, absent a warrant, to seize and maintain custody over these items.

The R&R is dismissive of this point, merely stating that the argument is "without legal merit and quite frankly unreasonable." *R&R*, Dkt. # 352 at 18. It cites one case, for the proposition that if Mr. Washington had consented to search of the vehicle, then he would have given up "or waived any reasonable or justifiable expectation of privacy with respect to any 'effects' that may be found in his vehicle by reason of the search… If such "effects" reasonably appeared to constitute evidence of criminal activity." *Id.* Specifically the R&R cites to *United States v. Jacobsen*, 466 U.S. 109, 121-122 (1984).

However, the full holding in *Jacobsen* actually supports the defendant's position. The contested seizure involved containers that were believed to contain contraband.

> Such containers may be seized, at least temporarily, without a warrant. Accordingly, **since it was apparent that the tube and plastic bags contained contraband and little else**, this warrantless seizure was reasonable, for it is well-settled that it is constitutionally reasonable for law enforcement officials to seize "**effects**" that cannot support a justifiable expectation of privacy without a warrant, **based on probable cause to believe they contain contraband**.

> *United States v. Jacobsen*, 466 U.S. 109, 121–22, 104 S. Ct. 1652, 1661, 80 L. Ed. 2d 85 (1984)(emphasis added).

The defendant's position here, is not that agents would have needed authorization to seize *contraband* from the vehicle if proper consent to search had been given. That is obvious. The

package in *Jacobsen* contained "nothing but contraband." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009). Moreover, *Jacobsen*, is a case "which measured the scope of a private search of a mail package the entire contents of which were obvious" contraband. *United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997). The holding of *Jacobsen* does not suggest that Federal agents are authorized to seize items that do not constitute contraband. Rather the "effects" referred to in *Jacobsen*, specifically must contain contraband for their seizure to be authorized without a warrant.

The issue, here, is that the items seized were not contraband, and there was no authority by warrant of by consent to seize those non-contraband items.

The agents' subjective opinion that a t-shirt, cash, or cell phones, might be evidence, does not warrant a seizure of those items; there was no warrant authorizing them to do so, and it is indisputable that if consent was given in this case, it did not go as far as to authorize the seizure of those items.

Returning to the FD-26, the form clearly seeks additional authorization to seize "any items which they determine may be related to their investigation" which is necessary to obtain authorization to seize item beyond anything that constitutes contraband. Here, the agents do not claim to have sought such consent.

Because the items seized were not contraband, there is no other basis for the agents to take that property; it was a clear violation of Mr. Washington's Fourth Amendment protections, and the evidence should be suppressed.

WHEREFORE, it is respectfully requested that this Court reject the Magistrate's Report, Recommendation and Order and grant the relief requested in the defendant's pretrial motion.

Dated: April 8, 2022

s/Mark A. Foti_____
Mark A. Foti, Esq.
Attorney for Defendant, David Washington