1          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF NEW YORK**
2

3    UNITED STATES OF AMERICA,          )
                                        ) Case No. 1:20-CR-00029
4                                       )              (RJA)(HKS)
                     Plaintiff,         )
5                                       )
     vs.                                ) March 22nd, 2022
6                                       ) 10:30 a.m.
     DAVID WASHINGTON,                  )
7                                       )
                     Defendant.         )
8

9          **TRANSCRIPT OF SUPPLEMENTAL EVIDENTIARY HEARING**
           **BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.**
10              **UNITED STATES MAGISTRATE JUDGE**

11

12   APPEARANCES:

13   For the Plaintiff:    TRINI E. ROSS
                           UNITED STATES ATTORNEY
14                         BY:  TIMOTHY LYNCH, ESQ.
                           ASSISTANT UNITED STATES ATTORNEY
15                         138 Delaware Avenue
                           Buffalo, NY 14202
16
     For the Defendant:    THE FOTI LAW FIRM
17                         BY:  MARK FOTI, ESQ.
                           16 W. Main Street, Ste. #100
18                         Rochester, New York 14614

19   Audio Recorder:       LLANE GUIDOTTI

20   Transcriber:          MEGAN E. PELKA, RPR
                           Robert H. Jackson US Courthouse
21                         2 Niagara Square
                           Buffalo, NY 14202
22                         (716) 364-6449

23        Proceedings recorded with electronic sound recording,
     transcript prepared with computer-aided transcription.
24

25

1          THE CLERK:  This is United States v. David

2   Washington, docket number 20-CR-29.  This is a supplemental

3   evidentiary hearing.  Assistant United States Attorney Timothy

4   Lynch appearing on behalf of the government, and Mark Foti

5   appearing with defendant.

6          THE COURT:  Good morning.

7          MR. FOTI:  Good morning, Your Honor.

8          MR. LYNCH:  Good morning, Judge.

9          THE COURT:  Am I correct in understanding the

10  government is not going to call Special Agent Webb?

11         MR. LYNCH:  Correct, Judge.  We're going to call

12  Detective Pliszka.

13         THE COURT:  And why isn't the government calling the

14  agent when I suggested they do so?

15         MR. LYNCH:  Well, Judge, I don't think the Court

16  has -- well, one, we continue to press with the Court that the

17  information regarding the field sobriety test is not material

18  to the issue of the probable cause.  I don't think the Court

19  has said that it is.

20     The search warrant that was obtained in this case

21  pertained to the drug investigation of Mr. Washington.  We

22  have certainly researched, as best we can, Judge, the issue of

23  whether or not there were field sobriety tests conducted on

24  that day and we cannot come to a conclusive decision one way

25  or the other.

1          THE COURT:  How can you say that when there are

2    police officers on the scene?

3          MR. LYNCH:  Well, they said -- I think -- Judge, I

4    read their testimony.  I went through all the record here.

5    They said I don't recall that there was or was not.  No, I --

6          THE COURT:  Well, the main police officer --

7          MR. LYNCH:  Davidson.

8          THE COURT:  -- Davidson, he came through clear and

9    loud to me and observing his demeanor, he really didn't

10   conduct a sobriety test.  He said he wasn't trained in that

11   and that's why he was taking the defendant downtown.

12          MR. LYNCH:  Right.  And so --

13          THE COURT:  The other officer, his partner, was never

14   called by the government, and the third officer, who basically

15   was there for the taking of the vehicle to the garage, said he

16   didn't see any drug -- sobriety testing going on.  But let me

17   back up for a moment --

18          MR. LYNCH:  Judge, can I just clarify the record,

19   because I specifically made reference to this.  On page 283 of

20   the record, Davidson says, quote, I don't know that they

21   weren't done or were done.  That's on page 283.

22          THE COURT:  And I concluded they weren't.

23          MR. LYNCH:  Okay.  And that's fine.  And then

24   Davidson says, referring to Officer Garry, quote, to my

25   knowledge, he did not conduct a field sobriety test.  That's

1   on page 287.  On page 310, Nagy during his direct said he saw

2   Kolcinski performing them, but he's not sure how Washington

3   performed.  Now, I spoke to Officer Kolcinski.  I just want

4   the Court to know what I did in preparation for this hearing.

5   He doesn't remember one way or the other.  So I want -- that

6   is an affirmative -- we're -- the government is presenting

7   that as affirmative evidence.  We're saying to you, without

8   testimony, Kolcinski cannot remember one way or the other

9   whether they were done or not done.

10      And the fact is, when we look at the issue of Franks --

11  and Franks law is very clear.  And the reason why we don't

12  jump to a Franks hearing is because the government is not

13  required to expose all of its witnesses at the pretrial

14  hearing stage.  Otherwise, effectively, it becomes a discovery

15  tool for defendants.  And that's not what the law requires,

16  but --

17          THE COURT:  What the law does require is justice.

18  What the law does require is that law enforcement officers

19  conduct themselves properly.  What the law does require is

20  that law officers don't lie.

21          MR. LYNCH:  And, Judge, there's --

22          THE COURT:  And -- wait.

23          MR. LYNCH:  -- affirmative --

24          THE COURT:  As I had told you before, it's precisely

25  the issue that I am concerned with.  It's precisely the issue

1   that I find disconcerting.  My role, as a judge, is to see

2   that law enforcement personnel conduct themselves accordingly

3   with the requirements of the oath they take in upholding the

4   Constitution of the United States.

5       Now, to say that it's unclear as to whether the on-sight

6   test took place or not belies the fact that Davidson said he

7   takes Washington downtown to be tested because, why?  They

8   didn't know whether he was intoxicated or not because they

9   didn't conduct any roadside test.

10      But my main concern is, we have an affidavit from a

11  federal agent presented to a magistrate judge of this district

12  saying that there were roadside sobriety tests conducted and

13  that the defendant failed them, which is untrue.  He didn't

14  fail any roadside tests.

15          MR. LYNCH:  And Judge, that may be right, but Franks

16  requires --

17          THE COURT:  I'm not talking about Franks.

18          MR. LYNCH:  Frank requires --

19          THE COURT:  Will you listen to me?  I am not talking

20  about Franks.

21          MR. LYNCH:  Okay.

22          THE COURT:  I have told you on now a number of times

23  I also have a role to determine the truth in this case.  I'm

24  not concerned about whether there's probable cause for the

25  search warrant --

1            MR. LYNCH:  That's fine.

2            THE COURT:  -- having to go through the two-step

3    process of taking the false information and pulling it out of

4    the affidavit, and then determining whether there's sufficient

5    evidence for probable cause.  That's not the issue.  The issue

6    is that a special agent presented false evidence to a

7    magistrate judge as part of the search warrant application.  I

8    am concerned about finding out how this falsity came about,

9    which is my obligation as a judge, which is my jurisdictional

10   right.

11           MR. LYNCH:  Judge, it has to be material.

12           THE COURT:  It doesn't.

13           MR. LYNCH:  The law requires --

14           THE COURT:  Police officers that are lying and

15   committing fraud is not material to a criminal case?

16           MR. LYNCH:  Why?

17           THE COURT:  It's material to see that justice is done

18   properly.

19           MR. LYNCH:  Why would Special Agent Webb --

20           THE COURT:  That's what I'd like to know.  That's

21   what I'd like to know.  Why won't the government call him?

22           MR. LYNCH:  Then we'll call him for that limited --

23           THE COURT:  What is the government hiding?

24           MR. LYNCH:  I am not --

25           THE COURT:  What is the government hiding?

1           MR. LYNCH:  I'm not hiding anything.

2           THE COURT:  You know what concerns me, Mr. Lynch, and

3    I don't mean this to you personally, but your office has now

4    demonstrated a total disregard of this Court's orders, Judge

5    Wolford's orders.  The recent events where Judge Wolford

6    ordered the government to produce two affidavits by a deadline

7    date and what did the government do?  Absolutely nothing.

8    They just -- they ignored it.

9           MR. LYNCH:  Okay, Judge.  That -- and I --

10          THE COURT:  I want to know how this office is

11   conducting itself.

12          MR. LYNCH:  I want you to know, Judge, since we had

13   that appearance, I tracked down as much -- and I had the

14   information --

15          THE COURT:  And I'm not contributing it to you,

16   Mr. Lynch.

17          MR. LYNCH:  And I want you to know, I tracked down as

18   much information as I could about the K9.  I had them do

19   GPS -- get GPS information on the K9 vehicle to find out

20   exactly when he went to the Seneca Street station.  They went

21   through all their emails to try to create a timeline.  I have

22   done my due diligence to present the case and answer the

23   questions.  Now --

24          THE COURT:  I'm not accusing you.

25          MR. LYNCH:  No.  I know you're not.

1         THE COURT:  Where did Webb get Moriarty's name or

2   whatever the name of the police officer, the K9 officer?

3   Where did he get his name?

4         MR. LYNCH:  Marshall?  They -- what we now know,

5   based on email, that HSI and Detective Sergeant Pliszka were

6   out at the Seneca Street station at 12:10 p.m. on June 20th,

7   so within 12 hours of the vehicle stop.  And we know that

8   because the K9 vehicle GPS tracker shows it go from its

9   training area in Father Conway playground area, which is down

10  near the Perry Projects, up to the Seneca Street station.

11  It's there for about 14 minutes and then it travels to Canada

12  where it does additional training.

13      And Pliszka sends an email to his superior at 3:01.  To

14  send that email, he would have had to go to his office, which

15  is downtown, not at Seneca Street.  He doesn't have a computer

16  there.  He sent it from his computer, not his iPhone.  And he

17  updated Detective Richards, Chief of Detectives Dennis

18  Richards, about what had happened.  He said there was a

19  positive drug dog hit.  He said HSI was involved.  He said I,

20  you know, me and my lieutenant arranged for Marshall to come

21  to Seneca Street.  So that's all in his email.

22        THE COURT:  I understand that.

23        MR. LYNCH:  So --

24        THE COURT:  But let me ask you this.

25        MR. LYNCH:  Pliszka says to Davidson when they're

1    communicating earlier in the 1:30 a.m. time period on the

2    20th, well, keep me advised, and if you're going to keep the

3    car, take it to Seneca Street.

4         MR. LYNCH:  Right.

5         THE COURT:  I'm having a hard time then.  If Davidson

6    is supposedly concerned about doing it right and keeping

7    Pliszka advised that he doesn't tell Pliszka after he has

8    taken the defendant downtown for the breathalyzer test that

9    the defendant passed, that he blew a, I think, a .03.

10        MR. LYNCH:  A .03 yeah.

11        THE COURT:  And so now, this is still well before

12   this 12 noon time period when the Buffalo Police Department

13   Davidson knows the defendant blew a .03.  And I got to believe

14   he, as a police officer, has got to know that that's well

15   below the limit of .08, and he tells that to Pliszka because

16   he's supposed to keep Pliszka advised.

17       So, the question then becomes, is Pliszka aware that the

18   defendant was not driving while under the influence or

19   intoxicated, and that being the case, the defendant is seeking

20   the return of his car.  He calls on the 20th supposedly at

21   12:30 or a time period after the so-called 12:15 application

22   for the search warrant, but nevertheless, he has a right to

23   get his car back because he wasn't intoxicated.  He wasn't

24   under the influence.  He wasn't charged with anything else

25   other than V&T violations.  But yet, we have people doing dog

1  sniffs.  We have agents submitting affidavits that contain

2  false information as far as I'm concerned.  And my issue is,

3  why is all this happening this way?  Why are things being non-

4  disclosed?  Why are things appearing to be covered up?  Why

5  are they appearing to be fabricated?  That's all I want to

6  know.

7          MR. LYNCH:  I guess I prefer to go in stages.  That's

8  how I prefer to do things, Judge.  And the stages, I see them

9  as this; one, was the stop and the detention of Mr. Washington

10 at the scene lawful, right?  Okay.  That's one issue.

11         THE COURT:  For purposes of discussion, I'll give you

12 that.

13         MR. LYNCH:  Okay.

14         THE COURT:  It was a V&T stop.

15         MR. LYNCH:  The second issue is, was the vehicle

16 lawfully detained?  Was it lawfully brought down?

17         THE COURT:  Then the evidence showed it's established

18 he wasn't intoxicated or under the influence.

19         MR. LYNCH:  So then the issue becomes, is the

20 extended period of time in which it was detained, what, seven,

21 eight hours, is that reasonable?  Because once the drug dog

22 hit on it, I think we're all in agreement the vehicle can then

23 be -- it could have been searched at that point.  It could be

24 detained for further investigation for sure, right?

25         THE COURT:  Well, you left out one thing.  There was

1   an administrative search conducted at the scene and nothing

2   was found.

3            MR. LYNCH:  Correct.  But we also --

4            THE COURT:  So, that's just an element to consider.

5            MR. LYNCH:  Right.  That's true.  And so, if we get

6   to those points, right, and if you decide that the detention

7   of the vehicle was unlawful and the government hadn't asserted

8   a valid basis for it, then I think we're all in agreement

9   we're not even getting to the search warrant, are we?

10           THE COURT:  Right.  No question.

11           MR. LYNCH:  Correct.  So --

12           THE COURT:  But --

13           MR. LYNCH:  Okay.

14           THE COURT:  But even if I give you those three

15   points, it was a valid V&T stop, they had a right to hold the

16   vehicle for at least a limited period of time.

17       And then, we get into the murky area of it's already

18   established on the record in the early morning hours of 2020

19   that the defendant was not intoxicated or under the influence

20   prior to the dog sniff.  And so, why is the dog sniff

21   occurring?  Where is the probable cause or the reasonable

22   suspicion, because the car had already been searched by a

23   police officer and no drugs were found?

24           MR. LYNCH:  But I think there was testimony last time

25   about, you know, it was a large investigation, there -- the

1   vehicle had traps in it.  There were some vehicles that had

2   traps in it.

3           THE COURT:  That information is in Webb's affidavit

4   where he says the defendant allegedly is known to use a number

5   of automobiles, some of which have traps in them.

6           MR. LYNCH:  Okay.  Right.  So, I mean --

7           THE COURT:  But --

8           MR. LYNCH:  -- if that --

9           THE COURT:  What the facts are on the date of June

10  20th, 2021, is, he's not under the influence or intoxicated.

11  A search of the vehicle was conducted and nothing was found,

12  and then after that is established, no other events occurred

13  to give even suspicion or let alone probable cause to want to

14  have a dog sniff.  And they had the car in their possession,

15  so they could have gotten a warrant if they felt they could do

16  a dog sniff.  And the search of the car with an affidavit that

17  is troublesome.

18          MR. LYNCH:  Okay.  So, let's -- so we're still in the

19  stages of things, okay?  So, Chris -- Detective Pliszka is

20  going to testify today regarding the drug dog.  He'll go into

21  a little more detail.  Whether the Court thinks that that's

22  sufficient evidence or not to justify the vehicle being

23  detained for that period, the Court will make its own

24  decision.  Then, the third step would be, okay, we've gotten

25  past all that.  Now we have to look at the warrant.  We have

1    to look -- examine it.  And the law is very clear.  One, it

2    has to be material.  Material information.  I understand the

3    Court wants the point of correct information in warrants and I

4    understand that, but the law also says it has to be material.

5    If it's material, the Court is supposed to either remove the

6    information or add in the omitted information.  And if it is

7    critical to the probable cause finding, then and only then, a

8    Franks hearing could be held.  That's the law.

9        That's what -- otherwise, there would be no basis -- we'd

10   have Franks hearings all the time.  And this --

11             THE COURT:  This is my point --

12             MR. LYNCH:  This is background information, Judge.

13   This wasn't even --

14             THE COURT:  You missed my point, Mr. Lynch.  I have

15   already stated that I am not addressing this in the context of

16   whether there was probable cause for the warrant, applying the

17   two-step process of taking out what is the improper

18   information in the affidavit, setting it aside, and then

19   decided if whether what is left is sufficient.  That's not

20   what I'm doing.

21       What I am doing is I am trying to determine whether there

22   were deliberate lies made, and if so, by whom.  I'm not going

23   to accuse Special Agent Webb of lying because I don't know

24   what he based his affidavit on.  But what I can say

25   affirmatively is that the information contained in his

1  affidavit is untrue based on the testimony of Officer Davidson

2  and the evidence that was presented.

3          MR. LYNCH:  And Judge --

4          THE COURT:  But now that kicks into play, not this

5  probable cause issue.  It kicks into play the Court's

6  supervisory power and jurisdiction over federal law

7  enforcement officers and agencies in determining whether they

8  are conducting themselves appropriately or not in making these

9  kinds of presentations to a United States magistrate judge.

10  That's the issue.

11          MR. LYNCH:  Okay.  But we all agree that that's not

12  tied to the Fourth Amendment.  That's tied --

13          THE COURT:  I didn't say it was.  I said it's the

14  supervisory powers.

15          MR. LYNCH:  Supervisory power.

16          THE COURT:  I'm not going to -- would you not agree

17  that if I find that Webb outright lied knowingly, it's not a

18  Fourth Amendment issue for me to say, well then, I'm going to

19  suppress it because the exclusionary rule is not based on a

20  Fourth Amendment concept.  The exclusionary rule is based on

21  the concept of deterrence to prevent law enforcement personnel

22  from doing the wrong things.

23          MR. LYNCH:  So, Judge, if we were, you know --

24          THE COURT:  Do you disagree with what I just said

25  about the exclusionary rule?

1          MR. LYNCH:  Well, the exclusionary rule pertains --

2          THE COURT:  Is meant to be a deterrent to law

3    enforcement --

4          MR. LYNCH:  Right, for Constitutional violations.

5          THE COURT:  The Supreme Court of the United States

6    has said that.

7          MR. LYNCH:  For Constitutional violations.  Correct.

8          THE COURT:  Well, lying is a violation when you're

9    doing it to carry out criminal activity in an investigation.

10          MR. LYNCH:  True, but not --

11          THE COURT:  That goes to due process.

12          MR. LYNCH:  Not every false statement is material.

13   We all agree with that.

14          THE COURT:  I'm not saying it's material.

15          MR. LYNCH:  Okay.

16          THE COURT:  But you -- stop saying -- because you

17   keep coming back to this probable cause material argument.

18   I'm saying that the due process clause of the United States

19   Constitution demands that law enforcement personnel conduct

20   themselves accordingly.  If officers outright lie or

21   fabricate, they are violating that concept of due process to a

22   criminal defendant.

23          MR. LYNCH:  So on -- so I -- let me engage in the

24   Socratic method for an immaterial matter, that someone lied --

25   no.  Let me ask you, what would -- what is the remedy?

1          THE COURT:  If they're lying?

2          MR. LYNCH:  If they're --

3          THE COURT:  -- and they do it knowingly?

4          MR. LYNCH:  Yes.

5          THE COURT:  The remedy is, perhaps, the enforcement

6     of the rule of exclusion.  You suppress evidence as a

7     deterrent.  This is what happens when you do this.

8          MR. LYNCH:  Yeah.  See, I don't think though --

9          MR. FOTI:  If I may, I agree with the Court's points.

10    And so, I generally haven't weighed in, but I also don't want

11    it to appear that I'm agreeing with the assertion by the

12    government that this is immaterial information.  I do think

13    that the search warrant is obviously anchored in right to

14    privacy and Fourth Amendment issues.

15       And I think what was very evident from Webb's application

16    is there was a careful effort to tailor the information to

17    misrepresent the circumstances that had occurred.  And it

18    doesn't just relate to the field sobriety test.  He suggested

19    that Mr. Washington failed the field sobriety test.  That

20    information has been established as false based on --

21         THE COURT:  He didn't suggest it.  He outright

22    stated.

23         MR. FOTI:  He outright said it, and then didn't

24    bother to mention to the magistrate that there was a

25    subsequent breath test that established Mr. Washington wasn't

1    intoxicated or even impaired by alcohol.  The clear

2    insinuation of that is he was trying to create the perception

3    that Mr. Washington was intoxicated by leaving out something

4    that is absolutely material.  It relates to whether

5    Mr. Washington could appropriately have been arrested and

6    whether they could have continued to hold the vehicle or not.

7            THE COURT:  I think we're all in agreement as to at

8    least the factual issue of this false information.  I

9    understand Mr. Lynch's argument about under Franks and

10   probable cause for the warrant.  I understand what you're

11   advocating, Mr. Foti, but it seems to me that instead of

12   chasing our tail about who said what and why and getting into

13   the nuances of Franks and the Fourth Amendment, the most

14   direct and simplest way of resolving what is concerning to me

15   is, what caused Special Agent Webb to say in his affidavit

16   that there were roadside sobriety tests conducted and that the

17   defendant failed those, as well as the rest that he puts in

18   the affidavit that we have doubts about their accuracy.

19      And it seems to me, as a federal agent, he's subject to

20   the U.S.  Attorney's Office calling him as a witness, that if

21   he answers those questions, we will resolve that mystery.  And

22   then I will be in a better position to make my determinations

23   in the context of what Mr. Lynch is advocating as far as the

24   sufficiency of the warrant, if I'm going to extract certain

25   parts of Special Agent Webb's affidavit, or I adopt the

 1  defense's argument and claim that, nevertheless, what was done

 2  warrants the application of the exclusionary rule.

 3      But it's this -- this is very troublesome why this main

 4  character in this dispute is not going to be called as a

 5  witness who is the one that can tell us.  Who told you that

 6  there was a failure of the test?  When did that occur?  That's

 7  not a big discovery fishing expedition.  The affidavit is

 8  already known to the defendant.

 9      I have stated for the record that those statements in the

10  affidavit, as far as I am concerned, are untrue because I

11  witnessed and I watched the demeanor of Davidson when he

12  testified and I watched the demeanor and testimony of and

13  heard the testimony of the other officer on the scene and I

14  also watched the demeanor and heard the testimony of Pliszka.

15  And I concluded that, in fact, no roadside breathalyzer tests

16  were conducted.

17      And this is further validated by Davidson's own testimony

18  who said that he wasn't trained to do that, and that's why he

19  was taking the defendant downtown, to have a breathalyzer test

20  administered.  And that's what he did.  A breathalyzer test

21  was administered, and the defendant blew a .03, well below the

22  limit of .08.

23          MR. LYNCH:  So, Judge, that's all we're calling him

24  for, those essentially five questions?

25          THE COURT:  So, why can't Webb tell me where he got

1    this information from?  What is the government hiding?

2          MR. LYNCH:  Nothing.

3          THE COURT:  Plain and simple --

4          MR. LYNCH:  No --

5          THE COURT:  -- what is the government hiding?

6          MR. LYNCH:  Nothing.  He got it from --

7          THE COURT:  Will you answer my question?  What is the

8    government hiding?  Why won't the government call Webb --

9          MR. LYNCH:  Because I don't want to --

10         THE COURT:  -- if I limit his questioning to that

11   affidavit?

12         MR. LYNCH:  I will call him.  If you limit him to

13   those two paragraphs, I will call him.

14         THE COURT:  I will limit his testimony to the

15   affidavit.

16         MR. LYNCH:  No.

17         THE COURT:  The affidavit is a matter of public

18   record.

19         MR. LYNCH:  Well, no.  Not all the source information

20   isn't, Judge.

21         THE COURT:  I'm not going to ask him about -- I'm not

22   going to let him testify or make him testify about named

23   informants or anything of that nature.  No.

24         MR. LYNCH:  Okay.  So, that's what I'm talking about.

25   The information in the affidavit about the stop, what happened

1   on June 20th?

2          THE COURT:  No, no.  I want to know what it is that

3   caused him to make those statements about the roadside test

4   being conducted, and the failures, and so forth.  That's what

5   I want to know.

6          MR. LYNCH:  That's fine.

7          THE COURT:  All of that scenario leading up to what

8   occurred at the Seneca Street garage on June 21st.

9          MR. LYNCH:  That's fine.

10          THE COURT:  That's all I want.

11          MR. LYNCH:  Okay.

12          MR. FOTI:  Judge, am I correct to understand that

13   while the field sobriety test and the -- and his false

14   statement that Mr. Washington had failed the field sobriety

15   test may be at the center of one of the clearest examples of

16   false information, we're also addressing other omissions and

17   other things that appear to be incorrect about the affidavit

18   as well, correct?

19          THE COURT:  Like what?

20          MR. FOTI:  Well, the -- there's been something

21   discussed at multiple previous court appearances that it

22   appears to be a pretty significant issue that, as the evidence

23   has established, there was an inventory search, established no

24   drugs in the vehicle, and Webb left that out altogether that

25   there had been any prior search when he asked for permission

1  to search because he believed there was probable cause to find

2  drugs in the vehicle.

3         THE COURT:  Well, when Ms. Higgins was here, and I

4  know Mr. Lynch is at a disadvantage because he didn't

5  participate in the evidentiary hearing, the government was not

6  disputing that; one, there was the so-called inventory search

7  conducted by Police Officer Nagy; and two, that Police Officer

8  Nagy didn't find anything in the way of drugs or contraband,

9  and that he did an inventory.  The inventory was put into

10  evidence, which described a number of cell phones in the car

11  as well as other clothing or something or other.

12         MR. FOTI:  So, my --

13         THE COURT:  There, I would move over to Mr. Lynch's

14  position and say, okay.  If that was left out, if I put that

15  in, is that going to change the validity of the search

16  warrant?  I'm not abandoning that concept.  It's just that,

17  before I get to doing that analysis, I want to know what it is

18  that occurred to cause Special Agent Webb to make these

19  opening statements in his affidavit.

20         MR. LYNCH:  Okay.  And I'll just -- and Judge, we're

21  happy to call Special Agent Webb for that.  And I also want

22  the Court to know that it may have been in Mr. Foti's papers,

23  but I sent him an email, at least the date and time, on June

24  20th at 3:21 p.m., the first draft of the affidavit by Special

25  Agent Webb went to AUSA Higgins, and I provided Mr. Foti with

1  the first two or the first draft of paragraphs 8 and 9 that

2  Special Agent Webb prepared.

3      THE COURT:  Okay.  Let me -- wait.  I want to make

4  sure I understand.  You said at 3 something p.m.

5      MR. LYNCH:  Correct.

6      THE COURT:  On June 20th.

7      MR. LYNCH:  June 20th, 3:21 p.m.

8      THE COURT:  So that the draft of an affidavit --

9      MR. LYNCH:  Correct.

10      THE COURT:  -- was sent.

11      MR. LYNCH:  So --

12      THE COURT:  But on June 20th at 12 p.m. or at 12 --

13      MR. LYNCH:  12:10.

14      THE COURT:  12:30.

15      MR. LYNCH:  Oh.

16      THE COURT:  What I'm getting at is the time the

17  defendant called about getting his car back.

18      MR. LYNCH:  That's the next day.

19      MR. FOTI:  No.  He called that day.

20      THE COURT:  He called -- my understanding is he

21  called that day the first time.

22      MR. FOTI:  He called multiple times.  I think

23  Detective Pliszka referred to not having any memory or

24  knowledge of when he called other than a call.

25      THE COURT:  In fact, do you have the exhibits?  One

1   of the exhibits shows the notes of the person that took the

2   telephone call.

3           MR. LYNCH:  Yeah.  Government Exhibit 12.  It's the

4   date -- the first date is 6/21 at 12:30.  That's the next day.

5           MR. FOTI:  That's true, Judge.  The notes that were

6   entered into evidence do say the 21st.  When I questioned

7   Pliszka about that, he said he didn't -- that wasn't

8   dispositive of how many times or when Mr. Washington called.

9   He said he wouldn't have known whether Mr. Washington called

10  before that.

11          MR. LYNCH:  But this is the only evidence we have of

12  phone calls.  If Mr. Washington is going to testify he made

13  phone calls at a certain time, that's fine, but this is the

14  evidence we have about the phone calls.

15          THE COURT:  All right.  Then, let me back up.  At

16  3:20 p.m. on June 20th, Pliszka certainly knows that the

17  defendant passed the breathalyzer test.  And this is before

18  Webb puts a final affidavit in.  And you are talking about a

19  draft of an affidavit.  Did the draft contain those two

20  opening paragraphs?

21          MR. LYNCH:  It didn't.

22          THE COURT:  Well, at 3:20 p.m. they certainly knew

23  that at 1:30 or 2 o'clock in the morning on June the 20th, the

24  defendant passed the breathalyzer.

25          MR. LYNCH:  Yeah.  And I -- and we -- and I mean, the

1  affidavit doesn't say he didn't pass, but it also says -- it

2  doesn't say he got arrested for drunk driving.  He only --

3          THE COURT:  The affidavit doesn't say anything about

4  the breathalyzer test on --

5          MR. LYNCH:  Correct, but it only says he got

6  arrested -- he was issued tickets for consumption of alcohol

7  in a motor vehicle and improper signal.  So he obviously

8  didn't get arrested for DWI.

9          THE COURT:  No, but why then does he put in his

10  affidavit that there were not one, but apparently more than

11  one, roadside --

12          MR. LYNCH:  Right.

13          THE COURT:  -- drunk driving tests conducted?

14          MR. LYNCH:  And he'll explain that.

15          THE COURT:  But that's what I'm getting at.  That's

16  all I'm asking.

17          MR. LYNCH:  As long as that -- I just want to -- I --

18  I have and I appreciate that Mr. Foti represents his client.

19  I represent my government client.  I want to make sure that

20  when I put witnesses on the stand, we're not opening up a can

21  of worms.

22          THE COURT:  I understand that, Mr. Lynch.

23          MR. LYNCH:  Okay.

24          THE COURT:  I understand that, Mr. Lynch, but what I

25  am afraid you haven't fully understood is my concern as a

1    United States magistrate judge, having taken an oath also to

2    uphold the laws of the United States, and most especially the

3    Constitution, is to see that law enforcement personnel conduct

4    themselves accordingly in meeting the requirements and demands

5    of the due process clause of the United States.

6              MR. LYNCH:  And I also -- I -- one final point.

7    Judge Wolford addressed the similar issue in *United States v.*

8    *Lucas* at 379 F. Supp. 3d 182.  And there's a quote that I want

9    the Court to hear.  The mere failure of a member of a task

10   force to convey information to an affiant without any evidence

11   that the failure was undertaken with the intent to deceive, is

12   insufficient to warrant a hearing under Franks.  So --

13             THE COURT:  You know --

14             MR. LYNCH:  No, I just --

15             THE COURT:  Wait, wait, wait.  If you read my words

16   carefully, and having been a practicing lawyer and a judge

17   total of 61 years, 62 in May, I use words carefully because

18   words are our business.  You never heard me ask and say we

19   were going to hold a Franks hearing.  In fact, I think in

20   either an email or in a statement I made I said, we will have

21   a supplemental hearing which may appear to be like a Franks

22   hearing.

23             MR. LYNCH:  So I just -- again, I --

24             THE COURT:  And so --

25             MR. LYNCH:  This becomes --

1          THE COURT:  -- once again, don't get hung up on --

2          MR. LYNCH:  I wasn't --

3          THE COURT:  On this being a Franks hearing in the

4    context of the sufficiency for probable cause of the

5    affidavit.

6          MR. LYNCH:  But if you --

7          THE COURT:  That's all I'm saying.

8          MR. LYNCH:  It becomes -- it does -- there is a fear

9    on my part that this becomes a slippery slope of, well, we

10   held a hearing in this case because, you know, he said it

11   happened on June 20th.  It actually happened on June 21st.  I

12   want to find out why he wrote June 20th.

13         THE COURT:  Now, don't -- you're insulting me.  You

14   know --

15         MR. LYNCH:  No, no, no --

16         THE COURT:  You know darn well --

17         MR. LYNCH:  But --

18         THE COURT:  -- that I, as a former prosecutor, know

19   what you are concerned with, and how defense will try, down

20   the road, to do certain things.

21         MR. LYNCH:  Right.

22         THE COURT:  But this is a case that hopefully will

23   not repeat itself in any other cases where we have clearly

24   established testimony and evidence that certain statements in

25   an affidavit submitted by a federal agent of the United States

1  to a magistrate judge are untrue.

2          MR. LYNCH:  So we'll --

3          THE COURT:  That's all I'm focused on.

4          MR. LYNCH:  -- call him.  I will -- I know the answer

5  to it.  We will call him for that, Judge, and I can -- I had

6  Special Agent Webb bring a suit today, so I'm more than happy

7  to give him a call.

8          THE COURT:  Oh, so you anticipated?

9          MR. LYNCH:  Well, Judge, I -- if there's one thing

10 I'd like to say is I'm prepared.

11         THE COURT:  I encourage you to be prepared.

12         MR. LYNCH:  Right.  So, I want to represent my client

13 as best I can, but I also understand, Judge, if you ordered me

14 to bring him here for that limited purpose, and I understand

15 what the scope was --

16         THE COURT:  You just made a statement that triggered

17 another thought.  Representing your client.  Your client is

18 the United States of America.  The people --

19         MR. LYNCH:  Judge --

20         THE COURT:  -- not the United States Attorney's

21 Office --

22         MR. LYNCH:  That's right.

23         THE COURT:  Wait a minute.  Let me finish.  Not the

24 ATF agency of the United States, or the FBI.  Your client is

25 the United States of America.  And that's why I sent that case

1    recently to the United States Attorney, the decision of the

2    district court from Arkansas about the role and obligations of

3    prosecutors in defending and effectuating the provisions of

4    the Constitution of the United States.

5              MR. LYNCH:  And that case was egregious, Judge, in my

6    view.  That is not this case.

7              THE COURT:  I didn't say it was.

8              MR. LYNCH:  No, no, I understand.  But I understand.

9    And Judge, we, you know, I stand at the gate, too, a different

10   gate than the Judge does as far as what we permit to come over

11   and all those things.  We do -- there is a gate that I

12   protect, too, regardless of whether the Court believes it or

13   not.  I don't -- I would never come over here with anything

14   less than what I think is --

15             THE COURT:  Mr. Lynch, from my experience with you

16   over these years, it convinces me that you are an ethical and

17   an experienced and a good lawyer.

18             MR. LYNCH:  Okay.

19             THE COURT:  And one of the things that I think needs

20   to be emphasized, and I don't mean to be lecturing, but when I

21   was U.S. Attorney, I would tell the assistants, you are the

22   attorneys.  The agents are your clients in the sense of you

23   don't let the tail wag the dog because the agents are always

24   trying to get as much as they can and push and test how far

25   they can go.  And that's why that rule in that context is for

1  the lawyer to make the determination.  And that's all that I'm

2  saying.  I'm not attributing anything to you personally or

3  anybody else in your office as far as wrongdoing or failure to

4  do something.  It's just that we do now find from the numerous

5  cases, there was another one again the other day in the

6  Southern District, about the failure to turn over Brady

7  materials or failure to do something that should have been

8  done.

9      And this is a concern for the Court as being a growing

10 issue, especially in this digital age, where we have thousands

11 and millions of documents and all kinds of things.  As to how

12 well the discovery process, Rule 16, et cetera, et cetera --

13 all I'm trying to do is to see that justice is done, and that

14 truth prevails.

15         MR. LYNCH:  So, I will -- I mean, I'm going to still

16 call Detective Pliszka, Judge, because he --

17         THE COURT:  Oh, I'm not going to prevent you from

18 calling other witnesses.

19         MR. LYNCH:  I'm assuming the Court has the afternoon

20 free.  Is that --

21         THE COURT:  Yes.

22         MR. LYNCH:  Okay.  So, I will call Special Agent Webb

23 right now.  And I'd ask, Judge, just so I have at least a

24 little bit of time to give him an idea of what questions I'll

25 ask and what to expect on cross, if, after Pliszka testifies,

1  we take a short lunch break and come back at -- I mean, I

2  don't know.  We can determine then --

3          THE COURT:  Sure.  No, I'll give you time.

4          MR. LYNCH:  I'll call him right now.

5          MR. FOTI:  Judge, my only concern with what's

6  happening or what we're going to do here is, I don't --

7  I've -- I haven't received any Jencks material in regards to

8  Special Agent Webb.

9      It appears that, in addition to the affidavit, that

10  there's multiple drafts of the affidavit which have relevance

11  to the issue we're dealing with.  And there's also emails

12  going back and forth between Webb and a number of other

13  individuals, including the U.S. Attorney's Office, and

14  apparently other members of the task force, and I've received

15  some indication that those emails and different versions of

16  the draft exist without having received copies of any of that.

17  I asked for --

18          MR. LYNCH:  That's simply not true, because I gave

19  him a copy.  I sent Mr. Foti an email that indicated that on

20  this June 20th of 2019, Special Agent Webb sent a draft

21  affidavit to Ms. Higgins, and I provided you with the exact

22  copy of what was written in that draft affidavit as to

23  paragraphs 8 and 9.

24          MR. FOTI:  What I said is true, Judge.  I have not

25  received a copy of that email or the attachment.  I did

1  indicate that Mr. Lynch provided some summary and that may

2  have been a word-for-word summary of portions of what was in

3  it, but I did not receive the email.  I did not receive the

4  attachment.  That's material provided by Mr. Lynch and created

5  by Mr. Lynch copying off of material that would be the Jencks

6  material.

7         MR. LYNCH:  Mr. Foti got the email, because the only

8  thing attached to the email he received was the affidavit.

9  And the only thing other on it was the to and from; to

10  Ms. Higgins from Special Agent Webb.  There was no other

11  content, which I provided to you last week.

12         MR. FOTI:  Judge, Mister --

13         MR. LYNCH:  It's right here.  I forwarded it to you

14  without the attachment, but I gave you the relevant paragraph.

15         MR. FOTI:  The relevant paragraph, Judge.  Any

16  attachment to that email is relevant to the issue before the

17  Court.  I don't --

18         MR. LYNCH:  But what he wants is the entire affidavit

19  that would then describe in detail the sources, source

20  information, that it's my -- unless I'm wrong, I don't think

21  Mr. Foti has a copy of -- an unredacted copy of the signed

22  search warrant.  Is that -- am I incorrect about that?

23         MR. FOTI:  No, I do not have an unredacted --

24         MR. LYNCH:  Right.  So I'm not going to give you an

25  unredacted copy of the draft.

1        MR. FOTI:  It would be Jencks material, Judge.  It's

2   relevant to the issue before the Court of just this one issue

3   which, by the way --

4        MR. LYNCH:  It's --

5        THE COURT:  Well, the issue right now, for purposes

6   of my concern, is paragraphs 8 and 9 --

7        MR. LYNCH:  Correct.

8        THE COURT:  -- of the Webb affidavit.

9        MR. LYNCH:  And that's what I gave him.  I gave him

10   the draft and he already has the original, you know, what --

11   the final signed copy.

12        MR. FOTI:  I -- Judge, I don't obviously know, but

13   I'm relatively confident that these are not the only emails

14   that Agent Webb sent in relation to the search warrant.

15        THE COURT:  You can ask him that.

16        MR. FOTI:  That's --

17        THE COURT:  Have you sent any other emails.

18        MR. FOTI:  That's fine, but --

19        THE COURT:  On this issue, the issue of the --

20        MR. LYNCH:  I mean, there was additional information

21   added about the passengers in the vehicle, Mario Sadler and

22   Anthony Lipscomb, which I don't think anybody took any issue

23   with, but, yeah.  They provided -- they sent Anthony

24   Lipscomb's criminal history to Ms. Higgins so she --

25        THE COURT:  Right.  Right.

1          MR. LYNCH:  That's like --

2          THE COURT:  Right.  And that's irrelevant.

3          MR. LYNCH:  Right.  It didn't -- there were no other

4    emails relating to the breathalyzer test, stop of the vehicle,

5    or anything else.

6          THE COURT:  All I'm saying is he can ask that

7    question.

8          MR. LYNCH:  That's fine.

9          MR. FOTI:  The problem, Judge, is I also asked that

10   question of Pliszka, after being told we had all of his Jencks

11   material, and then it turns out there's another email.

12         MR. LYNCH:  But, again, I take issue with Mr. Foti on

13   this because Ms. Higgins called Detective Pliszka at the first

14   hearing only to explain why the car was sent to the Seneca

15   Street station, Seneca Street garage, as opposed to the Dart

16   Street.  She didn't call him to talk about the K9.  She didn't

17   call him to talk about anything else.

18      That email that I provided to Mr. Foti just says, hey, I'm

19   working with the K9 and brought him up to the Seneca Street

20   station.  Now Mr. Foti asked Mr. Pliszka about that on cross,

21   but that doesn't make it Jencks material.  Jencks material is

22   if it's the subject matter of the testimony of the witness.

23   And that --

24         THE COURT:  Cross-examination is still part of the

25   subject matter of the testimony of the witness.

1          MR. LYNCH:  How could we possibly know what the

2    cross-examine -- what every avenue of cross-examination is --

3          THE COURT:  I'm not saying you have to know

4    everything, but we do know that there was this element of a

5    dog sniff having occurred.  In fact, that was known,

6    apparently, at 3:15 p.m. on June 20th by the government in

7    drafting the affidavits.

8          MR. LYNCH:  Yeah.  But when she called Detective

9    Pliszka, she didn't put him on the stand for that.

10          THE COURT:  But the government always hopes it can

11    narrow the testimony, but that's why we have cross-

12    examination.  As Judge Wolford has also written, cross-

13    examination, as the Second Circuit and the United States Court

14    of Appeals have written, is the greatest weapon to bring out

15    the truth.

16          MR. LYNCH:  And -- but either way then, he's got the

17    email.  I spent time over the last two weeks getting this

18    information.  He has the email.  He can cross-examine

19    Detective Pliszka, you know, hopefully not 'til the cows come

20    home but --

21          THE COURT:  But yeah.  I'm not going to limit cross-

22    examination where I think it's appropriate.

23          MR. LYNCH:  All right.  So, let me call Special Agent

24    Webb and I'll bring in Detective Pliszka.

25    (A recess was taken from 11:17 a.m. to 11:19 a.m.)

1          MR. LYNCH:  Judge, the government calls Detective

2   Pliszka.

3   (The witness was sworn at 11:19 a.m.)

4          THE COURT:  Please be seated.  State your name and

5   spell your last name for the record, please.

6          THE WITNESS:  Sergeant Christopher Pliszka,

7   P-L-I-S-Z-K-A.

8          MR. FOTI:  Judge, before we start, Mr. Washington is

9   handcuffed with both hands.  Would it be possible to have both

10  handcuffs removed or at least one so he can take notes?

11         THE COURT:  Yes.  Marshal, please?

12         MR. LYNCH:  I apologize, Judge.  Did you -- he was

13  administered the oath?

14         THE COURT:  Yes.

15         MR. LYNCH:  Okay.  I'm sorry.

16

17                         DIRECT EXAMINATION

18

19  BY MR. LYNCH:

20  Q.  Detective Pliszka, do you recall testifying before this

21  court on October 5th, 2021 regarding a June 20th, 2019 stop

22  of a Cadillac Escalade being driven by David Washington?

23  A.  I do.

24  Q.  Okay.  And -- as well as the issue of why the vehicle was

25  taken or directed to be taken to the Seneca Street garage

1    rather than the Dart lot.  Do you recall that?

2    A.   Yes.

3    Q.   Okay.  And you previously talked about the fact that

4    you've done some surveillance of this Cadillac Escalade with

5    Montana plates in approximately May of 2019?

6    A.   Yes.

7           MR. FOTI:  Objection.  Mischaracterizes prior

8    testimony.  He testified he never actually saw this particular

9    vehicle.

10          MR. LYNCH:  Is that -- maybe I misunderstood.  I

11   apologize.

12          THE WITNESS:  Yes.  I did some surveillance on

13   Escalades bearing Montana registration.

14   BY MR. LYNCH:

15   Q.   Okay.  On these exact Montana plates, I guess, that were

16   being driven on June 19th, 2019 -- June 20th, 2019?

17   A.   Yes.

18   Q.   Okay.  Now, referring you to the traffic stop on June

19   20th, 2019, you testified that you spoke with an officer in

20   the early morning hours of that date.  Do you recall that?

21   A.   I'm sorry.

22   Q.   Okay.  In the early morning hours of June 20th, 2019, did

23   you speak to a BPD officer regarding the stop of a David

24   Washington?

25   A.   Yes, I did.

1  Q.  And who was that singular officer?

2  A.  John Davidson.

3  Q.  Did you talk to any other officer, road patrol officer,

4  regarding the stop, as far as you remember?

5  A.  No.

6  Q.  So, any information you received you received from

7  Davidson?

8  A.  Yes.

9  Q.  Now you testified that you had told Davidson that if the

10 car was impounded, it should go to a particular lot, correct?

11 A.  Correct.

12 Q.  And what lot did you ask it to go to?

13 A.  The Seneca Street police impound.

14 Q.  And why did you ask that the vehicle go to that

15 particular impound?

16 A.  Because that's a police facility versus -- Dart Street is

17 a parking enforcement facility.

18 Q.  And can you describe for the Court, I guess, the

19 difference in the two facilities?

20      MR. FOTI:  Objection.  Cumulative, Judge.  We already

21 addressed this in the previous hearing.

22      THE COURT:  I'll let him answer for foundation

23 purposes.

24      THE WITNESS:  Dart Street, basically, is secured by a

25 chain link fence.  The majority of the storage there is

1   outdoor and, again, it's not a police facility.  Seneca Street

2   is an enclosed storage and to -- at that time, I believe all

3   vehicles within the facility that were held for investigation

4   were also encompassed in a chain link fence inside the

5   building.

6   BY MR. LYNCH:

7   Q.  So, fence and then within a building?

8   A.  Yes.

9   Q.  Okay.  Now, in preparation for your testimony here today,

10  did you try to create a timeline of events as to when a K9

11  was deployed around that Cadillac Escalade?

12  A.  Yes, I did.

13  Q.  And can you explain to the Court just briefly what you

14  did to track down that information?

15  A.  So, we utilize a system called CAD.  I believe it's an

16  acronym for Computer Automated Dispatch.  It logs

17  historically all the calls for service in the city, 911

18  calls.  It also has a GPS component that, for marked patrol

19  vehicles, it tracks their location and it saves that, which I

20  learned recently historically.

21      So, I utilized that software to search that date, found

22  the only K9 vehicle that was used that day but -- and it was

23  logged in as K9-41 which was Anthony Marshall's assignment

24  that day and I basically tracked the location and wrote down

25  when that vehicle was at the Seneca Street garage.

1   Q.  Now, did you also search your emails?

2   A.  Yes.

3   Q.  And did you find any emails that sort of helped you

4   determine maybe the timeline of events?

5   A.  I did.

6   Q.  And who was the email to?

7   A.  My chief at the time, Chief of Detectives, Dennis

8   Richards.

9   Q.  And do you recall as you sit there what the time and date

10  of that email was?

11  A.  It was 3:01 p.m. and the date I believe was 6/20/19.

12  Q.  I'm going to show you what's been marked as Government

13  Exhibit 15.

14          MR. LYNCH:  May I approach, Judge?

15          THE COURT:  Yes.

16  BY MR. LYNCH:

17  Q.  And ask if you can identify that?

18  A.  Yes.

19  Q.  What is it?

20  A.  That's the email that I sent.

21  Q.  Okay.  And is this email you sent on June 20th on 3:01

22  p.m.?

23  A.  Yes.

24  Q.  June 20th, 2019?

25  A.  Yes.

```
 1   Q.  Is that a fair and accurate copy of the original email?

 2   A.  Yes, it is.

 3          MR. LYNCH:  Judge, I'd ask that Government Exhibit 15

 4   be admitted.

 5          MR. FOTI:  Fifteen is the email?

 6          MR. LYNCH:  Yeah.

 7          THE COURT:  You got it on your screen.

 8          MR. FOTI:  No objection, Judge.

 9          THE COURT:  Okay.  There being no objection,

10   Government Exhibit --

11          MR. LYNCH:  Fifteen.

12          THE COURT:  Fifteen is received in evidence.

13   (Government Exhibit 15 was received in evidence.)

14

15   BY MR. LYNCH:

16   Q.  Detective Pliszka, a couple of things about this email.

17   When you look at this email, can you determine -- do you have

18   an idea of what electronic device you used to send this

19   email?

20   A.  Yes.  It would have been my work computer.

21   Q.  And I'm assuming you can also send email via your phone,

22   correct?

23   A.  Yes.

24   Q.  How do you know that this wasn't sent necessarily using

25   your phone?
```

 1  A.  I've utilized an iPhone for several years and -- both

 2  personally and for my work device -- and when an email is

 3  sent from that device, it says, sent from iPhone at the

 4  bottom.

 5          THE COURT:  Before we go any further, this is why I'm

 6  having this confusion.  The date is 6/20/2019 at 3:01 p.m.

 7          MR. LYNCH:  Right.

 8          THE COURT:  But the stop occurred at like 1 a.m.

 9          MR. LYNCH:  On June 20th.

10          THE COURT:  June 20th.

11          MR. LYNCH:  Yeah.

12          THE COURT:  Not 2019?

13          MR. LYNCH:  Not the 19th.

14          THE COURT:  Not the 19th.

15          MR. LYNCH:  So it was June 20th, 2019, at 1:30 in the

16  morning.  This email is sent essentially 13 and a half hours

17  later.

18          THE COURT:  2019?

19          MR. LYNCH:  In 2019, yeah.

20          THE COURT:  Okay.

21          MR. LYNCH:  Okay.

22  BY MR. LYNCH:

23  Q.  So, where was your computer located in 2019?

24  A.  It would have been in the narcotics office in my office,

25  my personal office.

1    Q.   Okay.  And do you recall if you were still at Franklin

2    Street or whether you were at the courthouse, I guess, the

3    old federal courthouse at that point?

4    A.   I believe that we did move that summer, but I believe we

5    were still in the Franklin Street address.

6    Q.   So, this would be -- and you would agree that it's

7    probably -- well, how far do you think it is from the Seneca

8    Street garage to the Franklin Street office?

9    A.   A mile.

10   Q.   And what was the purpose of you sending this email to the

11   Chief of Detectives?

12   A.   To basically inform him what I did that day and I believe

13   we were coming in to assist when the search warrant would

14   have been executed.  And, normally, if we execute a search

15   warrant, I would send -- if we're the affiants on a search

16   warrant that we're going to execute with BPD, personally, I

17   would send him an operations plan and a synopsis and the

18   affidavit.

19   Q.   Now, were you scheduled to work on June 20th, 2019?

20   A.   No, I was not.

21   Q.   And did you actually look to see if you were working that

22   day as a regular scheduled shift or working overtime?

23   A.   I did.

24   Q.   And what did you determine?

25   A.   I worked the overtime.  I was not regularly scheduled to

1    work on the 20th.

2    Q.   And how many hours of overtime did you work that day?

3    A.   I believe it was six.

4    Q.   And was the purpose of this email also to provide the

5    Chief of Detectives as to what you were doing on this

6    overtime hour?

7    A.   Yes.

8    Q.   And what did you advise Detective Richards or Chief

9    Richards?

10   A.   HSI was going to obtain a search warrant for the Cadillac

11   Escalade bearing Montana registration 466173B, as in Bravo,

12   that we coordinated with BPD K9 who positively hit on a

13   narcotics indication, and that the U.S. Attorney's Office

14   wanted the search warrant to be written by one of our federal

15   partners.  I don't think they wanted us to write it for some

16   reason.

17   Q.   Okay.  So, it was going to be written by a federal agent?

18   A.   Yeah.

19   Q.   Okay.  And then also was there information put there

20   about some cell phones?

21   A.   Yes.

22   Q.   And were those cell phones that were inside the vehicle?

23   A.   Yes.

24   Q.   So, based on this email, you knew that the positive alert

25   had already occurred, correct?

1    A.   Yes.

2    Q.   Okay.  So, you said that you were also focused on, I

3    guess, the whereabouts of Officer Marshall's vehicle on June

4    20th, 2019, correct?

5    A.   Correct.

6    Q.   And in preparation for your testimony here, did you --

7    well, strike that.

8         When you looked at the information for Officer Marshall,

9    are you getting GPS coordinates for the vehicle?

10   A.   Yes.

11   Q.   Okay.  Did you take those GPS coordinates and attempt to

12   do something with those GPS coordinates to make it -- I

13   guess, for production in court?

14   A.   Yes.  Again, being unfamiliar with the software, I took

15   it to one of our crime analysts who -- he often maps crimes

16   trends, any of the departmental needs that require mapping or

17   geography.  And I explained to him that I was trying to

18   make -- put it in a form that I could demonstrate or provide

19   to the Court, and he mapped it.  He mapped the coordinates,

20   the longitude and latitude coordinates.

21   Q.   Did he do the whole day for you or just the relevant

22   portion?

23   A.   Just the -- when that vehicle was located at the Seneca

24   Street garage that was utilized by Tony Marshall.

25   Q.   I'm going to show you what's been marked as Government

1    Exhibit 16 and ask if you can identify what this is?

2    A.  Yes.  This is the maps that were prepared based on the

3    data provided.

4    Q.  And how many pages are included in this exhibit?

5    A.  Four.

6    Q.  And again, was this prepared -- who was -- prepared this

7    at the crime analysis center?

8    A.  Our crime analyst, lead crime analyst, Kevin Schellinger.

9    Q.  Schellinger?

10   A.  Schellinger.

11   Q.  Okay.  And that's S-C-H-E-L-L-I-N-G-E-R?

12   A.  I believe so, yes.

13   Q.  His name is actually at the bottom of the map, is that

14   correct?

15   A.  It is.

16   Q.  Okay.  And was this prepared in your presence?

17   A.  Yes.

18   Q.  Okay.

19          MR. LYNCH:  Judge, I'd ask that Government Exhibit 16

20   be admitted.

21          MR. FOTI:  May I voir dire, Judge?

22          THE COURT:  Pardon me?

23          MR. FOTI:  May I voir dire?

24          THE COURT:  Sure.

25

1                        VOIR DIRE EXAMINATION

2

3    BY MR. FOTI:

4    Q.  Good morning, sir.

5    A.  Good morning.

6    Q.  Do you know what type of software was used to create

7    these maps?

8    A.  I believe it was Archview or Arch GIS is the software

9    company that they utilize.

10   Q.  And you said you have no training in it yourself?

11   A.  Ironically, I do in Archview.  I have a Bachelor's Degree

12   in Geographical Information Systems.

13   Q.  And that includes training in this particular software?

14   A.  In Archview, yes, but not in CAD, which would be the

15   dispatch software in which this data originated from.  The

16   metadata is from that.

17   Q.  Okay.  But you have training in the software that creates

18   the heat map or the map that we have in front of us, but the

19   CAD information, that's outside your realm of training?

20   A.  Correct.

21   Q.  Understood.  Okay.  And the information that was obtained

22   to create this map that you obtained from CAD, did you

23   provide that separately to the government at any point?

24   A.  No.  I'm not even aware how to do that.  I basically told

25   the analyst what I needed mapped and how I found the data and

1   then he was able to extract it.

2   Q.  As far as the exhibit, what's marked for identification

3   as Government Exhibit 16, I think you indicated that this

4   exhibit identifies the location of K9 unit K9-41, correct?

5   A.  Correct.

6   Q.  And you testified that you believe that's Anthony

7   Marshall's vehicle?

8   A.  Yes.

9   Q.  Okay.  And as far as what's been presented, is there any

10  additional information to establish that Anthony Marshall was

11  in that vehicle other than your knowledge that K9-41 is

12  typically used by him?

13  A.  So, in CAD, you can bring up all units that logged into

14  the software on a particular date, and Tony Marshall was

15  logged into CAD.  His normal shift was during that day, so it

16  showed he worked that day.

17  Q.  Okay.  So you're aware that Anthony Marshall was working

18  that day and anything to establish whether he was operating

19  in Car 589?

20  A.  I can't -- again, being kind of unfamiliar with that

21  software, I can't recall or say for certain if that feature

22  directly says that.

23  Q.  Do you have any firsthand knowledge of whether any of the

24  information in this exhibit is correct in regard to where Car

25  589 was on June 20th, 2019?

1   A.  Well, I mean, I know the system.  There's basically two

2   forms of geographical data when you map it, roster and

3   vector.  And I believe this is, basically, vector data that

4   communicates via a satellite.  And it uses trigonometry to --

5   I believe within -- I don't know what the margin of error.

6   Geographically, it's generally 5 meters sometimes to 50

7   depending on signal strength, wealth conditions, a myriad of

8   factors, but that's my understanding of the technology.

9   Q.  So, setting aside the technology and what that may show,

10  did you observe Car 589 at any of these locations at any of

11  these times on that date yourself?

12  A.  Not that I recall.

13  Q.  Did you observe Anthony Marshall in any of these

14  locations at the times and dates specified in this email?

15  A.  Not that I can recall exactly.

16  Q.  Did you ever talk to Anthony Marshalll to confirm that he

17  was at any of those locations on the times and dates

18  specified?

19  A.  No.

20          MR. FOTI:  Judge, I would object to Government

21  Exhibit 16 coming in.  It purports to be information obtained

22  from the CAD software.  This witness has some familiarity

23  with, but no specific training, and he doesn't have any

24  firsthand knowledge of whether what it's being offered for is,

25  in fact, accurate, which is whether Anthony Marshall was at

1   any of those locations at any of these times.

2            THE COURT:  Overruled.  So, Government Exhibit 16 is

3   received in evidence.

4   (Government Exhibit 16 was received in evidence.)

5

6                    DIRECT EXAMINATION, CONTINUED

7

8   BY MR. LYNCH:

9   Q.  How many K9s does BPD have or did it have in 2019?  Do

10  you have any idea?

11  A.  I do not.

12  Q.  Okay.  Do you -- so as you sit -- and now, you know that

13  you sent an email to your Chief of Detectives that there was

14  a positive alert on the Escalade, correct?

15  A.  Yes.

16  Q.  Okay.  And so, as you sit here today, you just don't

17  remember which drug dog did that?

18  A.  After reviewing the K9 affidavit, I now know that it was

19  Georgie, whose handler is Tony Marshall.

20  Q.  Okay.  So, you sent an email to Detective Richards that

21  there was a positive drug dog hit, correct?

22  A.  Correct.

23  Q.  Okay.  You reviewed an affidavit from Anthony Marshall

24  that's dated June 20th, 2019, correct?

25  A.  Correct.

1  Q.  Okay.  And you located his GPS vehicle records that

2  demonstrate the vehicle was at the Seneca Street garage on

3  June 20th, 2019, correct?

4  A.  Yes.

5  Q.  Okay.  Based on that then, you believe it was Anthony

6  Marshall who was the K9 officer who went -- who responded to

7  the Seneca Street garage?

8  A.  I do.

9  Q.  Okay.  So let's talk about --

10         MR. LYNCH:  Judge, I'm going to hand this up just in

11  case you wanted it closer than it is on the screen, so here's

12  a copy of that.

13  BY MR. LYNCH:

14  Q.  Showing you page 1 of the exhibit --

15         THE COURT:  I assume Mr. Foti has a copy.

16         MR. LYNCH:  Yes.

17         MR. FOTI:  I do.

18         MR. LYNCH:  And so the Court is aware, Judge, I

19  emailed this to Mr. Foti last week.

20         MR. FOTI:  Yes.  That's true.

21  BY MR. LYNCH:

22  Q.  So, we'll start at the top, and each page has, at the

23  top, at least the timeframe that this map relates to; is that

24  correct?

25  A.  Correct.

1    Q.  So, this one is June 20th, 2019 from 12:05 p.m. to June

2    20th, 2019 at 12:10 p.m.?

3    A.  Yes.

4    Q.  Okay.  And just -- can you briefly describe for the Court

5    when this map shows as far as where that vehicle was during

6    that timeframe?

7    A.  So, the earliest locations of it ranges from 12:05 p.m.

8    to 12:07, it appears that it was at -- adjacent to Father

9    Conway playground, which is also where the Buffalo Police K9

10   training facility is.

11   Q.  So, again, consistent with at least this being affiliated

12   with a K9 vehicle?

13   A.  Yes.

14   Q.  And after that point, did the vehicle move?

15   A.  Yes.  At approximately 12:07, it begins heading

16   northbound down Louisiana Street in the direction of the

17   Seneca Street garage.

18   Q.  And let's just refer to approximately 12:09 and 57

19   seconds.  Where is the vehicle approximately located at that

20   point?

21   A.  At the Seneca Street garage.

22   Q.  Is that, I guess, the one entry point is right there

23   where the, I guess, the warehouse -- the facility ends and

24   you can pull into it; is that right?

25   A.  Yes.

1  Q.  Okay.  Now, I'll refer to page 2 of this Government

2  Exhibit 16.  And, again, referring to the timeframe, what is

3  the timeframe of this page?

4  A.  12:10 to 12:15 p.m.

5  Q.  And what does the map show about the location of Anthony

6  Marshall's vehicle on that day or at that time?

7  A.  It appears to be parked inside the Seneca Street garage,

8  the police garage.

9  Q.  And is that where that Cadillac Escalade was located?

10  A.  Yes.

11  Q.  Page 3 of the exhibit, what is the timeframe?

12  A.  12:15 to 12:20 p.m.

13  Q.  And could you briefly describe for the Court what the

14  information or what information is depicted on this

15  particular map?

16  A.  It appears the vehicle exits the garage at or about

17  12:18, 12:19.  It heads east on Seneca, I believe.  It makes

18  it as far as Hamburg Street.

19  Q.  And then from the fourth page of the exhibit, what's the

20  timeframe?

21  A.  12:20 to 12:25 p.m.

22  Q.  And what does this -- briefly describe what this

23  information shows on the map.

24  A.  The Car 589 traveling northbound on the 190, ultimately

25  getting on the, what appears to be, the Peace Bridge heading

1    to Canada.

2    Q.  And did that -- did the vehicle going into Canada, did

3    that have any significance to you?

4    A.  Yes.  At that time, I don't know if they are presently

5    because of COVID restrictions, but our K9 trained often with

6    the -- some kind of Canadian police facility up there.

7    Q.  I'll show you what's been marked as Government Exhibit

8    Number 9 and ask if you can identify what this is?

9    A.  Yes.  This is a K9 Corps affidavit signed by Police

10   Officer Anthony Marshall dating back to 6/20/19.

11   Q.  2019?

12   A.  Yes.

13   Q.  And then, in that affidavit, does it state where and when

14   Georgie was certified?

15   A.  On 4/4/2019, K9 Georgie searched three rooms at Ridgeway

16   School in Canada and found 10.02 grams MDMA that was hidden

17   inside the cabinet drawer.

18   Q.  So this corroborates that that's where Georgie does at

19   least some of his training; is that correct?

20   A.  Yes.

21   Q.  All right.  Now, do you recall who -- one of the HSI

22   agents you were working with?  Because in your email to Chief

23   Richards, you said you were -- met with members of HSI on

24   June 20th, correct?

25   A.  Yes.

 1   Q.  Do you remember one of the officers or agents you were

 2   working with?

 3   A.  Special Agent TJ Webb was my primary point of contact.

 4            THE COURT:  I'm sorry.  I didn't hear --

 5            THE WITNESS:  He was my primary point of contact with

 6   HSI.

 7   BY MR. LYNCH:

 8   Q.  And were you the conduit of information between BPD and

 9   to Special Agent Webb about what had occurred during the

10   traffic stop?

11   A.  Yes.

12   Q.  Okay.  At any point, did you provide either Officer

13   Davidson with Special Agent Webb's phone number?

14   A.  No, not that I recall.

15   Q.  Okay.  And as far as you know, do you remember whether

16   Special Agent Webb asked for Officer Davidson's phone number

17   that day?

18   A.  No.

19   Q.  As I understand it, you told Special Agent Webb what you

20   knew about the car stop on June 20th?

21   A.  Yes.

22   Q.  And that's the information you got from Officer Davidson?

23   A.  Yes.

24   Q.  Now, prior to becoming -- you're a Detective Sergeant

25   now?

1    A.   I was then also, yes.

2    Q.   Okay.   In 2019.   Prior to that, I assume you had patrol

3    duties at some point in your career?

4    A.   Prior to that, I was a detective and prior to that, yes,

5    I was a patrolman.

6    Q.   Okay.   And how long were you a patrolman?

7    A.   Six years, I believe.

8    Q.   Okay.   During those six years and -- strike that.

9        You understand that there's an issue about this Court's

10   concerned about information that got in an affidavit about

11   field sobriety tests, whether they were conducted or not,

12   correct?

13   A.   Yes.

14   Q.   All right.   And during preparation for your testimony,

15   were you asked whether, in fact, you had ever conducted field

16   sobriety tests in your career?

17   A.   Yes.

18   Q.   Okay.   Have you ever conducted field sobriety tests?

19   A.   No.   Well, in the academy, we were trained on how to

20   conduct them.

21   Q.   Okay.

22   A.   So we had to do a mock scenario, mock traffic stops,

23   things like that.

24   Q.   While you were a BPD officer on the streets of Buffalo,

25   did you conduct field sobriety tests?

1  A.  No.

2  Q.  What did you do in the instances where you thought maybe

3  somebody was intoxicated?

4  A.  Generally, if I responded to a call where there's an

5  accident with injury and alcohol was suspected, a lieutenant

6  would also or supervisor would be on scene and something that

7  serious where there was injury or serious physical injury,

8  generally, our AIU unit would be notified, Accident

9  Investigation Unit, and they would conduct -- they would

10 handle the sobriety test portion of the investigation.

11 Q.  How about just someone who, you know, hadn't caused

12 injury or damage but maybe is just intoxicated, do you

13 remember any of those stops you may have done in your career?

14 A.  Yes.  I -- like I said, I just would have defaulted to

15 another police officer if they needed to be performed.

16 Q.  Now, could you explain, does BPD have K9 units available

17 24 hours a day, 7 days a week?

18 A.  No, they do not.

19 Q.  Okay.  And so is it just if someone might call out for a

20 K9, but if there's a K9 not working, what happens?

21 A.  It's just not available to you in most instances that

22 I've experienced.

23 Q.  Okay.

24 A.  There's really no other option.  I know a few times it

25 was frowned upon contractually by our union if -- again, I

1  was never involved in any of these instances, but officers

2  reached out to other municipalities.  Like, say, Cheektowaga

3  has a K9 dog working and we don't, and if that dog assists,

4  it's a contractual issue.

5  Q.  Okay.

6  A.  And just -- I think it's important to note that, even

7  now, again, I don't know how many dogs we have, but they're

8  not all narcotics dogs.  So, some are just bomb recognition

9  and they're not cross-trained.

10  Q.  Oh, I see.  And you might have one that detects clothing

11  if you're looking for a person?

12  A.  Cadaver, et cetera, yes.  There's different skill sets

13  with the dogs.

14  Q.  Okay.

15  A.  To my knowledge, there's not a dog that does, kind of,

16  all.

17  Q.  Now, from your emails going back to Government Exhibit

18  15, you indicated that you and the lieutenant coordinated

19  with a BPD K9 to come to the Seneca Street garage, correct?

20  A.  Correct.

21  Q.  Okay.  And why did you have a K9 come to the garage?

22  A.  To see if there was a presence of narcotics in the

23  vehicle we were investigating.

24  Q.  Had you, in your career, utilized a K9 to deploy around a

25  vehicle or some other box or item of interest?

1    A.   Yes.

2    Q.   Okay.  And why have you done that?  And what's your goal,

3    I guess, as far as why would you use narcotic dog in that

4    way?

5    A.   In this instance, it would have been to provide probable

6    cause for the affiant's search warrant.

7    Q.   Now, at that point, did you know whether an inventory

8    search had been conducted of the vehicle?

9    A.   I don't recall.

10   Q.   Okay.  If there had been nothing -- if an inventory

11   search had been done and nothing was found, would that have

12   impacted whether you would have asked for a K9 anyway?

13   A.   No.

14   Q.   Why is that?

15   A.   Because I don't really see -- it's just something I don't

16   consider.  It's not -- when I go through the steps of calling

17   a K9 to investigate the article of clothing or a vehicle, if

18   there's no prerequisite for that, then I need an inventory

19   sheet.

20   Q.   Okay.  And you don't -- so, I guess the question is, if

21   there were no drugs found in the vehicle, does that mean that

22   you shouldn't use a narcotic drug dog to deploy around a

23   vehicle?

24   A.   No.

25   Q.   Okay.  And why -- is there other reasons why you would

1    use a K9 around a vehicle that maybe has already done an

2    inventory search on?

3    A.   Yes.  There's hidden compartments or commonly referred to

4    as traps, secret compartments.

5    Q.   Which wouldn't necessarily come through on an inventory

6    search?

7    A.   Right.  Correct.  Yes.

8    Q.   Now, following the -- on June 20th, were you sent a copy

9    of the proposed affidavit that Agent Webb was going to sign?

10   A.   Yes.

11   Q.   I'm going to show you what's been marked as Government

12   Exhibit 17 and ask if you can identify this.

13   A.   It's an email, I believe.

14   Q.   And is it an email that you received?

15   A.   Yes.

16   Q.   Who did you receive it from?

17   A.   Agent Webb.

18   Q.   And when did you receive that email?

19   A.   On 6/21/2019 at 11:45 a.m.

20   Q.   And in preparation for your testimony, did you review the

21   attachment to that email?

22   A.   Yes, I did.

23   Q.   And what was attached to that email?

24   A.   The affidavit for the said search warrant of the vehicle

25   we were investigating.

1    Q.  In your experience -- strike that.

2        Do you recall whether you read the affidavit that day?

3            THE COURT:  Whose affidavit are we referring to?

4            MR. LYNCH:  I'm sorry.  And I'll clarify what they --

5    the -- let me go back a little further.

6    BY MR. LYNCH:

7    Q.  Do you know -- and I forgot to ask this.  When was this

8    email sent?

9    A.  6/21/2019, 11:45 a.m.

10   Q.  Do you recall whether you read it specifically right when

11   you -- right when it was received?

12   A.  I do not recall.

13   Q.  Okay.  But would you have read it within the -- at least

14   that day or the day you received it?

15   A.  Yes.

16   Q.  Okay.  And would you have reviewed the affidavit?

17   A.  Yes, most likely.

18   Q.  If there was anything you thought to be inaccurate about

19   BPD information, would you have notified Special Agent Webb?

20           MR. FOTI:  Judge, I'm going to object.  What he would

21   have done is irrelevant.  And it's pretty clear the witness

22   doesn't recall when he reviewed this or not.  What he would

23   have --

24           MR. LYNCH:  I think I'm going to ask one more

25   question.

1          THE COURT:  First of all, I'm still waiting to find

2     out whose affidavit we're talking about here.

3          MR. LYNCH:  Oh, I'm sorry.  Special Agent Webb.

4          THE COURT:  All right.

5          MR. LYNCH:  And I have attachment, Judge.  It's just

6     not -- which I'm prepared to provide to the Court the exact

7     copy of it.  The problem is, it's unredacted and Mr. Foti does

8     not have an unredacted.

9          THE COURT:  Is it the draft or is it the final?

10         MR. LYNCH:  It was the one they submitted to Judge

11    McCarthy minutes after this.  Yes.

12         THE COURT:  Okay.  That is -- Government Exhibit 17

13    is docket number 1 at 19-mj-1078, which you will not be able

14    to get into, Mr. Foti, because it's sealed.

15         MR. LYNCH:  But I would --

16         THE COURT:  But you're saying that is the original

17    affidavit submitted to Judge McCarthy?

18         MR. LYNCH:  Correct.

19         THE COURT:  Okay.  And I heard references from you

20    before we took testimony about drafts of that.

21         MR. LYNCH:  Yeah.  That did not go to Special Agent

22    Pliszka -- I'm sorry --- Detective Pliszka.  That was from

23    Special Agent Webb to Ms. Higgins.

24         THE COURT:  Okay.

25         MR. LYNCH:  Okay.

1    BY MR. LYNCH:

2    Q.  So, I guess would you have reviewed it for accuracy

3    relating to BPD information that was in there?

4    A.  Yes.

5    Q.  Okay.  And if something was inaccurate, would you have

6    advised someone?

7    A.  Yes.

8    Q.  Did you ever advise anyone about information you thought

9    was untrue in this affidavit?

10   A.  No.

11   Q.  Okay.

12        MR. LYNCH:  I'd ask that Government Exhibit 17 be

13   admitted to the extent the Court also wants to see the actual

14   attachment, the unredacted search warrant affidavit, but it's

15   the same as the one that was submitted to Judge McCarthy.

16   We'd admit it for the purpose of the Court reviewing it and

17   not Mr. Foti.

18        THE COURT:  Right.  Let me just look at it so I can

19   compare it to what is actually docketed.  All right.  Let the

20   record reflect I have reviewed and compared the affidavit,

21   which had been marked Government Exhibit 17, the attachment to

22   the email that was received by Detective Pliszka from Special

23   Agent Webb to the original affidavit that has been docketed on

24   the Court's docket as 19-mj-1078, find that they are the same.

25        MR. LYNCH:  Judge, I'd ask that Government Exhibit 17

1   and Government Exhibit 9, which is that affidavit, be

2   admitted.  I don't think 9.  I wasn't sure if 9 --

3          THE COURT:  You haven't offered 9, but before I make

4   a ruling on that, the only affidavit I've seen, both on the

5   docket and in some of the papers that have been filed, was the

6   affidavit indicating the training of K9 Georgie.

7          MR. LYNCH:  Right.

8          THE COURT:  I have not seen an affidavit of Marshall.

9          MR. LYNCH:  Yes.  So, I don't know if Detective

10  Pliszka can answer this question, the question that you have.

11  BY MR. LYNCH:

12  Q.  Do you understand what or do you have an understanding of

13  what Officer Marshall would do when a -- there was a positive

14  alert on an item?  Do you know what he would fill out?

15  A.  K9 affidavit.

16  Q.  And is it this affidavit that I showed you, Government

17  Exhibit 9?

18  A.  Yes.

19  Q.  Okay.  He just -- what, does he just date it and sign it?

20  A.  Yes.

21  Q.  Okay.

22          THE COURT:  That affidavit doesn't establish probable

23  cause.

24          MR. LYNCH:  I know.  So, I mean that says -- that's

25  all he does.  He just --

1          THE COURT:  For example, as you're well aware, in a

2     postal --

3          MR. LYNCH:  Yeah.  I think --

4          THE COURT:  -- affidavit, they put the training

5     affidavit from the officer and the actual affidavit of what

6     the officer did in running the dog through the process.

7          MR. LYNCH:  I tried to track that down, Judge, and --

8          THE COURT:  Doesn't exist.

9          MR. LYNCH:  Zero.  This is all I got.  I even

10    looked -- and just so the Court is aware and, in fact,

11    Detective Pliszka did this, but we tried to see whether there

12    was any record of him on the CAD being called out or anything.

13    I spoke with Lieutenant Koshisburger, who is now retired, but

14    I went and asked if there were any records, just like you're

15    asking for, Judge, and I was told there are none.  I spoke to

16    Anthony Marshall.  He said if there were records, BPD had

17    them.  So, I can state that, conclusively, this is all we

18    have.  There's Government Exhibit number 9.

19          THE COURT:  Mr. Foti?

20          MR. LYNCH:  Now, as long as -- oh, I'm sorry.  Yeah.

21          MR. FOTI:  Judge, I think -- I thought Ms. Higgins

22    attempted to admit it previously and it -- I could be wrong

23    about that.

24          THE COURT:  No.  She did not tender it.

25          MR. LYNCH:  Okay.  I thought she did.

1          MR. FOTI:  I thought she attempted to, I objected,

2    and because the affidavit --

3          THE COURT:  No, you objected to the CAD.

4          MR. FOTI:  Okay.  Well I trust the Court's

5    recollection.  In any event, Judge, I --

6          THE COURT:  We'll put both of your minds at ease.  I

7    made a mental note that after I marked Government Exhibit 9 as

8    the K9 affidavit of -- regarding the training of Georgie, you

9    didn't offer it.

10          MR. FOTI:  I object primarily on relevance, Judge.  I

11    understand what the government has elicited in terms of

12    testimony, but if the affidavit refers to his training in

13    April 2019, and there's no indication that just because he

14    signed it on June 20th that he was, in any way, involved or,

15    more importantly, what the results of his involvement was, and

16    what the result of the sniff was, I think the training is

17    irrelevant.  I would object to its admission.

18          THE COURT:  Well, training is not irrelevant in the

19    sense of qualifying the dog as an authorized drug-sniffing

20    dog, but as I've indicated, that affidavit alone doesn't

21    relate to the underlying basis for what caused the application

22    to have this dog sniff conducted.

23       Normally, I would expect to see an affidavit from the dog

24    handler, in this case Buffalo Police Department Officer

25    Marshal, indicating the basis or the reasons why he wants to

1    conduct the dog sniff or why he did conduct the dog sniff.

2        Mr. Lynch had indicated he has made a thorough search for

3    such an affidavit, including an interview of Marshall, and has

4    concluded that he is unable to state to the Court whether

5    there is such an affidavit.  But in his efforts, he has not

6    been able to find one.

7            MR. LYNCH:  Right.  And I --

8            THE COURT:  So, I am going to allow the admission of

9    Government Exhibit 9 for whatever purpose it states, but

10   nothing more.

11           MR. LYNCH:  Yeah.  And part of it was to show that

12   he's trained in Canada, which explained why the vehicle that's

13   on the CAD map is his vehicle.  That was part of the reasons

14   for it.  But I guess I just want to make sure the record is

15   clear.

16   BY MR. LYNCH:

17   Q.  You, Detective Pliszka, you and the lieutenant arranged

18   for Anthony Marshall to conduct an exterior sniff of the

19   vehicle, correct?

20   A.  It most likely would have been myself.  And if it wasn't

21   me, it would have been Lieutenant Chris Koshisburger

22   (phonetic).  I don't have Tony Marshall's -- I checked to see

23   if I had his personal phone number.  So, we would have either

24   contacted him over the radio, which we checked and I didn't.

25   I did not recover any radio transmissions from that time

1    period of that day of myself or Lieutenant Koshisburger

2    (phonetic) calling K9 or cell phone call.  Or, the only third

3    option would be somebody would have reached out to a

4    supervisor and the supervisor would have dispatched to our

5    location.

6    Q.   Okay.  But based on your email to the Chief of

7    Detectives, you know it did, in fact, happen?

8    A.   We did utilize it.  Yes.

9    Q.   Okay.  And you're contemporaneous or close in time to the

10   summary of the events was that there was a positive alert on

11   the car, correct?

12   A.   Yes.

13   Q.   All right.  And that information, how did you obtain that

14   information?

15   A.   At the time I wrote the email?

16   Q.   Yeah.

17   A.   It would have been because I was present for the search.

18   Q.   Right.

19   A.   Sniff.

20   Q.   Okay.  So it's fair to say this occurred almost three

21   years, correct?

22   A.   Yes.

23   Q.   Okay.  So, your best recollection of what occurred on

24   that day is your email from yourself to Detective Richards on

25   June 20th?

 1  A.  Yes.

 2          MR. LYNCH:  So, I assume 17 is admitted.  I don't

 3  think there was an issue with 17.

 4          THE COURT:  I admitted it for the limited purpose of

 5  what it is.

 6          MR. LYNCH:  Well, that was -- 17 was the email.

 7          THE COURT:  Seventeen.  I'm sorry.  I misspoke.

 8          MR. LYNCH:  Yeah.

 9          THE COURT:  Not -- I.

10          MR. LYNCH:  For the limited purpose.

11          THE COURT:  Government Exhibit 17 you had not yet

12  offered.

13          MR. LYNCH:  I'm sorry.  I'm offering 17, too.

14          THE COURT:  Mr. Foti?

15          MR. FOTI:  Was that -- I don't have any objection to

16  the admission of Government Exhibit 17 without the attachment.

17  The attachments of it, I'd like a copy of it.  I understand if

18  it's identical to something now under seal but if it's part of

19  this record, I will --

20          THE COURT:  Well, so everybody is aware, for purposes

21  of transparency, I'm accepting Government Exhibit 17 as being

22  the email to Detective Pliszka from Special Agent Webb on --

23  the email being June 21st, 2019 at 11:45 a.m., but the email

24  had attached to it Special Agent Webb's affidavit which was

25  submitted to Judge McCarthy for the search warrant of the

1  Cadillac.

2     Mr. Lynch has asked the witness to identify that

3  affidavit.  It's the original unredacted.  As I stated for the

4  record, I took that Government Exhibit 17 and compared it to

5  the affidavit that is part of the court docket under docket

6  number 19-mj-1078 and found that Government Exhibit 17 does

7  mirror the docket entry, but I also believe that Mr. Foti is

8  entitled to an unredacted affidavit of paragraphs 8 and 9.

9          MR. LYNCH:  Which he has.

10         THE COURT:  Which --

11         MR. FOTI:  I do have.  I have redacted.

12         THE COURT:  Which are the crucial paragraphs, as far

13  as the Court is concerned, for purposes of this hearing.

14         MR. LYNCH:  Right.  It's my understanding he has a

15  copy of the signed search warrant affidavit.

16         THE COURT:  Unredacted or redacted?

17         MR. LYNCH:  Well, redacted.

18         THE COURT:  Okay.

19         MR. LYNCH:  So, is that -- I mean, that's correct,

20  Mr. Foti, correct?

21         MR. FOTI:  Yes.

22         MR. LYNCH:  Now, you have a draft of that same

23  affidavit from June 20th of only paragraphs 8 and 9.

24         THE COURT:  Okay.  And when you said draft that, once

25  again --

1          MR. LYNCH:  I know.  So draft from June 20th in the

2     afternoon, the one -- that first one that TJ Webb sent to AUSA

3     Higgins.

4          THE COURT:  I thought that was the original.

5          MR. LYNCH:  No.  This one -- this one was -- this was

6     on June 21st, 2019 right before it got sent to McCarthy.  So,

7     this was the final one.  Pliszka got the final one.

8          THE COURT:  The one at June 21st, 2019, 11:45 a.m.,

9     that was the final?

10         MR. LYNCH:  And that was the final.

11         THE COURT:  I have not seen the draft.

12         MR. LYNCH:  I gave that to Mr. Foti.

13         THE COURT:  No, but I haven't seen it.

14         MR. LYNCH:  Right.  And I'm not seeking to admit it

15    yet.

16         THE COURT:  Okay.  But I assume some --

17         MR. LYNCH:  Yeah.  I'm going to use it with Special

18    Agent Webb.  Detective Pliszka knows --

19         THE COURT:  I just want to make sure we're all on the

20    way.

21         MR. LYNCH:  You are, yeah.  Do you want to see the

22    whole draft or just paragraphs 8 and 9?  I'm only going to use

23    it for paragraphs 8 and 9.

24         THE COURT:  Based on your representation that the

25    draft kind of mirrors the rest of the other paragraphs, I'm

1    only focusing on paragraphs 8 and 9.

2              MR. LYNCH:  Right.  No problem.

3              THE COURT:  All right.

4              MR. LYNCH:  So, then I am complete with my

5    presentation.

6              THE COURT:  All right.  Before you get started,

7    Mr. Foti, I just want to ask Detective Pliszka, are you the

8    person who asked to have the dog sniff conducted with the

9    approval of Lieutenant Koshisburger?

10             THE WITNESS:  Your Honor, can I just put things in

11   perspective real quick?

12             THE COURT:  Sure.  Sure.

13             THE WITNESS:  So, at that point, I was a supervisor

14   of anywhere between nine and ten narcotics investigators.

15   During 2019, we executed approximately 250 search warrants

16   with us as the entry team.  I can't -- I mean, I would utilize

17   the K9 in some form or fashion, whether it be with us or if we

18   were working with the Erie County Sheriffs several times a

19   week; whether it be in a vehicle search, a home search, or an

20   item search.

21      To add to further confusion, like I said, we would often

22   work with the sheriffs, use their dog.  And in regards to this

23   case, I know, again, in that summer, there was another

24   Cadillac that was involved in this case that we searched at

25   Seneca Street garage where a dog was -- where we utilized a

1    dog in that search.  So I can't testify to, in particular, I

2    called the dog that day or Lieutenant Koshisburger did.

3            THE COURT:  But as I understand it, a regular

4    patrolman, as Officer Davidson testified, would not be

5    authorized to just order a dog search.  He would have to go

6    through a supervisor.

7            THE WITNESS:  So, yes and no.  So, Officer Davidson,

8    I believe, was testifying that at one in the morning when

9    there's no dog scheduled, it would take somebody in the

10   administration to get a dog there.

11           THE COURT:  Right.  But there is a report that

12   indicates there was not a dog available.  So, apparently,

13   there was some discussion about a dog.

14           THE WITNESS:  Right.

15           THE COURT:  Okay.

16           THE WITNESS:  And so, to get a dog, to get somebody

17   to come in from home or another agency, it would require --

18   you would need to up it to the level of administration of some

19   form.

20           THE COURT:  I understand, but Officer Marshall just

21   didn't, on his own, decide to stop at the Seneca Street garage

22   and conduct a dog sniff.

23           THE WITNESS:  Correct.

24           THE COURT:  Somebody had to tell him.

25           THE WITNESS:  He would have been either called by

1    myself or Lieutenant Koshisburger.

2              THE COURT:  Okay.  Now, Officer Davidson also

3    testified that when he had the two telephone conversations

4    with you on the early morning hours of the 20th, some time

5    between 1 a.m. and 2 a.m., you told him to just do it by the

6    book, basically, he testified, and he said that you were to

7    keep him advised or he was to keep you advised.  Did he keep

8    you advised about the outcome of the breathalyzer test

9    downtown?

10             THE WITNESS:  Again, Your Honor, I'm assuming he did,

11   but I can't recall those exact details of a conversation on 1

12   in a morning on a day I was --

13             THE COURT:  I mean after that, like on the later

14   morning hours of June 20th, did there come a time when you

15   learned that the defendant passed the breathalyzer test?

16             THE WITNESS:  I can't recall that, sir.  I'm assuming

17   I did.  I am assuming we did have a conversation about it, but

18   I just can't --

19             THE COURT:  Okay.

20             THE WITNESS:  -- recall those specifics.

21             THE COURT:  Mr. Foti?

22             MR. FOTI:  Thank you, Judge.

23

24

25

1                        CROSS-EXAMINATION

2

3    BY MR. FOTI:

4    Q.  Detective, you would have followed up to confirm --

5            THE COURT:  Wait until you get to a mic.

6    BY MR. FOTI:

7    Q.  You would have to have followed up to confirm if

8    Mr. Washington had, in fact, failed the field sobriety -- the

9    breathalyzer test, wouldn't you have?

10   A.  I -- it may have been told to me.  I can't recall.

11   Q.  That's something you would have wanted to know, though,

12   correct?

13   A.  It's something that I would have certainly relayed if it

14   was told to me.

15   Q.  A lot of what we're talking about here, both on direct

16   and cross, is efforts by you to recall or to identify what

17   you think you would have done under those circumstances,

18   right?

19   A.  Correct.

20   Q.  Because you don't have an actual recollection of a lot of

21   what you're being asked about, right?

22   A.  Correct.

23   Q.  That includes what you were asked about on direct

24   examination, correct; for example, the content of the email

25   where it indicated you coordinated with the K9 unit.  You

1    don't actually recall doing that, correct?

2    A.   Correct.

3    Q.   You don't recall whether you spoke to Anthony Marshall

4    specifically, correct?

5    A.   That's correct.

6    Q.   And in that email, this is what's been entered into

7    evidence as Government Exhibit 15, and that's the email we're

8    talking about that you were asked about on direct, correct?

9    A.   Yes.

10   Q.   You can see it on your screen, right?

11   A.   Yes.

12   Q.   And it -- the email says, we coordinated with BPD K9 who

13   positively hit on a narcotics indication.  That was something

14   that you wrote in this email, correct?

15   A.   Yes.

16   Q.   The fact that it says BPD, that, at least, appears to

17   rule out that it was Erie County Sheriff K9 that was

18   involved, right?

19   A.   Yes.

20   Q.   But, as far as you know, you have no recollection of

21   whether that was Anthony Marshall that you were referring to,

22   correct?

23   A.   Correct.  Yes.

24   Q.   You don't have any recollection of any communication with

25   Anthony Marshall on June 20th, 2019, correct?

1   A.   Yes.

2   Q.   He asked, you do not have any recollection?

3   A.   Correct.

4   Q.   Now, do you recall talking to Lieutenant Koshisburger in

5   relation to anything that Anthony Marshall specifically did

6   on that date?

7   A.   I do not.

8   Q.   We did look at (inaudible) and I am taking 15 off of the

9   ELMO and putting on Government Exhibit 16, which is the map

10  that was created using software from information provided by

11  CAD as to the location of Car 589 on June 20th, 2019.  With

12  regards to this exhibit, you indicated you don't have any

13  recollection of having seen Anthony Marshall at any of these

14  locations on that date, correct?

15  A.   Yes.  Correct.

16  Q.   Okay.  The presumption created by this exhibit is that

17  Anthony Marshall, or at least a vehicle that was assigned to

18  him, went to the Seneca garage at some point, correct?

19  A.   Yes.

20  Q.   Now, you have no knowledge of what -- presuming it was

21  Anthony Marshall, you have no knowledge of what he was doing

22  at the garage at that time, correct?

23  A.   Correct.

24  Q.   This exhibit doesn't provide any information other than

25  purely location data, correct?

1  A.  Yes.

2  Q.  And it's certainly possible that he could have been

3  assigned another search of -- or dog sniff on that day, on

4  June 20th, 2019, correct?

5  A.  Yes.

6  Q.  You would have no way of knowing that, right?

7  A.  Not that I can figure out at this point.

8  Q.  And this exhibit contains, at the top, certain times

9  ranging from 12:10 to 12:25 p.m., correct?

10  A.  Yes.

11  Q.  But this exhibit doesn't provide any information of

12  whether this vehicle would have traveled to that garage any

13  other time besides those specific times contained in the

14  exhibit, correct?

15  A.  This exhibit, correct.

16  Q.  Removing Exhibit 16 from the ELMO.  The exhibit that we

17  just talked about covers the period of time where the vehicle

18  assigned to Anthony Marshall was travelling close to noon on

19  June 20th, 2019, correct?

20  A.  Yes.

21  Q.  But you're not accounting for any other whereabouts of

22  any other vehicle on that date, correct?

23  A.  As far as this exhibit, correct.

24  Q.  Did you give any other maps to the government besides

25  that which were contained in Exhibit 16?

1   A.   No.

2   Q.   Now, at noon on June 20th, 2019, at that point, the

3   traffic stop that had happened in the early hours of the

4   morning had already been completed, correct?

5   A.   Yes.

6   Q.   And it had been completed by approximately, 11 to 10

7   hours, right?

8   A.   Yes.

9   Q.   And you were aware at that point that Mr. Washington had

10  already been released from any custody of the Buffalo Police

11  Department, correct?

12  A.   I don't recall if I was aware of that.

13  Q.   That's something you would have been made aware of, that

14  he was no longer in the custody of the Buffalo Police

15  Department correct?

16  A.   Most likely.

17  Q.   And in terms of when there would have been coordination

18  with the K9 unit, you don't recall a specific time, correct?

19  A.   Yes.

20  Q.   You don't recall whether you were personally involved in

21  that, correct?

22  A.   Yes.

23  Q.   Do you have any estimate of when it would have occurred?

24  A.   The search or calling for K9?

25  Q.   The call into or the coordination with the K9 unit to go

1  to the Seneca garage.  Do you have any estimate of time other

2  than it occurred before 3 p.m.?

3  A.  Again, I'm working off the presumption from the map that

4  it would have been around noon.

5  Q.  It would have been, sorry?

6  A.  Around noon.

7  Q.  So, the presumption is that would have immediately

8  proceeded the commute to the Seneca garage by the vehicle

9  that was associated with Anthony Marshall?

10  A.  Yes.

11  Q.  You don't know that for sure though?

12  A.  Correct.  I do not know that for sure.

13  Q.  Now, putting back on the ELMO Government Exhibit 15, that

14  sentence that I pointed out earlier, we coordinated with

15  Buffalo Police Department K9 who positively hit on a

16  narcotics indication, I thought you said something on direct,

17  maybe I misheard, but is it your understanding that you would

18  have been present for when the K9 would have done the sniff

19  on the vehicle?

20  A.  Yes.  It's likely I was present.

21  Q.  Okay.  So, if this dog sniff was conducted on that

22  Cadillac Escalade, your belief is that you would have been

23  present at the time that occurred?

24  A.  Yes.

25  Q.  You have no memory of that taking place?

1   A.   It's been murky.  Again, I'm getting it confused with

2   many other searches.

3   Q.   On October 5th, 2021, you testified about your

4   involvement in this investigation.  You remember giving

5   testimony on that date, correct?

6   A.   Yes.

7   Q.   And we talked about whether you had any recollection of

8   ever having seen that Cadillac Escalade, correct?

9   A.   Yes.

10  Q.   And at least on October 5th, 2021, you indicated you have

11  no recollection of having seen that vehicle.  You're not sure

12  if you ever saw it or not, correct?

13  A.   As I recall, I believe you, on cross, asked me if I'd

14  seen Mr. Washington personally driving that vehicle.

15  Q.   So, I -- there was a set of questions where I asked about

16  the vehicle that you had conducted surveillance on, right?

17  A.   Yes.

18  Q.   And in regards to -- that was surveillance that took

19  place on another date before this, correct?

20  A.   Yes.

21  Q.   And although it was a similar make and model, it was a

22  different vehicle, correct?

23  A.   I believe so.

24  Q.   And I had asked you questions in regard to whether you

25  had seen Mr. Washington driving the vehicle on that date,

1    correct?

2    A.   Correct.

3    Q.   Now, as far as June 20th, 2019, you were asked whether

4    you had ever observed the vehicle at any time following its

5    seizure, correct?

6           MR. LYNCH:  Judge, I have the transcript here to

7    assist not only our witnesses, but also Mr. Foti.

8           MR. FOTI:  I think --

9           THE COURT:  How we're going to use it to refresh his

10   memory, or if he can answer without being refreshed.

11          MR. FOTI:  Judge, do you want it marked just for

12   purposes of refreshing recollection?

13          THE COURT:  I don't think it's necessary.

14          MR. FOTI:  May I approach?

15          THE COURT:  Because we already have the transcript as

16   part of the documents.

17          MR. FOTI:  Right.  May I approach?

18          THE COURT:  Yes.  Mr. Foti, state for the record what

19   pages and folios you indicated to the witness.

20          MR. FOTI:  Judge, I handed the witness a copy of his

21   prior testimony, the cross-examination, and it's on page 342

22   and 343 of the cross-examination that I've directed the

23   witness to for purposes of refreshing recollection.

24          THE COURT:  And the folios?

25          MR. FOTI:  It's 3 into 5 on page 343.

1          THE COURT:  All right.  Thank you.

2   BY MR. FOTI:

3   Q.  Sir, having reviewed a portion of the cross-examination

4   on October 5th, 2021, does that refresh your recollection as

5   to the testimony on that date?

6   A.  Yes.

7   Q.  Okay.  And you were asked about whether you had made any

8   observations of the vehicle yourself, correct?

9   A.  Yes.  Mr. Foti, are you referring to the vehicle in April

10  or now we're talking June 20th?

11  Q.  So, we could do this by going further back in the

12  transcript, but I'm just going to withdraw the question.  Let

13  me ask you, because ultimately this is what's more important.

14  Regardless of what you recall on October 5th, 2021, today, as

15  you sit here today, you don't have any recollection of having

16  specifically seen this vehicle, do you?

17  A.  I -- again, I remember searching Escalades before.  I

18  remember, you know?  But I can't particularly say because I

19  wasn't the affiant for the search warrant, nor did I ever

20  intend to document any of this, you know?  If it was my

21  search warrant, I would have, you know?  But I can't.  No, I

22  can't testify that I recall that.

23  Q.  So you're testifying that you have some recollection in

24  that time period having searched or having been present for

25  the search of vehicles that have a particular make and model

1    to the vehicle in question?

2    A.  Yes.

3    Q.  And that's sort of the extent of what you can offer at

4    this point?

5    A.  Yes, sir.

6    Q.  There is at least one other vehicle, similar make and

7    model, during the course of this investigation that you're

8    aware of, correct?

9    A.  Yes.

10   Q.  And in terms of the vehicle on June 20th, 2019, you don't

11   recall whether specifically you ever observed that vehicle,

12   correct?

13   A.  I do not.  You're correct.  They were both the same

14   color, also.

15   Q.  The email that's still -- you can still see the email on

16   the screen, correct?

17   A.  Yes.

18          THE COURT:  Referring to Government Exhibit 15?

19   BY MR. FOTI:

20   Q.  In terms of Government Exhibit 15, the email that you

21   sent on June 20th, you never specifically indicate that you

22   were present at the time of the dog sniff, correct?

23   A.  Correct.

24   Q.  Okay.  It refers to coordination with the K9 unit, but

25   no -- there's no information in there stating any

1    observations that you had personally made, correct?

2    A.   That's correct.

3    Q.   And in terms of what would have happened, is there a

4    possibility that Lieutenant Koshisburger would have been

5    present without you at that time or any?

6    A.   Is it possible?

7    Q.   Yeah.  Is that something that could have happened?

8    A.   We both would have been present at Seneca Street garage.

9    Q.   Okay.  So, your expectation is the dog sniff happened,

10   that you would have been present along with Lieutenant

11   Koshisburger, if I'm mispronouncing his name?

12   A.   Most likely, yes.

13   Q.   Okay.  Now, the email also refers to a meeting with

14   members of Homeland Security, correct?

15   A.   Yes.

16   Q.   And were these specifically members of the Safe Streets

17   Task Force?

18   A.   They could have been.  I don't recall.

19   Q.   Do you have any recollection of this meeting at all?

20   A.   Well, the meeting would have been at the Seneca Street

21   garage.  It would have been like a formal meeting.  We met --

22   I guess I should have denoted that we met at Seneca Street

23   garage.

24   Q.   Your belief, having reviewed this email, is that you met

25   with members of Homeland Security.  There would have been a

1  meeting that took place at the Seneca Street garage?

2  A.  Yes, because that's where that vehicle was impounded.

3  Q.  Is it your belief then that there were other members of

4  Homeland Security who would have been present for the dog

5  sniff?

6  A.  I'd assume so.

7  Q.  And the -- there's reference to US -- Assistant US

8  Attorney Higgins and her position on the search.  Was she

9  present at this time?

10 A.  No.  I don't remember Ms. Higgins ever being at the

11 Seneca Street garage.

12 Q.  You don't recall having been at the Seneca Street garage

13 yourself either, correct?

14 A.  Like I said, specifically, that day and time, no.  I

15 can't recall.  I can't give you a recollection of it.

16 Q.  And so, by extension of that, you don't recall this

17 specific meeting with members of Homeland Security, correct?

18 A.  Correct.

19 Q.  Did you have any other meeting with members of Homeland

20 Security that took place on June 20th, 2019 outside the

21 Seneca Street garage?

22 A.  Not that I recall.

23 Q.  We're removing Exhibit 15 from the ELMO.  I am placing on

24 the ELMO Government Exhibit 17, which was another email you

25 were asked about on direct.  This was an email from Thomas

1    Webb directed to you, correct?

2    A.   Yes.

3    Q.   All right.  And there was an attachment which you could

4    see as an icon at the bottom of the page.  It says

5    affidavit.docx, correct?

6    A.   Yes.

7    Q.   And is it your understanding that this was sent to you

8    just shortly before the affidavit was submitted to a

9    magistrate for review?

10   A.   Yes.

11   Q.   And do you recall any conversation with Thomas Webb

12   regarding the contents of the email that he sent you?

13   A.   I do not.

14   Q.   Okay.  You testified that you would have reviewed it, at

15   some point, for accuracy.  You have some recollection that

16   your responsibility was to review this affidavit to determine

17   if it was accurate?

18   A.   Yes.

19   Q.   Okay.  And you said that you believe you would have

20   reviewed it at some point, correct?

21   A.   Correct.

22   Q.   You don't recall whether you actually reviewed it or not

23   though, do you?

24   A.   No, sir.

25   Q.   And again, by extension of that, you don't recall when

1  you would have or when you would have reviewed it then?

2  A.  That's correct.

3  Q.  I'm removing Exhibit 17 from the ELMO.  Okay.  When you

4  last testified, sir, on October 5th, 2021, at that time, you

5  were not asked about the email that you had sent related to

6  coordinating with the K9, correct?

7  A.  Correct.

8  Q.  Okay.  Now, had you -- were you aware of the existence of

9  that email prior to your testimony on October 5th, 2021?

10  A.  I was at least aware of it on June 21st, 2019.

11  Q.  When did you provide a copy of that to the government?

12  A.  Within the past week.

13  Q.  Okay.

14  A.  I believe.  Maybe.

15  Q.  Okay.  And prior to your testimony on October 5th, 2021,

16  did you make any effort to go back and review emails that you

17  had either sent or received on June 20th, 2019?

18  A.  No, I did not.

19  Q.  And what prompted you to do so in the last week or so?

20  A.  This hearing.

21  Q.  What about this hearing caused you to go check your

22  emails as opposed to hearing on October 5th, 2021?

23  A.  To be honest, in October, I wasn't really sure -- I'm

24  still not clear on the scope of this hearing.  You know, like

25  I said, basically, I answered at phone at 1 in the morning

1  and now, here I am.  So, now that it's a little bit clearer,

2  obviously.  I looked through my email to see any

3  correspondence I had with anybody involved in this case

4  around that date.

5  Q.  Okay.  And when you went through email to look for any

6  correspondence that you had with anybody related to this

7  case, you found the email that was from you to supervisor

8  Dennis Richards?

9  A.  Yes.

10  Q.  And you found this email from Special Agent Webb

11  containing the attachment that says affidavit in it?

12  A.  Yes.

13  Q.  Okay.  And was there any other email correspondence that

14  you located during the course of preparing for this hearing?

15  A.  No.

16  Q.  You didn't send any other emails at any point documenting

17  any involvement in your -- on your part in this

18  investigation?

19  A.  The email that -- the exhibit you have to my chief,

20  that's what I sent.

21  Q.  That's the only email?

22  A.  Yes.

23          THE COURT:  That's Government Exhibit 17?

24          MR. LYNCH:  Fifteen.

25          THE COURT:  Or 15.  I'm sorry.

1   BY MR. FOTI:

2   Q.  Prior to testifying today, Detective, did you have any

3   conversations with Special Agent Webb regarding this hearing?

4   A.  Yes.

5   Q.  Okay.  And was there any discussion related to what

6   information had been communicated to him on June 20th and

7   June 21st, 2019?

8           MR. LYNCH:  Judge, I -- and I apologize, Mr. Foti,

9   for interrupting, but do we have a date as to when or

10  approximate time when these communications took place?

11          MR. FOTI:  I can -- I maybe should ask that.

12          MR. LYNCH:  Okay.

13  BY MR. FOTI:

14  Q.  Do you recall when you spoke to Special Agent Webb about

15  the content of this investigation in preparation for this

16  hearing?

17  A.  Do I recall when I spoke to Agent Webb regarding this

18  hearing?

19  Q.  Yes.

20  A.  No.

21  Q.  Do you have an estimate about how long ago it was?

22  A.  It was within the past week.

23  Q.  And when you spoke to him within the last week, was there

24  any discussion regarding information that you would have

25  conveyed to him back on June 20th, and June 21st, 2019?

1  A.  When I spoke to him last week, was there any discussion

2  pertaining to -- I'm sorry.

3  Q.  Generally, without -- generally, what did you talk about

4  related to this hearing?

5  A.  That, basically, that I found an email I sent to my

6  chief.  I can't remember if I told TJ or Mr. Lynch only that

7  I had utilized the CAD software to find the geographical and

8  historical whereabouts of K9-41 that would have been probably

9  covering it.

10  Q.  You didn't talk about the creation of the search warrant

11  affidavit at all?

12  A.  I did not.

13  Q.  Okay.  Anything about your conversation with Special

14  Agent Webb that refreshed your recollection as to anything

15  that happened on June 20th that you didn't recall back on

16  October 5th, 2011 -- '21?

17  A.  No.

18  Q.  And in addition to what's been presented as exhibits,

19  just to follow up on something you said, there were

20  additional efforts taken to try to determine how the

21  communication with the K9 officer took place, correct?

22  A.  Can you repeat the question?  I'm sorry.

23  Q.  You took additional efforts, including looking at radio

24  transmissions, to determine how communication with the K9

25  officer may have taken place, correct?

1  A.  I requested that our 911 lieutenant, who presides over

2  dispatch, to have -- I requested his personnel listen for

3  what they had regarding that day.

4  Q.  And you found no communication relevant to ordering a K9

5  sniff?

6  A.  They did not.

7  Q.  And did you take any other efforts beside those that have

8  been discussed at this point?

9  A.  No, sir.

10  Q.  Did you -- I'm almost done here.  In terms of that

11  attachment and the search warrant affidavit that was

12  ultimately prepared --

13        THE COURT:  That's Government Exhibit 17?

14        MR. FOTI:  That's the attachment that's -- that was

15  contained or the attachment to the email that was Government's

16  Exhibit 17.

17  BY MR. FOTI:

18  Q.  Do you have any recollection of having reviewed that

19  search warrant affidavit at any point; that one specifically?

20  A.  That one, no.  Not -- no.

21  Q.  In terms of the content of what was contained in that

22  affidavit, you have no ability to confirm or correct any

23  information at this point as to what was in there?

24  A.  I mean, I've seen the affidavit within the past week.

25  Q.  Okay.  And when you saw the affidavit, you saw that there

1  were certain -- information conveyed to the magistrate,

2  correct?

3  A.  Yes.

4  Q.  Including the information about the field sobriety test,

5  correct?

6  A.  Yes.

7  Q.  Specifically, that there was an allegation contained in

8  that affidavit that Mr. Washington had failed the field

9  sobriety test, correct?

10 A.  Yes.

11 Q.  And you don't have any reason or any information to

12 suggest that that information is correct?

13 A.  Correct.

14 Q.  And, in fact, in terms of your conversation with Davidson

15 in the early hours of June 20th, 2019, there was no

16 indication that field sobriety tests had been done, correct?

17 A.  Not that I call.

18 Q.  Okay.

19         MR. FOTI:  May I just have a moment, Judge?

20         THE COURT:  Certainly.

21         MR. FOTI:  I have nothing further, Judge.

22         THE COURT:  Detective Pliszka, focusing on the

23 affidavit of Special Agent Webb, you said he sent you a copy

24 of it.

25         THE WITNESS:  Yes.

1          THE COURT:  On the 20th of June, 2019?

2          THE WITNESS:  The 21st, sir.

3          THE COURT:  Or June 21st, 2019?

4          THE WITNESS:  Yes.

5          THE COURT:  Did you look at it?  Did you read it?

6          THE WITNESS:  Your Honor, I generally read them all

7   or at least glance over it to --

8          THE COURT:  At that time, did you have any discussion

9   with him about the issues of roadside sobriety tests?

10          THE WITNESS:  No.  No.

11          THE COURT:  Okay.

12          MR. LYNCH:  So, that's what I want to follow up on

13   redirect.

14

15                    REDIRECT EXAMINATION

16

17   BY MR. LYNCH:

18   Q.  So, as you sit here today, you say you don't recall

19   certain things, correct?

20   A.  Yes.

21   Q.  Okay.  Now, I want to put that in context a little bit,

22   because you did make an email contemporaneous with the events

23   that occurred on June 20th, correct, that you sent to

24   Detective Richards?

25   A.  Yes.

1    Q.  Okay.  And is it fair to say you have to be honest with

2    your superiors?

3    A.  Yes.

4    Q.  Okay.  And is it fair to is say that when you put stuff

5    in an email, it's correct to the best of your knowledge?

6    A.  Yes.

7    Q.  Okay.  You don't fabricate information in emails?

8    A.  No, sir.

9    Q.  Okay.  So, on June 20th, the information that's contained

10   in that email, it would be accurate?

11   A.  Yes.

12   Q.  You just don't remember today because you've done so many

13   other warrants about this particular day?

14   A.  That's correct.

15   Q.  Okay.  Does the email help refresh your recollection or

16   give you some confidence that that's what happened?

17   A.  It does.  That's why I provided it.

18   Q.  Okay.  And the same thing with Anthony Marshall.  As you

19   sit here today, you don't remember if Anthony Marshall was

20   called out on June 20th, 2019 or some other date for some

21   other vehicle all the time you've been a narcotics detective?

22   A.  Correct.

23   Q.  Okay.  But do you have confidence on June 20th, 2019

24   Anthony Marshall and his K9 was the one who was used?

25   A.  I do.

1    Q.  And why is that?

2    A.  He was the only K9 officer working that day and that's

3    who we utilize.

4    Q.  And you went to the mapping and had it mapped out for the

5    time that he was at the Seneca Street station, correct?

6    A.  Correct.

7    Q.  Okay.  Now, is there more -- there were -- you could plot

8    out the whole day for his vehicle, correct?

9    A.  Yes.

10   Q.  Do you know what time that vehicle came back from Canada?

11   A.  Approximately 3 o'clock.

12   Q.  Okay.  And where did the vehicle go to?

13   A.  I believe it went back to Seneca Street garage.

14   Q.  Okay.  Now, you know you sent your email at 3:01,

15   correct?

16   A.  Yes.

17   Q.  Okay.  And that email you said you sent from your office

18   down a mile away?

19   A.  Yes.

20   Q.  Okay.  So, did you then determine, based on the CAD GPS

21   coordinates, that had to be 12?  You would have had to be

22   there to convey the information to your chief, correct?

23   A.  Correct.

24   Q.  And you couldn't have done it if you were at the Seneca

25   Street station?

1   A.  Correct.

2   Q.  When he got back from Canada?

3   A.  Correct.

4   Q.  Officer Marshall?  Okay?

5   A.  And just, another thing that I think is significant,

6   that's also where our gas pumps are located.  So -- and

7   again, this is -- I would assume that he took a lengthy drive

8   to Canada and the K9 officers generally don't turn off their

9   vehicle because, a lot of time, the animal is stowed in the

10  car.  So, whether it be heat or air conditioning, it must be

11  running and idle.  So, again, I'm working under the

12  assumption he came back from Canada and gassed up.  That's

13  where you would get gasoline.

14  Q.  Okay.  Now, going back to the field sobriety test

15  questions that Mr. Foti asked you, you know that's in the

16  affidavit, correct, that Special Agent Webb prepared and sent

17  to Judge McCarthy, correct?

18  A.  Yes.

19  Q.  All right.  You said it's your practice to review the

20  affidavits that are sent to you?

21  A.  Yes.

22  Q.  All right.  And you actually, in 2019, were you a

23  supervisor?

24  A.  Yes.

25  Q.  Okay.  So, it would be your regular practice to review

 1  this kind of information?

 2  A.  Yes.

 3  Q.  All right.

 4  A.  Often.

 5  Q.  Yeah.  Now, I understand you're not Special Agent Webb's

 6  supervisor, correct?

 7  A.  I am not.

 8  Q.  All right.  But he did send it to you?

 9  A.  Yes.

10  Q.  All right.  And you had been involved with him in the

11  investigation the last two -- 24 to 36 hours?

12  A.  Yes.

13  Q.  All right.  If there was information that you thought was

14  incorrect, would you have notified Special Agent Webb?

15  A.  Yes.

16  Q.  All right.  Would you remember notifying Special Agent

17  Webb of an incorrect or false information in this affidavit?

18          MR. FOTI:  Objection, Judge.

19          THE WITNESS:  I believe --

20          THE COURT:  Sustained.  Speculative.

21  BY MR. LYNCH:

22  Q.  If there was false or incorrect information in affidavit,

23  wouldn't you notify the person to let them know?

24  A.  Yes.

25  Q.  All right.  Do you have any recollection of doing that in

1  this case?

2  A.  I do not.

3  Q.  Okay.  That doesn't mean the information that's in there

4  is incorrect, correct?

5  A.  Correct.

6  Q.  You just don't remember as you sit here today?

7  A.  I do not.

8  Q.  All right.

9          THE COURT:  I'm not sure I understood that question.

10         MR. LYNCH:  Okay.  Well --

11         THE COURT:  You said, that doesn't mean the

12  information in there wasn't correct.  What does that mean?

13         MR. LYNCH:  Well, about the field sobriety test.

14  BY MR. LYNCH:

15  Q.  Do you have a recollection of whether he even took field

16  sobriety tests and failed them?

17  A.  Today?  No.

18  Q.  Right.  Today, you don't.  That doesn't mean he didn't

19  fail them, correct?

20  A.  Correct.

21  Q.  And you weren't even at the scene, were you?

22  A.  No.

23  Q.  Okay.  The information you were getting was from Officer

24  Davidson?

25  A.  Yes.

1   Q.  Do you remember every specific piece of information he

2   provided you that morning?

3   A.  I do not.

4   Q.  All right.  But would you agree that Special Agent Webb

5   prepared a document based on information that you were

6   providing him within 36 hours of presenting it to a

7   magistrate judge?

8   A.  Yes.

9   Q.  All right.  Same thing with what your email did to

10  Detective Richards?

11  A.  Yes.

12  Q.  Were you conducting an investigation of -- with the

13  federal agencies regarding David Washington's driving under

14  the influence of alcohol?

15  A.  No.

16  Q.  Okay.  Did you even care whether David Washington was

17  driving under the influence of alcohol, I mean, as far as

18  your investigation went?

19  A.  No.

20  Q.  Other than public safety on the streets?

21  A.  No.

22  Q.  Whether or not he was driving under the influence of

23  alcohol, did that have any role in your decision to have the

24  K9 do a sniff of the vehicle?

25          MR. FOTI:  Objection.  He has no recollection of

1   whether it was his decision or not.  This is referring to

2   speculation as if it's facts as represented by the witness.

3           THE COURT:  Well, the way the question is formed, he

4   can answer either he does have a recollection or he doesn't or

5   he says, I know, or I don't know, or yes, that's what

6   happened.  Overruled.

7           THE WITNESS:  I'm sorry.

8           MR. LYNCH:  I don't remember --

9   BY MR. LYNCH:

10  Q.  Whether or not David Washington was driving under the

11  influence of alcohol on June 20th, would that have -- did

12  that play in role in your decision to -- would that have

13  played any role in your decision to get a K9 for a sniff of

14  the vehicle?

15  A.  No.

16  Q.  Okay.

17          MR. LYNCH:  I have no further questions.

18          THE COURT:  Detective Pliszka, Mr. Lynch just asked

19  you or indicated in his question that you were the person that

20  provided information to Special Agent Webb that he used for

21  his affidavit for the search warrant, correct?

22  A.  Yes.

23  Q.  Do we have paragraphs 8 and 9 please?

24          MR. LYNCH:  Yes, Judge.

25          THE COURT:  Which would be Government Exhibit -- part

1    of Government Exhibit 17, I guess.  I want you to look at

2    paragraphs 8 and 9 of Government Exhibit 17, which was the

3    attachment to the email.

4              THE WITNESS:  Okay.

5              THE COURT:  Okay?  After having reviewed paragraphs 8

6    and 9 of Government Exhibit 17, are you the person that

7    supplied that information to Special Agent Webb?

8              THE WITNESS:  Yes, sir.  It wouldn't have been

9    anybody else.

10             THE COURT:  Okay.  Thank you.

11             MR. LYNCH:  That's all, Judge, I have.

12             MR. FOTI:  Judge, may I recross?

13             THE COURT:  Yes, on redirect.

14             MR. FOTI:  Yes.

15

16                       RECROSS-EXAMINATION

17

18   BY MR. FOTI:

19   Q.  Your testimony on redirect was that the patrol vehicles

20   gas up at the Seneca Street garage?

21   A.  Yes.

22   Q.  So --

23   A.  That's where -- our gas pumps are located there.

24   Q.  So, that map demonstrating that the vehicle went to the

25   Seneca Street garage around noon, that could have been to gas

1  up?

2  A.  So, if you want to bring that back up again, I think I

3  can --

4          MR. LYNCH:  It's page 2.

5          MR. FOTI:  I'm looking at Exhibit 16 on the ELMO

6  (inaudible).

7          THE WITNESS:  Okay.  So, Mr. Foti, where these three

8  dots are signified, that's inside the building, okay?  To

9  the -- from my point of view to the right where you see

10 Carroll Street, Seneca Street, and it looks like there's a --

11 it would be east, that's outside where it's a little bit

12 lighter, that's where the gas pumps are.  So it looks like

13 there's streets there, do you see that?  I don't know if

14 there's a way I can point it out.

15         MR. LYNCH:  You can, I think, if you touch the

16 screen.

17         THE WITNESS:  This is where the pumps are.  This

18 (indicating) is all indoors, okay?

19         THE COURT:  Where you placed the, what appears to be

20 the number one and you circled it?

21         THE WITNESS:  Yes.  That's where the pumps are, sir.

22         THE COURT:  That's not only where the gas pumps are,

23 but that's the whole outside parking area where they store

24 vehicles, wrecked police cars, and seized vehicles, correct?

25         THE WITNESS:  Correct.

1    BY MR. FOTI:

2    Q.   And when the vehicle returned from Canada, do you

3    remember the specific time when it returned to the garage?

4    A.   Again, I don't remember specific time.

5    Q.   I think it was estimated for you that it was

6    approximately 3 o'clock or some time after that?

7    A.   Yes.

8    Q.   You don't recall the exact time though, do you?

9    A.   No, I do not.

10   Q.   And do you recall where the vehicle went to at that time

11   in relation to the garage?

12   A.   I don't.

13   Q.   In regards to the last question about the information

14   that was conveyed, you made the statement that it wouldn't

15   have been anybody else that would have conveyed this

16   information.  To some degree, you're speculating about that,

17   correct?

18   A.   Yes, sir.  I mean, I received a call from Officer

19   Davidson, and I would have called TJ Webb.  I don't really

20   think of anybody else I would have contacted at that time in

21   the morning to tell them.

22   Q.   When you say you don't think there would have been

23   anybody else, do you recall TJ Webb telling you that he had

24   only spoken to you about this?

25   A.   I don't.

1    Q.  You didn't ever attempt to determine who else he

2    communicated with related to what transpired on the early

3    hours of June 20th, 2019?

4    A.  I'm sorry, Mr. Foti.  I don't -- can you just repeat the

5    question?

6    Q.  You didn't ever make any effort to determine who else he

7    may have spoken to about what happened that morning, correct?

8    A.  No.

9    Q.  Okay.

10              THE COURT:  Wait a minute.  When he says correct and

11   you say no, that indicates he's not correct.

12              THE WITNESS:  Okay.

13              THE COURT:  So, either you leave the correct off in

14   your question or --

15              THE WITNESS:  He's good at that.

16              THE COURT:  -- or your change your answer.

17              MR. FOTI:  Or bad at it.

18              THE COURT:  One or the other.

19   BY MR. FOTI:

20   Q.  You would agree that you didn't have contact, or you

21   didn't ever determine who else TJ Webb had contact with in

22   regard to what took place on June 20th, 2019?

23   A.  Yes.

24   Q.  And you don't recall whether he was present for any

25   meetings involving other members of Homeland Security?

1          MR. LYNCH:  That's beyond the scope of my redirect.

2          THE COURT:  Overruled.  I'll let him answer.

3          MR. LYNCH:  Okay.

4          THE WITNESS:  If -- I don't recall if TJ Webb was

5     present with other members of HSI.

6     BY MR. FOTI:

7     Q.  In terms of communication about what happened on June

8     20th, your email suggests that you had met with other members

9     of Homeland Security, correct?

10    A.  Correct.

11    Q.  And you don't recall whether TJ Webb was present for

12    those meetings, do you?

13    A.  I don't.

14         MR. FOTI:  Okay.  All right.  Nothing further, Judge.

15         THE COURT:  Thank you, Detective.  You're excused.

16         THE WITNESS:  Thanks, Judge.

17    (The witness was excused at 1:03 p.m.)

18         MR. LYNCH:  Do we want to come back at 2, Judge?

19         THE COURT:  If that's going to give you enough time

20    to also meet with Special Agent Webb.

21         MR. LYNCH:  It will.

22         THE COURT:  All right.  We'll adjourn until 2

23    o'clock.

24    (A recess was taken from 1:04 p.m. to 2:06 p.m.)

25         THE CLERK:  Back on the record in United States v.

1    David Washington.

2              MR. LYNCH:  Judge, the government will call Special

3    Agent TJ Webb.

4              THE COURT:  All right.

5    (The witness was sworn at 2:07 p.m.)

6              THE COURT:  Have a seat.  State and spell your name

7    for the record.

8              THE WITNESS:  Thomas Webb, W-E-B-B.

9              MR. LYNCH:  May I proceed, Your Honor?

10             THE COURT:  Yes.

11

12                        DIRECT EXAMINATION

13

14   BY MR. LYNCH:

15   Q.  Mr. Webb, how are you employed?

16   A.  I'm employed with Homeland Security Investigations.

17   Q.  And how long have you been employed with Homeland

18   Security Investigations?

19   A.  Since 2007.

20   Q.  And you're a special agent?

21   A.  Yes, I am.

22   Q.  And can you just briefly describe the duties that you

23   engage in as a special agent?

24   A.  I'm currently assigned to the Border Enforcement Safety

25   Task Force.  We investigate transnational criminal

1    organizations with regards to narcotics, firearms, currency

2    violations.

3    Q.  And prior to becoming a special agent with Homeland

4    Security, did you have other law enforcement employment?

5    A.  I did.

6    Q.  And can you just kind of go back in time for us?

7    A.  Sure.  I began my career as a student with the

8    Immigration and Naturalization Service in '95 or '96.  I was

9    a co-op with the Immigration and Naturalization Service and

10   then was given an inspector's position in 1997.  Immigration

11   then formed with US Customs to become Customs and Border

12   Protection, and prior to taking my position with Homeland

13   Security, I was a Customs and Border Protection supervisor.

14   Q.  And what were your duties as a supervisor with Customs

15   and Border Protection?

16   A.  I was assigned to the anti-terrorism contraband

17   enforcement team, which was a roaming unit, primarily focused

18   on interdicting narcotics and other violations of the ports

19   of entry and I was also a liaison at the Border Patrol fusion

20   center.

21   Q.  Did you have any other law enforcement experience prior

22   to working with Immigration?

23   A.  I did not.

24   Q.  Okay.  During your time with Immigration, at any point,

25   did you ever engage in field sobriety testing of individuals?

1  A.  No.

2  Q.  How about when you were with Customs and Border

3  Protection, did you ever engage in field sobriety tests?

4  A.  No.

5  Q.  While you've been a special agent with Homeland Security

6  Investigations, have you ever engaged in field sobriety

7  testing of any individuals?

8  A.  I have not.

9  Q.  Do you have any training in field sobriety testing?

10  A.  I do not.

11  Q.  Do you have any idea what is involved in field sobriety

12  tests that are conducted on the road by local police

13  officers?

14  A.  Outside of being a casual observer, I do not.

15  Q.  So, do you understand that the issue pertaining to this

16  hearing relates to information that was provided in a search

17  warrant affidavit to judge -- Magistrate Judge Jeremiah

18  McCarthy?

19  A.  Yes, I do.

20  Q.  Okay.  And it relates to a search warrant that was

21  obtained on June 21st, 2019?

22  A.  Correct.

23  Q.  Of a Cadillac Escalade?

24  A.  Yes.

25  Q.  Now, when did you first learn about David Washington's

1  relationship with that Cadillac Escalade that you got a

2  search warrant for?

3  A.  On June 20th, in the morning of June 20th.

4  Q.  And who did you obtain that information from?

5  A.  Buffalo Police Detective Christopher Pliszka.

6  Q.  And after you received the information from Christopher

7  Pliszka, did you have conversations with anyone at the United

8  States Attorney's Office?

9  A.  Yes, I did.

10  Q.  And who was that?

11  A.  AUSA, Assistant United States Attorney, Laura Higgins.

12  Q.  And at some point, did you formulate a plan as to what

13  would be -- if any other investigative activity would be done

14  with respect to that Cadillac Escalade?

15  A.  Yes, we did.

16  Q.  And what was determined?

17  A.  It was determined that we would obtain a federal search

18  warrant.

19  Q.  Were there discussions also about maybe whether a state

20  warrant should be obtained?

21  A.  Yes.

22  Q.  But, ultimately, the U.S. Attorney's Office asked for a

23  federal warrant?

24  A.  That's correct.

25  Q.  Okay.  And based on that, did you then begin compiling

1  information for an affidavit?

2  A.  Yes, I did.

3  Q.  You said that you learned about the stop in the morning

4  hours of June 20th, 2019.  Do you remember what time?

5  A.  I don't recall specifically, but it would have been early

6  a.m., around the 8 or 9 a.m.

7  Q.  Okay.  Could have been earlier, maybe a little bit later,

8  but somewhere around that time?

9  A.  Yes.

10  Q.  All right.  What time is your normal shift duty for

11  Homeland Security?

12  A.  At 8:30.

13  Q.  And are you aware that at some point -- strike that.

14      In preparation for your testimony, did you examine several

15  emails relating to the preparation of the affidavit for that

16  Cadillac Escalade?

17  A.  Yes, I did.

18  Q.  All right.  I'm going to first show you what's been

19  marked as Government Exhibit Number 18 and ask if you can

20  identify what that is.

21  A.  This is a cover of an email sheet from me on Thursday,

22  June 20th, 2019 at 3:21 p.m. to AUSA Laura Higgins.  The

23  subject line is, SWF, search warrant affidavit and the

24  attachments include SW2017CadillacEscalade.docx.

25  Q.  And prior to your testimony here today, did we -- did you

1  and I print out a portion of that affidavit that was attached

2  to this email?

3  A.  Yes.

4  Q.  Okay.  Specifically as it relates to paragraphs 8 and 9

5  of that email?

6  A.  Yes.

7  Q.  Or affidavit?

8  A.  Correct.

9  Q.  Is that also attached to Exhibit 18?  Is that paragraphs

10 8 and 9 of the affidavit in the initial draft?

11 A.  Yes, it is.

12 Q.  So, is this a fair and accurate copy of the email?

13 A.  It appears to be.

14        MR. LYNCH:  All right.  Judge, I'd ask that

15 Government Exhibit 18 be admitted.

16        THE COURT:  Do I have a copy?

17        MR. LYNCH:  I don't know.

18        THE COURT:  Mr. Foti?

19        MR. FOTI:  No objection.

20        THE COURT:  There being no objection, Government

21 Exhibit 18 is received in evidence.

22 (Government Exhibit 18 was received in evidence.)

23

24 BY MR. LYNCH:

25 Q.  So, just to clarify, this email was sent by you at 3:21

1    p.m., correct?

2    A.   Correct.

3    Q.   So that would be approximately seven hours after you

4    started your -- approximately seven hours after you started

5    your shift?

6    A.   Approximately.

7    Q.   Okay.  And --

8         THE COURT:  Before you go further, I'm assuming the

9    entire affidavit was attached to the email to Ms. Higgins?

10        MR. LYNCH:  Just to clarify.

11   BY MR. LYNCH:

12   Q.   Special Agent Webb, we printed that attachment together,

13   but only printed paragraphs 8 and 9, correct?

14   A.   That's correct.

15   Q.   And they appeared on page 4, and I blacked out the other

16   information contained on that page; correct, Special Agent

17   Webb?

18   A.   That's correct.

19   Q.   All right.  Now, referring you to paragraph 8, do you see

20   paragraph 8 in front of you?

21   A.   Yes, I do.

22   Q.   Where did you obtain the information that you put in

23   paragraph 8?

24   A.   All the facts included in paragraph 8 were provided to me

25   by Buffalo Police Detective Chris Pliszka.

1  Q.  Did you add any information that you didn't obtain from

2  Detective Pliszka to this affidavit?

3  A.  No, I did not.

4  Q.  Specifically, as it relates to field sobriety tests, did

5  you, I guess, insert that information without any basis into

6  this affidavit; in other words, without anybody telling you

7  it?

8  A.  No.

9  Q.  Did you fabricate any of the -- personally fabricate any

10  of the information contained in that affidavit?

11  A.  Absolutely not.

12  Q.  When you created that affidavit and sent it to AUSA

13  Higgins, did you believe the information to be accurate?

14  A.  Yes, I did.

15  Q.  Okay.  Would you have submitted the affidavit to AUSA

16  Higgins or to the Court if you thought the information was

17  inaccurate?

18  A.  No, I would not.

19  Q.  Certainly if you thought it was false, would you have

20  submitted it?

21  A.  No, I would not.

22  Q.  Okay.  What are the -- what would be the impact to a

23  person, a special agent, if you submitted false information

24  to a federal judge?

25          MR. FOTI:  Objection.

1          MR. LYNCH:  Knowingly submitted information to a

2     federal judge.

3          THE COURT:  Basis?

4          MR. FOTI:  Speculation.  There's the obvious answer,

5     Judge, but I think beyond that, it's speculating as to what

6     would actually happen.

7          THE COURT:  If he knows.  You can answer if you know.

8          THE WITNESS:  I think the consequences would be dire.

9     I would be discredited, if not Giglio'd.

10    BY MR. LYNCH:

11    Q.  Could it have an impact on your ability to promote within

12    HSI?

13    A.  Absolutely.

14    Q.  So, again, the information here was obtained from

15    Detective Chris Pliszka?

16    A.  Yes, it was.

17    Q.  Did you ever talk to any of the officers who were

18    involved in the traffic stop on June 20th, 2019 at the time

19    you prepared the affidavit?

20    A.  Not in regard to the facts in paragraph 8.

21    Q.  Okay.  So, specifically, did you ever talk to an Officer

22    Davidson about the facts that you put in paragraph 8?

23    A.  No.

24    Q.  How about an Officer Garry?

25    A.  No.

1    Q.  How about an Officer Nagy?

2    A.  No.

3    Q.  How about an Officer Kolcinski?

4    A.  No, I did not.

5    Q.  Okay.  So, again, the information you got in this

6    paragraph came from Detective Pliszka?

7    A.  Correct.

8    Q.  You didn't add anything that you didn't know or believe

9    to be true?

10   A.  No, I did not.

11   Q.  Now, ultimately, was there additional information added

12   to paragraph 8 once you spoke with Ms. Higgins?

13   A.  Yes.

14   Q.  And what kind of information -- I mean, there's edits

15   made, violation is spelled wrong in the last sentence, but

16   was there information added about the occupants of the

17   vehicle?

18   A.  There was.

19   Q.  Okay.  And that was ultimately put in about Anthony

20   Lipscomb and Mario Sadler, right?

21   A.  Kenneth Lipscomb and Mario Sadler.  Correct.

22   Q.  Sorry.  Kenneth Lipscomb?

23   A.  Yes.

24   Q.  But the facts about the field sobriety test, that

25   remained throughout the draft and what was submitted to Judge

1   McCarthy?

2   A.   Yes.

3   Q.   Okay.  And at no point did you ever learn that that

4   information might not be accurate?

5   A.   No, I did not.

6   Q.   Okay.  I'm going to show you what's been marked as

7   Government Exhibit 19 and ask if you recognize this.

8   A.   Yes, I do.

9   Q.   What is it?

10  A.   It's an email correspondence between AUSA Higgins on

11  Friday, June 21st, 2019 at 11 a.m. to the chambers of Judge

12  McCarthy; specifically, to Nywdml_Judge McCarthy's Chambers.

13  I was carbon copied in, Thomas Webb.  Subject is the

14  application for search warrant.  The attachments include

15  portfolio.1PDF.

16  Q.   Which appears to be the PDF of the search warrant?

17  A.   Yes.

18  Q.   Showing you what's been marked as Government Exhibit

19  number 20, what is that?

20  A.   Again, this is email correspondence from AUSA Higgins

21  sent Friday, June 21st, 2019 at 11:39 a.m. to me, Thomas J.

22  Webb; subject, affidavit; attachments, affidavit.docx.

23           MR. LYNCH:  Judge, if I could have a moment?

24  BY MR. LYNCH:

25  Q.   What time is the email?

1   A.  It's 11:39 a.m.

2   Q.  I'm going to show you what's been marked in evidence as

3   Government Exhibit 17.  Do you see that?

4   A.  Yes, I do.

5   Q.  And is that a copy of an email you sent to Detective

6   Pliszka?

7   A.  It appears to be.

8   Q.  And approximately what time was that sent on June 21st?

9   A.  11:45 a.m.

10  Q.  So after Ms. Higgins sent you the document?

11  A.  That's correct.

12  Q.  All right.  Now, after you sent that to -- this email to

13  Detective Pliszka, did anyone ever contact you and say the

14  information in that affidavit was incorrect?

15  A.  No, they did not.

16  Q.  If somebody had contacted you, would you have done

17  something?

18  A.  Absolutely.

19  Q.  What would you have done?

20  A.  I would have corrected the information, but first, I

21  would have contacted AUSA Higgins.

22  Q.  Did you do any of those?

23  A.  I did not.

24  Q.  Okay.  So, no one ever told you the information was

25  incorrect?

1   A.  No, they did not.

2   Q.  Or could even be incorrect?

3   A.  No, they did not.

4           MR. LYNCH:  I'd move to admit 19 and 20.

5           THE COURT:  Do you have copies?

6           MR. LYNCH:  I do, Judge.

7           THE COURT:  Mr. Foti, do you already have copies?

8           MR. FOTI:  I do.

9           THE COURT:  As to Exhibit 19?

10          MR. FOTI:  No objection.

11          THE COURT:  As to Exhibit 20?

12          MR. FOTI:  No objection.

13          THE COURT:  There being no objection, Government

14  Exhibit 19 and 20 are received in evidence.

15  (Government Exhibits 19 and 20 were received in evidence.)

16

17  BY MR. LYNCH:

18  Q.  Now, I want to refer to paragraph 9 of that affidavit.

19  Do you still see that up on the screen?

20  A.  I do.

21  Q.  Okay.  And again, on that morning, do you remember --

22  strike that.

23      Did you ever go to the Seneca Street station on -- garage,

24  I'm sorry, on June 20th in the afternoon?

25  A.  I may have.  I can't say with certainty.

 1   Q.   Now, you do have information in there about an Officer

 2   Marshall and a K9 detection dog, correct?

 3   A.   Yes, I do.

 4   Q.   Was that -- where would you have obtained that

 5   information from?

 6   A.   If I didn't directly observe it, I would have received

 7   the information from Detective Pliszka.

 8   Q.   And, again, do you have any reason to doubt -- at any

 9   time when you submitted this affidavit, did you have any

10   reason to doubt the accuracy of the information in here?

11   A.   No.

12   Q.   Did you, in fact, doubt the information -- the accuracy

13   of the information provided in paragraph 9?

14   A.   No, I did not.

15   Q.   If you had doubted the accuracy, what would you have

16   done?

17   A.   I would have questioned it with Detective Pliszka and not

18   included it.

19   Q.   Now, was your investigation of David Washington -- did it

20   have anything to do with him driving in this -- potentially

21   driving in the City of Buffalo under the influence of

22   alcohol?

23   A.   No.

24   Q.   I mean, did you care at all about the stop of the -- for

25   driving while ability impaired on June 20th?

1   A.  Outside of being a concerned citizen, no.

2   Q.  Okay.  So, was your focus on the vehicle and what was

3   inside of it?

4   A.  Yes.

5   Q.  Okay.  And whether a search warrant could be obtained?

6   A.  Correct.

7   Q.  All right.  Now, at some point that morning, did you

8   learn that there may have been at least some search of the

9   vehicle done at the, I guess, during the traffic stop?

10  A.  Yes.

11  Q.  Okay.  And why do you recall that?

12  A.  I remember items being -- I remember a conversation where

13  items were allowed to be removed from the vehicle and some

14  items still remained.

15  Q.  And what kind of items were there?

16  A.  Personal belongings.  I believe the other two occupants

17  were allowed to collect telephones and other belongings that

18  were theirs.

19  Q.  Was your understanding there may be still cell phones in

20  the vehicle?

21  A.  Yes.

22  Q.  Okay.  And do you know whether you asked Detective

23  Pliszka to -- for a K9 or whether that was done by someone

24  else?

25  A.  I don't recall.

1    Q.   Okay.  Was the use of a K9, though, significant to your

2    investigation of the vehicle?

3    A.   Yes.

4    Q.   Okay.  Why is that?

5    A.   Well, a narcotics K9 would -- a positive alert would lead

6    you to believe that there could be narcotics in the vehicle.

7    Q.   And in your experience, where have you -- have narcotics

8    been located inside of vehicles?

9    A.   In every place of a vehicle to include bumper, tires,

10   undercarriage, headlight.  I mean, all aspects of a vehicle

11   had been utilized to conceal narcotics.

12   Q.   Behind glove compartments?

13   A.   Absolutely.

14   Q.   Behind the dashboard?

15   A.   Correct.

16   Q.   In air filters?

17   A.   Correct.

18   Q.   Okay.  So, narcotics may not be located in just the

19   passenger compartment of a vehicle?

20   A.   That's correct.

21   Q.   All right.  But a narcotics dog may detect things that a

22   human eye can't see?

23   A.   Correct.

24   Q.   All right.  Special Agent Webb, I ask you one more time,

25   at any point, did you ever question the accuracy of the

1    information; personally question whether that information was

2    accurate?

3    A.   No.  I had no reason to believe it wasn't factual.

4    Q.   Okay.  And you were simply relying on information

5    provided to you by Detective Pliszka?

6    A.   That's correct.

7    Q.   And you understood he was getting the information from

8    someone else, too?

9    A.   Yes.

10   Q.   Okay.  From the officers at the scene?

11   A.   Yes.

12          MR. LYNCH:  All right.  I have no further questions.

13          THE COURT:  Mr. Foti?

14          MR. FOTI:  Yes.  Thank you, Judge.

15

16                      CROSS-EXAMINATION

17

18   BY MR. FOTI:

19   Q.   Okay.  On direct examination, you were asked about when

20   you were first made aware of the Cadillac Escalade.  And I

21   think you did your best to estimate that it was probably some

22   time near the beginning of your shift on June 20th, 2019,

23   correct?

24   A.   I believe so.

25   Q.   And that your shift begins or would have began on June

1   20th, 2019 at 8:30 a.m.?

2   A.   Yes.

3   Q.   Okay.  So, some time give or take maybe a half hour to an

4   hour around then is when you would have learned about what

5   had happened early that morning?

6   A.   I believe so.

7   Q.   You didn't get a call in the early hours of the morning

8   at 1 or 2 a.m. to advise you what was taking place as it was

9   happening, correct?

10  A.   Not that I recall.

11  Q.   When you testify on direct that you learned of this at

12  the beginning of your shift, is that based on recollection or

13  is that generally based on when you believe that you learned

14  about it?

15  A.   It's a general belief.

16  Q.   Okay.  You don't have any actual recollection of when you

17  were contacted and advised of what had taken place?

18  A.   I don't.

19  Q.   Do you know who it was that contacted you and initially

20  advised you of what had taken place?

21  A.   I believe it was Detective Pliszka.

22  Q.   Do you remember it being him or is that just generally

23  your belief?

24  A.   I had spoke with Detective Pliszka.

25  Q.   Okay.  And did you also speak to other members of

1    Homeland Security that morning?

2    A.   I don't recall.

3    Q.   What about anybody from the U.S. Attorney's Office,

4    Ms. Higgins or any other prosecutor?

5    A.   Yes.  Yes.

6    Q.   And do you recall whether by the time you spoke to -- was

7    it Ms. Higgins you spoke to?

8    A.   Yes.

9    Q.   Okay.  By the time you spoke to Ms. Higgins, was she

10   aware of what had taken place in the early hours of June

11   20th, 2019?

12   A.   She would have learned it from me.

13   Q.   So, as far as you can -- as far as what you believe

14   happened, you would have been the one to advise her of what

15   had taken place?

16   A.   Correct.

17   Q.   You don't know when that conversation would have taken

18   place, do you?

19   A.   It would have been the morning of June 20th.

20   Q.   You don't have any specific times or anything like that?

21   A.   Not that I recall.

22   Q.   Do you remember how you contacted her?

23   A.   Telephonically.

24   Q.   Okay.  By the time that you had learned of the vehicle

25   being seized, Mr. Washington had already been released at

1  that point, correct?

2  A.  I don't recall if I was told that.

3  Q.  Okay.  You were advised that there was a vehicle stop,

4  correct?

5  A.  Yes.

6  Q.  And that, at some point, Mr. Washington was taken into

7  custody?

8  A.  Yes.

9  Q.  And what you've indicated today is that Detective Pliszka

10  told you that there were failed field sobriety tests; is that

11  correct?

12  A.  That's what he told me.  Correct.

13  Q.  And do you have any recollection of him advising you that

14  Mr. Washington had submitted to a breathalyzer or breath

15  test?

16  A.  No.  I don't recall that.

17  Q.  Do you recall ever asking him or trying to inquire of him

18  whether there had been a breath test?

19  A.  No.

20  Q.  Did you ever ask him whether Mr. Washington was charged

21  with DWI?

22  A.  No.  I believe the information I received was about the

23  field sobriety test, and then tickets being administered.

24  Q.  So, you were advised that minor traffic violations were

25  charged against Mr. Washington?

1    A.   That was my understanding.

2    Q.   And you were never advised that he was charged with

3    driving while intoxicated?

4    A.   No.

5    Q.   You never inquired as to why he wasn't charged with

6    driving while intoxicated, even though you had been told that

7    he failed the field sobriety test?

8    A.   No.

9    Q.   Was it clear to you in the early hours -- when you

10   learned of what had taken place on June 20th, 2019,

11   approximately 8, 9 a.m., was it made clear to you at that

12   time that Mr. Washington had not been charged with a crime?

13   A.   At some point, I learned Mr. Washington had been given

14   tickets for whatever vehicle and traffic infraction had

15   occurred.

16   Q.   And you understood those to be minor traffic violations?

17   A.   I believe them to be traffic violations, correct.

18   Q.   You understood that driving while intoxicated was not

19   something Mr. Washington had been charged with?

20   A.   Correct.

21   Q.   There was no other misdemeanor or criminal charges that

22   you were advised Mr. Washington had been charged with?

23   A.   Not to my knowledge.

24   Q.   And, at that point, you were made aware that the vehicle

25   was being held as evidence despite lack of criminal charges,

1   correct?

2   A.  I was advised that the Buffalo Police had impounded the

3   vehicle.

4   Q.  Were you made aware that it was being held as evidence?

5   A.  I don't think that that term was used.  No.

6   Q.  Well, what was -- what term was used to describe the

7   status of the vehicle at that time?

8   A.  Impounded.

9   Q.  And were you of the understanding that the vehicle could

10  not be released until the Buffalo Police Department

11  authorized it?

12  A.  Could you ask that again, sir?

13  Q.  Were you of the understanding at that time that the

14  vehicle was in possession of the Buffalo Police Department

15  until they authorized its release?

16  A.  I don't know if I'm familiar with Buffalo Police policy

17  on that.

18  Q.  Okay.  Did you -- were you under the impression that

19  Mr. Washington could go pick up that vehicle at any time?

20  A.  I don't know what the procedure is.  No.

21  Q.  Okay.  You didn't know one way or another?

22  A.  I don't believe so.  I don't --

23  Q.  It would have impacted sort of -- it would have impacted

24  the timeline under which you were conducting your

25  investigation if the vehicle could be picked up at anytime,

1  wouldn't it?

2  A.  It was my understanding that it was impounded.

3  Q.  And what is -- your understanding of impounded mean?

4  A.  That it had been towed from the scene of the infraction

5  to the -- wherever the police hold their vehicles for

6  impound.

7  Q.  Why were you told it was impounded?

8       MR. LYNCH:  I object.  Why?  That would be pure

9  speculation why was he told it was impounded.

10       THE COURT:  True.  Rephrase it.

11 BY MR. FOTI:

12 Q.  What was your understanding in the morning of June 20th

13 of 2019 why the vehicle had been impounded at that point?

14 A.  For the facts I included in my affidavit, that there was

15 a field sobriety test, and there were traffic infractions

16 that were issued.

17 Q.  And it was your understanding that based on failed field

18 sobriety tests, that was the basis to impound the vehicle?

19 A.  I don't know that I was told what the basis was.

20 Q.  You didn't know why the vehicle was impounded?

21 A.  I don't know Buffalo Police policy.  I don't --

22 Q.  I'm not asking about Buffalo Police policy.  I'm asking

23 about this vehicle.  Did anybody explain to you why the

24 vehicle was impounded?

25 A.  For the facts that I set forth in the affidavit.  That

1   was my understanding, that I was provided the information

2   that he was -- that Mr. Washington was encountered, that the

3   field sobriety test had been administered, and that,

4   ultimately, he was issued tickets.

5   Q.  But not for DWI?

6        MR. LYNCH:  Asked and answered.

7        THE WITNESS:  No.

8        MR. LYNCH:  I mean, that's --

9        THE COURT:  Overruled.

10  BY MR. FOTI:

11  Q.  On direct examination, you were asked about certain

12  investigative decisions that were made, including to get a

13  federal search warrant, right?

14  A.  That's correct.

15  Q.  Do you remember when the decision was made that the

16  search warrant to authorize search of the vehicle would be a

17  federal search warrant?

18  A.  In the morning hours of June 20th.

19  Q.  And do you have any recollection of when it was requested

20  that a K9 unit conduct a dog sniff of the vehicle?

21  A.  I don't.

22  Q.  Do you have any recollection of whether that took place

23  before or after the decision to obtain a federal search

24  warrant?

25  A.  I think a federal search warrant was sought from the

 1   initial point of contact with the U.S. Attorney's Office.

 2   Q.  You're referring to your first conversation with

 3   Ms. Higgins?

 4   A.  I am.

 5   Q.  So, in the morning of June 20th, after you had learned

 6   the vehicle had been seized, the decision was made during

 7   your conversation with Ms. Higgins that a federal search

 8   warrant would be sought?

 9   A.  At some point during that morning, it was determined that

10   we would seek a federal search warrant.  I don't recall at

11   what point.

12   Q.  Okay.  And you weren't personally involved in any

13   decision related to whether a K9 unit would be used on the

14   vehicle?

15   A.  Was it at our request?  No.

16   Q.  I think you were asked this on direct.  Do you recall

17   going to the Seneca Street garage on June 20th, 2019 at any

18   point?

19   A.  I believe I testified that I couldn't say with certainty

20   whether I had or had not been there on June 20th.

21   Q.  You don't recall observing a dog sniff on that particular

22   vehicle?

23   A.  It's possible, but, again, I can't say with 100 percent

24   certainty.

25   Q.  And you say can't say with 100 percent certainty that you

1   made any observation of the vehicle on that date?

2   A.   I cannot.

3   Q.   Now, from the morning of June 20th until the search

4   warrant application was submitted to Judge McCarthy, you have

5   about a day and a half of time that passes, correct?

6   A.   Correct.

7   Q.   Specifically, the -- you were cc'ed on the email sent to

8   Judge McCarthy by Assistant US Attorney Higgins containing

9   the application for the search warrant, correct?

10  A.   Yes.

11  Q.   And that was at 11 a.m. on Friday, June 21st, 2019,

12  correct?

13  A.   Correct.

14  Q.   Okay.  And in the period of time from when you learned

15  about this vehicle being seized to when the search warrant is

16  sent that the application is sent to Judge McCarthy, there

17  are multiple emails that you're sending out related to the

18  contents of the search warrant application, correct?

19  A.   Multiple?

20  Q.   There were multiple emails that you had sent out prior to

21  that, correct?

22  A.   I believe I sent an email, received an email, and then

23  potentially sent one more if that is -- I'd have to review

24  what was sent and received.  I don't recall specifically.

25  Q.   Before we do that, did you, prior to the hearing today,

1   go back and look through your emails to determine what had

2   been sent or received related to the search warrant?

3          MR. LYNCH:  Judge, I want the record to be clear.

4   There were emails about Sadler and Lipscomb that were

5   exchanged because Ms. Higgins wanted more information about

6   the passengers.  I did not provide those because, this

7   morning, I was told that the issue about Lipscomb and Sadler

8   wasn't of significance.

9      So, there were other emails, but I reviewed them and they

10  related to Lipscomb and Sadler.  I just want -- I don't want

11  anyone to think I didn't tell the Court that or not.  I only

12  brought the emails that related -- anything that had to do

13  with paragraphs 8 and 9 to the extent -- the traffic stop.

14         THE COURT:  I understand.  And as I indicated this

15  morning to both counsel, my focus was on the affidavit and,

16  more specifically, paragraphs 8 and 9 of the affidavit of

17  Special Agent Webb relating to the dog sniffing of the

18  Cadillac, whatever that might produce, and the search of the

19  vehicle.

20         MR. LYNCH:  Right.  Okay.  I just -- with that

21  understanding.

22         MR. FOTI:  I remember that, Judge, and I don't

23  disagree with that, I just also believe this morning we talked

24  about the fact that I would be allowed to inquire as to what

25  emails exist.

 1                THE COURT:  As to paragraphs 8 and 9.

 2                MR. FOTI:  Well --

 3                THE COURT:  In other words, the subject matter of the

 4   hearing, the core of the subject matter of the hearing, are

 5   paragraphs 8 and 9.

 6                MR. FOTI:  Well, those emails, for example, I do

 7   think relate to paragraphs 8 and 9.  I could be wrong, but I

 8   think that information was ultimately included in paragraph 8

 9   and 9.

10                THE COURT:  Which -- what are you referring to now

11   when you say those?

12                MR. FOTI:  The emails that Mr. Lynch was just

13   referred to.

14                THE COURT:  That would be Government Exhibit 19 and

15   20?

16                MR. LYNCH:  No.  Well, yeah.  It -- there were --

17                THE COURT:  Seventeen?

18                MR. LYNCH:  No.  Ms. Higgins's indication about

19   the -- because the initial draft said there were two other

20   occupants in the vehicle.  Ms. Higgins said, who were the

21   other two occupants?  So they added information about Sadler

22   and Lipscomb.

23                THE COURT:  Okay.  We're not going to get into that.

24                MR. LYNCH:  Those were the -- I asked --

25                THE COURT:  We're not going to get into that.

1          MR. LYNCH:  I know.  I just want to make sure the

2    Court knows what I did.  I asked Ms. Higgins to provide me the

3    emails that she exchanged with Mr. Webb and her on that day.

4    And I asked Mr. Webb to send me the emails that he personally

5    engaged with her.  In addition, Special Agent Webb had another

6    person at HSI Fantuzzo, who sent the criminal histories of

7    Sadler and Lipscomb to Ms. Higgins.  Those were the emails

8    that I received.

9       And I even went through my own personal emails to make

10   sure I didn't have any emails about this, and I didn't have

11   any.  So, I want the Court to know I did a thorough review.

12   The emails that relate to the issue of this hearing are right

13   there.

14          THE COURT:  Government Exhibits 19 and 20?

15          MR. LYNCH:  Yes, 18, 19 and 20.

16          THE COURT:  Seventeen --

17          MR. LYNCH:  Yes, 17, 18, 19 and 20.

18          THE COURT:  -- eighteen, nineteen, and twenty.

19   BY MR. FOTI:

20   Q.  Okay.  In terms of the emails that you sent, sir, you

21   sent various drafts of this affidavit containing versions of

22   paragraph 8 and 9 to multiple recipients over the period of

23   this day and a half, correct?

24   A.  I sent a draft.

25   Q.  There was an earlier draft that you ultimately amended,

1  right?

2  A.  I guess, in regards to the final draft.

3  Q.  So, there is an email you sent to Ms. Higgins that

4  contained a draft of the affidavit that would later be

5  amended, correct?

6  A.  Yes.

7  Q.  And there was also emails where you sent the final draft,

8  correct?

9  A.  Yes.

10 Q.  Okay.  So, in terms of and besides this earlier draft

11 sent to Ms. Higgins and the final draft, were there any other

12 drafts of the affidavit containing paragraph 8 and 9?

13 A.  No.  I don't believe so.

14 Q.  Okay.  And did you send a copy of the early draft to

15 anybody besides Ms. Higgins?

16 A.  No.

17 Q.  The early draft that you sent to Ms. Higgins was sent to

18 her on June 20th at 3:21 p.m., correct?

19 A.  Yes, it was.

20 Q.  In fact, just to be clear, putting it on the ELMO, that's

21 Government's Exhibit 18.  Government's Exhibit 18, that

22 contains the email that you sent to Ms. Higgins on June 20th

23 at 3:21 p.m., correct?

24 A.  Correct.

25 Q.  Now, this email contains an earlier draft of the

1  affidavit that you would ultimately submit, correct?

2  A.  Correct.

3  Q.  And you only sent this draft to Ms. Higgins?

4  A.  I believe so.

5  Q.  Didn't send a copy to Detective Pliszka?

6  A.  No.

7  Q.  And you didn't send it to Detective Pliszka in any other

8  format, correct?

9  A.  No.

10 Q.  Detective Pliszka didn't review this draft on June 20th,

11 2019, correct?

12 A.  Reviewed as in, we had a correspondence telephonically to

13 the account of the aff.  So, he would review it through

14 communicating with me.

15 Q.  You recall speaking to Detective Pliszka on the phone

16 about the search warrant?

17 A.  I do.

18 Q.  Okay.  And did you read him portions of the search

19 warrant or did you just discuss general information?

20 A.  I don't recall specifically, but it would have been about

21 the contents of the affidavit.

22 Q.  Nothing would stop you from emailing him a draft of the

23 affidavit, was there?

24 A.  Was there anything stopping me?

25 Q.  Was there any reason why you would only email

1    Ms. Higgins?

2    A.   No.

3    Q.   If you had sent an earlier draft to Detective Pliszka, he

4    could have reviewed it for accuracy, correct?

5    A.   I spoke with Detective Pliszka to make sure that the

6    items being included were accurate.

7    Q.   And if you had emailed Detective Pliszka with a copy of

8    the draft, he would have been able to review it for accuracy,

9    correct?

10   A.   But I was in communication with Detective Pliszka to

11   include the facts as they were presented to me.

12   Q.   Okay.  What I'm asking about is, whether he actually had

13   a copy of the search warrant.  He didn't, did he?

14   A.   Not until the following day.

15   Q.   Okay.  And again, had he actually had a copy, he could

16   have reviewed it for accuracy, right?

17   A.   I spoke with him about it.

18   Q.   Sir, I appreciate that you talked to Detective Pliszka.

19   What I'm asking was, is there a reason why you couldn't give

20   him a physical copy?

21   A.   I believe I was providing him with a final copy for

22   review.

23   Q.   And we'll talk about that in a moment, but in terms of

24   this draft, is there a reason why he couldn't be provided

25   with a copy of the draft?

1   A.   No.

2   Q.   Now the -- after having some conversations with

3   Ms. Higgins, you made some modifications to paragraph 8,

4   specifically, from the search warrant affidavit, correct?

5   A.   Correct.

6   Q.   And she suggested those changes by email or by phone or

7   how did she suggest those changes?

8   A.   I believe it was -- it began by phone, and then a copy of

9   the affidavit would have been returned to me.

10  Q.   And do you remember what changes you made to paragraph 8

11  after speaking to Ms. Higgins?

12  A.   Not without reviewing them.

13  Q.   After you modified the draft that you had sent to

14  Ms. Higgins on June 20th at 3:21 p.m., how did you deliver to

15  her the final draft with the modifications?

16  A.   How did I deliver it?

17  Q.   Yeah.  How did the U.S. Attorney's Office receive the

18  modified affidavit?

19  A.   I believe the modified -- they would have a copy of the

20  modified application and then I would be asked to review for

21  accuracy any changes that were made, whether they were typed

22  in by AUSA Higgins or myself.

23  Q.   In this case, did Ms. Higgins make the modifications?

24  A.   She might have included the stuff relevant to the

25  passengers, I believe, but I can't say for certain.

1   Q.   Okay.  And when did you receive a copy of the modified

2   application?

3   A.   It would have been the next correspondence with

4   Ms. Higgins.

5   Q.   I'm putting on the screen Government Exhibit 19 in

6   evidence and this is an email from Ms. Higgins you're cc'ed

7   on that has an attachment.  The subject line is, application

8   for search warrant.  Is this the next correspondence you're

9   referring to?

10  A.   I believe there was correspondence in between then.

11  Q.   And the correspondence prior to this, if you believe it

12  exists, is that a reference to emails involving other

13  passengers?

14  A.   I believe so.

15        MR. FOTI:  Judge, I would request a copy of those

16  emails.  It seems relevant to the modification in paragraph 8

17  and 9.

18        MR. LYNCH:  I object, Your Honor.  I'd like Mr. Foti

19  to tell me which modifications he's referring to because then

20  we'd be able to tell which ones that are -- supposedly relate

21  to the issues why we're even here in the first place.

22        MR. FOTI:  Judge, I can answer that.

23        THE COURT:  Yes.

24        MR. FOTI:  Judge, I -- here's what we received from

25  the government; an email from Special Agent Webb to

1  Ms. Higgins, which was a draft of the application that he

2  ultimately submits to the magistrate.

3          THE COURT:  Now, that would be Government Exhibit 18,

4  am I correct?

5          MR. FOTI:  Right.  Yes, correct.  The next -- the

6  government made a determination that the next email that we're

7  entitled to receive under Jencks is Exhibit 19, which is an

8  email from Ms. Higgins to the magistrate with Mr. Webb

9  included.  That's Exhibit 19.

10         THE COURT:  Government Exhibit 19.

11         MR. FOTI:  Government Exhibit 19.  And the testimony

12 we're receiving is that modifications are made with the

13 assistance of the U.S. Attorney's Office and those

14 modifications, which are specifically paragraph 8 and 9, or 8

15 even more specifically, that there's some modifications that

16 take place that appear to be made over email.  And this

17 witness is saying I believe so, I believe there are other

18 emails that address it.  I have no way of confronting him.

19         MR. LYNCH:  But I -- Mr. Foti --

20         THE COURT:  Wait a minute.  Wait a minute.  Wait a

21 minute.  When I look at Government Exhibit 19, that's from

22 Higgins to special agent -- to Judge McCarthy.  And that's for

23 June 21st, 2019 at 11 a.m.  When I look at Government Exhibit

24 20, it's an email from Higgins to Special Agent Webb at 11:39,

25 which would be 39 minutes after she sent something to Judge

1    McCarthy.  Now, I don't know if that attachment -- it says

2    subject is affidavit.  The attachments say affidavit document.

3    I don't know if she was sending a search warrant.

4         MR. LYNCH:  Just the affidavit.

5         THE COURT:  Had it been executed?

6         MR. LYNCH:  Just the Word document and the affidavit.

7         THE COURT:  I still don't know the answer.  Is she

8    sending the executed warrant?

9         MR. LYNCH:  No, no, because it doesn't get signed

10   until like 12 --

11        THE COURT:  12:15.

12        MR. LYNCH:  Yeah, 12:15.

13        THE COURT:  So, we've got something that's being

14   transmitted to Special Agent Webb --

15        MR. LYNCH:  It's this.

16        THE COURT:  -- on June 21st, 2019 at 11:39 a.m.  Now,

17   if it's something that relates to the other occupants of the

18   car, we're not going to explore that.

19        MR. LYNCH:  And what he sent is exactly what he

20   sent -- what Agent Webb then forwarded on to Detective Pliszka

21   which you already said is an exact copy of the affidavit that

22   was submitted to Judge McCarthy.  He -- Webb sent the email to

23   Pliszka at 12:45.  Laura sent -- Ms. Higgins sent TJ Webb the

24   affidavit at 12:30 -- I'm sorry.  AUSA Higgins sent the email

25   to Special Agent Webb at 11:39 on June 21st.  At 11:45 that

 1   same day, Agent Webb forwarded that affidavit on to Pliszka.

 2   It's the same affidavit --

 3            THE COURT:  Okay, but --

 4            MR. LYNCH:  -- which you looked at this morning.

 5            THE COURT:  Right.  But where I'm having some

 6   difficulty is I'm assuming somewhere along the way, the search

 7   warrant, at least from what I see on the docket, 19-mj-1078,

 8   Judge McCarthy signed it on June 21st, 2019 at 12:15 p.m.

 9            MR. LYNCH:  Right.

10            THE COURT:  I'm trying to figure out what the

11   relationship or the reason for the email from AUSA Higgins on

12   Friday, June 21st, 2019 at 11:39 a.m. since she has not yet

13   gotten a search warrant from Judge McCarthy.

14            MR. LYNCH:  She was just sending the affidavit by

15   itself to Webb, presumably for Webb say, hey, this is the last

16   version.  Make sure you read it over, let -- you know --

17            THE COURT:  Is that what happened?

18            THE WITNESS:  Yes, it is.

19            THE COURT:  Okay.

20            MR. LYNCH:  And I --

21            THE COURT:  And is there an email showing you sending

22   it back?  Is that the email -- no.  It's not the email dated

23   June 20th.

24            MR. LYNCH:  No, there's no email.  I would definitely

25   mark that.  But I want -- because I want the Court to know, on

1    March 17th at 12:53 p.m., I emailed Mr. Foti.

2         I gave him -- I cut and pasted in the draft of paragraphs

3    8 and 9 that were provided by Special Agent Webb on June 20th,

4    2019 at 3:21 p.m. to AUSA Higgins.  I then noted for Mr. Foti

5    you will note that paragraph 8 was revised before submitting

6    it to Magistrate Judge McCarthy for your consideration;

7    specifically, information was added about the vehicle, quote,

8    having excessive tints, and the following sentence was added:

9    While pulling over, the vehicle pulled off the roadway onto

10   the apron between the sidewalk and road blocking a fire

11   hydrant.

12        Three sentences at the end of paragraph 8 were added about

13   the other occupants of the vehicle, Sadler and Lipscomb.  A

14   few typos were fixed, too.  Paragraph 9 stayed, I think,

15   exactly the same.  And as per paragraph 9, I wrote, minimal

16   revisions were made.  I'm just saying, when Mr. Foti questions

17   my witness about the changes, he knows exactly what changes

18   he's referring to --

19             THE COURT:  Yeah, but wait a minute.  What he knows

20   is not the court record.  He's got to make a record as an

21   advocate.

22             MR. LYNCH:  But we're getting in now to Sadler and

23   Lipscomb.  My agent --

24             THE COURT:  I know what he said.  We will not get

25   into that.

1          MR. LYNCH:  So, I would ask Mr. Foti to focus his

2    questions.

3          THE COURT:  Will you listen to me a moment, please?

4    I have now repeatedly said we are not going to get into any

5    other individual, the passengers, or anybody else.  But for

6    you to say, well, Mr. Foti already knows something, that's

7    irrelevant to what he has to do as an attorney.

8      He's got to make a record that can be utilized, not only

9    by me, but by the district judge to whom this case is

10   assigned, and perhaps the Second Circuit Court of Appeals.  So

11   what he knows in his head has to be put somehow in that record

12   and that's done by cross-examining the witness.

13          MR. LYNCH:  And I just ask it be more focused in his

14   questions so that we don't get into the -- because Special

15   Agent Webb --

16          THE COURT:  The way you do that, Mr. Lynch, is you

17   make an objection, you give me a basis, and I make a ruling.

18          MR. FOTI:  Judge, I'd also like to point out that I

19   don't personally know what changes were ultimately made.  I'm

20   not -- there's something that's not making sense to me, Judge,

21   I legitimately don't know the answer to.  And that is,

22   there's -- what I have before me and what the Court has before

23   it in terms of this record is that on Thursday, June 20th, at

24   3:21 p.m., a draft of this affidavit is sent to the U.S.

25   Attorney's Office, and we're specifically talking about

1  paragraphs 8 and 9.  Then, there's revisions made, which

2  Special Agent Webb signs off on, but I'm not clear when.

3      On the next day at 11 a.m., he receives a copy of what

4  appears to be the final draft of the search warrant in an

5  email from Ms. Higgins to Judge McCarthy.  And I don't know if

6  that application had the affidavit attached at that time or

7  not, but if it did, I'm not clear when the agent adopted the

8  changes.  He receives an email after the email is sent to

9  Judge McCarthy.

10  He received an email from Ms. Higgins about 39 minutes

11  later with an attachment of an affidavit.  That appears to be

12  after Judge McCarthy had received an email with an application

13  for search warrant that says, the agent and I are hoping for

14  the earliest possible time to sign once the Court has approved

15  the warrant.

16      So, I legitimately -- maybe I'm just missing it, but there

17  is something that's not connecting for me in terms of this

18  witness apparently receiving a copy of his final affidavit at

19  11:39 a.m. on June 21st after he had received a copy of it as

20  an attachment to Judge McCarthy, and not having anything in

21  between to indicate to me when he read the version that was

22  submitted to Judge McCarthy was, in fact, accurate.

23          MR. LYNCH:  Well, I think Special Agent Webb

24  probably -- I mean, I don't know if he can answer in this

25  specific instance, but he might be able to answer how search

1    warrants are edited in our office.  I mean, I can certainly

2    tell you in my own experience, Judge.

3            THE COURT:  No, I'm trying to go back to the signed

4    affidavit.

5        I don't know why it's not giving me all the different

6    numbers.  When I try to go on the mj-1078, it comes up 1-9.

7    (An off-the-record discussion was held.)

8            MR. LYNCH:  Judge, I have copies of the original one.

9            THE COURT:  I have got the search warrant now and the

10   affidavit.

11           MR. LYNCH:  Okay.

12           THE COURT:  Okay.  The notarization of Thomas Webb's

13   signature was done by Judge McCarthy on the 21st day of June,

14   2019, which would indicate to me that that was done some time

15   immediately prior to Judge McCarthy signing the search

16   warrant.  My review of the search warrant shows that he signed

17   that on June 21st, 2019 at 12:15 p.m.  So, I think it's

18   reasonable to assume that when he notarized the signature, and

19   having placed Special Agent Webb under oath, that occurred

20   somewhere probably around 12:13, 12:14 p.m. on that date.

21       Assuming that as a basic premise, the question I guess I

22   now have is, when was the executed search warrant sent to

23   Special Agent Webb?  I'm assuming it would be some time after

24   12:15 p.m.  And so, I really don't know what this June 21st,

25   2019 11:39 a.m. affidavit and document is, and that's the

1  email from Higgins to Special Agent Webb.

2          MR. LYNCH:  Right.  It's just the affidavit by itself

3  in a Word document, not signed, not anything, just the Word

4  document.

5          THE COURT:  Okay.  Do we know why though?

6          MR. LYNCH:  Probably because they knew she wanted to

7  make sure if there were anything to be changed, let me know.

8          THE COURT:  Let's ask Special Agent Webb then if he

9  knows.

10          Do you know -- do you recall, Special Agent Webb,

11  what Ms. Higgins sent to you on June 21st, 2019 at 11:39 a.m.?

12  That's Government Exhibit 20.

13          MR. FOTI:  I'll put it on the ELMO.

14          THE WITNESS:  I believe it to be the affidavit that I

15  was going to swear to in front of Judge McCarthy.

16          THE COURT:  Do you know whether it was the final

17  affidavit by you?

18          THE WITNESS:  I believe it was.  We didn't make any

19  other corrections.

20          THE COURT:  All right.  Mr. Foti?

21  BY MR. FOTI:

22  Q.  So that was at 11:39.  And June -- did you submit --

23  Government Exhibit 19, did you review this email that morning

24  from Ms. Higgins to Judge McCarthy at 11 a.m. you were cc'ed

25  on?

1    A.   Yes.

2    Q.   There was an attachment.  Do you remember it had

3    portfolio1.PDF.  It's referred to in the body of the email

4    search warrant; is that correct?

5    A.   Yes.

6    Q.   And was your affidavit included in that attachment sent

7    at 11 a.m. to Judge McCarthy?

8    A.   I believe it was.

9         MR. LYNCH:  And Mr. Foti wouldn't know this but,

10   Judge McCarthy's practice is he wants all the documents in one

11   PDF.

12   BY MR. FOTI:

13   Q.   Sir, was this the first time you recall receiving a final

14   copy of your affidavit?

15   A.   I believe so.

16   Q.   Do you recall approximately what time you swore to the

17   affidavit before Judge McCarthy?

18   A.   I would need to see the actual time, but I believe it to

19   be in or around 12:15 p.m.

20   Q.   Okay.  And prior to doing so, did you -- prior to doing

21   so, you sent the final copy of the affidavit to Detective

22   Pliszka, correct?

23   A.   I did.

24   Q.   Anybody else?

25   A.   No.

1   Q.  Did you ever follow up with Detective Pliszka to confirm

2   he had reviewed the affidavit?

3   A.  I don't recall, but I do remember having a conversation

4   with Detective Pliszka to tell me if there were any changes

5   necessary.

6   Q.  Do you recall having conversation at some point where you

7   had advised anyone there were any changes?

8   A.  Correct, to review for accuracy.

9   Q.  Okay.  And do you recall when that -- was that on June

10  21st when you had that conversation?

11  A.  Yes.

12  Q.  But no follow-up as far as you recall with you talking to

13  Detective Pliszka after 11:45 a.m. when you sent the email

14  to -- the final version of the affidavit?

15  A.  No.

16  Q.  And there would have been a window of what is

17  approximately a half hour from when you sent the email to

18  when you swore to the affidavit before Judge McCarthy?

19  A.  Correct.

20  Q.  And do you recall whether you attempted to contact

21  Detective Pliszka to make sure he reviewed it?

22  A.  I knew that Detective Pliszka had reviewed it.  I spoke

23  with Detective Pliszka about the contents of the affidavit.

24  Q.  You spoke to Detective Pliszka about the contents of the

25  affidavit after 11:45 a.m. on June 21st, 2019?

1    A.   No.   I don't believe so.

2    Q.   On direct examination, I believe you indicated you were

3    you aware that an inventory search had been conducted on the

4    vehicle prior to the tow, correct?

5    A.   I don't know that I was told it was an inventory search.

6    Q.   You were made aware there was some search of the contents

7    of the vehicle?

8    A.   To the best of my recollection, I remember being told

9    that the passengers of the vehicle were allowed to take items

10   out and that some items did remain.

11   Q.   Okay.   And you were advised as to what some of those

12   items were that still remained, correct?

13   A.   Yes.

14   Q.   Including that there were cellular devices?

15   A.   Correct.

16   Q.   And you were advised that there were items -- let me go

17   back for a second.   This information was relayed to you by

18   Detective Pliszka?

19   A.   Yes, it was.

20   Q.   As to what was in that vehicle at that point?

21   A.   Some of the items that he knew were in the vehicle.

22   Q.   And he had indicated to you that there was awareness of

23   what was in the vehicle because the vehicle had been searched

24   at some point?

25   A.   I don't know that he used that term, but he was aware of

1    some of the contents of the vehicle.

2    Q.  Do you recall whether there was a discussion of whether

3    the vehicle had been searched?

4    A.  I don't.

5    Q.  You didn't ask how he would know those items were in the

6    vehicle?

7    A.  Again, I believe it was information he received that the

8    passengers were allowed to take certain personal belongings

9    and that there were still some belongings in the vehicle.

10   Q.  But you don't know how he knew those items were in the

11   vehicle?

12   A.  I don't.

13   Q.  Did you -- besides your conversation with Detective

14   Pliszka, did you review any paperwork at all related to the

15   vehicle stop on June 20th, 2019 at approximately 1:20 a.m.?

16   A.  Did I receive any paperwork?

17   Q.  Yes.  Did you receive any paperwork related to the stop

18   or the tow of the vehicle?

19   A.  No, I don't believe so.

20   Q.  And the information that you had, including the license

21   plate number, that was all relayed to you by Detective

22   Pliszka?

23   A.  Correct.

24          MR. FOTI:  May I have a moment, Judge?

25          THE COURT:  Yes.

1    BY MR. FOTI:

2    Q.  The -- sir, the draft of the search warrant affidavit

3    that you sent to Ms. Higgins contained paragraph 9 which, for

4    the most part, wasn't altered in the final draft, correct?

5    A.  Correct.

6    Q.  That's the paragraph involving the K9 that was used,

7    correct?

8    A.  Correct.

9    Q.  Okay.  So, you were made aware of the usage of the K9

10   unit at least by 3:21 p.m. on June 20th, 2019, correct?

11   A.  Yes.  Correct.

12   Q.  Do you recall whether you were made aware that the K9

13   unit would be used prior to the dog sniff taking place?

14   A.  I don't recall.

15   Q.  In any event, whether it was before or after, at some

16   point, you were made aware that this investigative measure is

17   going to be taken, correct?

18   A.  Correct.

19   Q.  And I believe you -- as you've indicated, you may have

20   been present at the time that this took place, but you don't

21   recall one way or another?

22   A.  I don't.

23   Q.  There was, as far as just the dog sniff, there was no

24   steps taken to obtain authorization from the Court to subject

25   a dog sniff that you are aware of, correct?

1    A.   I don't know.

2    Q.   Nothing that you were personally involved in?

3    A.   Correct.

4    Q.   Nothing that the U.S. Attorney's Office directed?

5    A.   Correct.

6    Q.   And in terms of the information relayed to the

7    magistrate, the paragraph 9 indicates that this dog sniff

8    took place at some point on June 20th, 2019, correct?

9    A.   That's correct.

10   Q.   You didn't indicate when, in the affidavit to the

11   magistrate, correct?

12   A.   That's correct.  I've got to review it, but I believe

13   that's correct.

14   Q.   Putting on the ELMO the Government Exhibit 18, the second

15   page of the exhibit, which is the portion of the attachment

16   that is included, that's paragraph 9 of your affidavit,

17   correct?

18   A.   Of the draft affidavit?

19   Q.   Of the draft affidavit that was sent on June 20th a

20   little after 3 p.m.  This is the paragraph 9 that was

21   included in that, correct?

22   A.   Correct.

23   Q.   And for the most part, as far as you recall, there was no

24   real modification made.  This is the final draft, correct?

25   A.   Again, without reviewing, I believe that to be correct.

1   Q.  Okay.  This excludes any indication as to what time the

2   K9 sniff -- the K9 unit was utilized, correct?

3   A.  It does not include the time.

4   Q.  It does not mention that this took place at the Seneca

5   Street garage as opposed to Seneca Street station?

6   A.  That's correct.

7   Q.  And at no point do you recall was it ever requested that

8   you modify this paragraph to include that information to the

9   magistrate?

10  A.  Can you say that again sir?

11  Q.  You had conversation with the U.S. Attorney's Office

12  about these paragraphs, correct?

13  A.  Yes.

14  Q.  And there were recommendations made to make changes to

15  paragraph 8 specifically, correct?

16  A.  That's correct.

17  Q.  Which you can see on the screen?

18  A.  Yes, I can.

19  Q.  So, in this draft, there are changes ultimately made to

20  paragraph 8 based on recommendations from the U.S. Attorney's

21  Office?

22  A.  Correct.

23  Q.  But paragraph 9 remains the same even after your

24  conversations with the U.S. Attorney's Office?

25  A.  Again, I would have to see a side-by-side comparison, but

 1    I believe they remained the same.

 2    Q.  You certainly don't remember it ever being suggested that

 3    you modify paragraph 9 to let the magistrate know when the

 4    dog sniff took place, correct?

 5    A.  Correct.

 6            MR. FOTI:  I have nothing further.

 7            THE COURT:  Mr. Lynch?

 8            MR. LYNCH:  Yes, Judge.

 9

10                        REDIRECT EXAMINATION

11

12    BY MR. LYNCH:

13    Q.  Agent Webb, in your experience, can you just explain to

14    the Court sometimes how search warrant affidavits are edited

15    after you submit an initial draft to the Assistant United

16    States Attorney?

17    A.  Certainly.  It's a working draft until it's delivered to

18    the Court.  And even at that time, if there's an error that's

19    identified, it's brought to the Court's attention.

20    Q.  But I mean, is everything done by email, is it done in

21    person, is it done on the phone?

22    A.  It could be a combination of all three.

23    Q.  Okay.  For all you know, you went into Ms. Higgins's

24    office on June 21st and edited it with her?

25    A.  That's correct.

1    Q.  Okay.  Do you remember that?

2    A.  I don't, but it's common practice.

3    Q.  But you looked at your emails and you didn't throw back

4    drafts of the affidavit, correct?

5    A.  We did not.

6    Q.  You sent her the draft, there was a final version created

7    based on conversations you had with her, and then it was

8    submitted to the Court?

9    A.  That's right.

10   Q.  And those conversations would have been on the phone or

11   they could have been in person?

12   A.  That's right.

13   Q.  Now, is it -- did you -- looking at paragraph 9, there's

14   no time.  We agree there's no time in there where the dog

15   sniff took place, correct?

16   A.  That is correct.

17   Q.  All right.  But the paragraph before indicates the

18   vehicle was impounded, then the next paragraph is a dog sniff

19   was done, correct?

20   A.  Correct.

21   Q.  All right.  Now, I mean, did you draft it this way to --

22   so that there might be some confusion about where the K9

23   sniff took place?

24   A.  No, I did not.

25   Q.  So, in fact, you separated it out into a separate

1   paragraph, correct?

2   A.  I did.

3   Q.  All right.  And if the Court had asked you about where it

4   took place, would you have put it in there?

5   A.  Of course.

6   Q.  In your experience, does Judge McCarthy ask questions and

7   edits are made based on conversations with him?

8   A.  Yes.

9   Q.  Okay.  So, again, nothing was done in -- this wasn't --

10  was this crafted in an intentional manner to deceive the

11  Court?

12  A.  Absolutely not.

13          MR. LYNCH:  Okay.  I have no questions.

14          THE COURT:  Special Agent Webb, you have testified

15  that the information that's contained in paragraph 8 of your

16  affidavit was obtained from Detective Pliszka, correct?

17          THE WITNESS:  That's correct, Your Honor.

18          THE COURT:  Do you recall just when he conveyed that

19  to you?

20          THE WITNESS:  Beginning the morning of June 20th.

21          THE COURT:  And I believe you said somewhere around 8

22  or 9 a.m.?

23          THE WITNESS:  To the best of my recollection, yes,

24  Your Honor.

25          THE COURT:  When he was conveying this information to

1    you, did you make notes?

2         THE WITNESS:  I believe the conversations we had were

3    general at first until I began to draft the affidavit and then

4    I, to the best of my recollection, I was writing it

5    contemporaneously with the information being received.

6         THE COURT:  The reason I ask that is, unless you are

7    some type of clairvoyant or person with a strong memory,

8    paragraph 8 starts off describing the Cadillac as a black 2017

9    Cadillac bearing Montana state license plate number 4661173B.

10   I'm assuming you didn't have that from memory.  You must have

11   written it down when you were given the information.

12        THE WITNESS:  I don't recall writing it down, Your

13   Honor, but I do remember having conversations with Detective

14   Pliszka and I don't believe that I would have been able to

15   complete that sentence in one attempt.  I believe I would have

16   had to ask Detective Pliszka probably to provide that

17   information more than once to me.

18        THE COURT:  Okay.  So you don't recall having any

19   notes at the time you were talking to him?

20        THE WITNESS:  I do not.

21        THE COURT:  All right.  Thank you, sir.  You are

22   excused.

23   (The witness was excused at 3:22 p.m.)

24        THE COURT:  Does that complete the government's case?

25        MR. LYNCH:  Yes, Judge.

1          THE COURT:  Just as a matter of grammatical

2    direction, one could read paragraph 8, the last sentence, as

3    indicating the Buffalo Police Department failed the sobriety

4    test.

5          MR. LYNCH:  I didn't look at that, but okay.

6          THE COURT:  Mr. Foti, anything?

7          MR. FOTI:  Judge, we do not intend to offer any

8    proof.

9          THE COURT:  All right.  Do the parties intend to get

10   a transcription of the proceeding today and file post-hearing

11   memoranda?

12         MR. LYNCH:  Yes, Judge.

13         MR. FOTI:  Yes.

14         THE COURT:  All right.  Once again, I'm going to rely

15   on counsel to act diligently in taking the appropriate steps

16   to order the transcript.  And then I'm going to give both

17   sides 30 days after the notice of the filing of the transcript

18   to file memoranda simultaneously.

19         MR. FOTI:  Judge, in terms of the issues we're

20   briefing, I -- as I understand it, there are the two issues

21   the Court identified when we appeared two weeks ago.  So,

22   we're dealing with the issues surrounding the search warrant,

23   the creation of the search warrant, the information contained

24   in the search warrant, and also, as a secondary issue, we're

25   dealing with the legality of the dog sniff at the time it

 1   occurred based on the evidence -- the evidence that was

 2   presented at this hearing.

 3              THE COURT:  Right.  The first question that I'd like

 4   to see, at least in a memoranda, would be the legality of the

 5   dog sniff, and then the second question is the issue of the

 6   presentation of information to the magistrate judge; that is,

 7   the affidavit which contains erroneous information as to the

 8   field sobriety test and the ramifications of that with respect

 9   to the validity of the search warrant.

10      Let's save both of you time.  I already acknowledge that

11   if it comes down to just a question of excising that

12   information in paragraph 8 about the sobriety test, the next

13   step that I would undertake in -- as the magistrate judge, in

14   determining the validity of the warrant, would be whether

15   there was still probable cause for the issuance of the warrant

16   after excising that information.

17      In addition, if there's information that the defendant

18   claims should have been included, then I would take the step

19   of including that information, such as, there was an inventory

20   search conducted in the vehicle and no contraband was found.

21   I would then, once again, plug that information into the

22   contents of the affidavit and then make a determination

23   whether that would, in any way, vitiate the validity of the

24   search warrant.  Any problem with that, either one of you?

25              MR. LYNCH:  No, Judge.

1          MR. FOTI:  I don't have any problem with it, Judge,

2     but I just -- the analysis after the exclusion of false

3     information and the inclusion of at least what the defense has

4     asserted are material omissions, that I would also intend to

5     brief that as an issue of consequence that the Fourth

6     Amendment -- any potential Fourth Amendment violation would

7     have been of consideration to the magistrate, not just a

8     purely probable cause -- not just purely an analysis related

9     to whether there's sufficient probable cause, but also that

10    the magistrate would have been advised by that information

11    being omitted that could indicate that there's -- the vehicle

12    was being illegally held at that point.

13         MR. LYNCH:  Well, I don't know if they --

14         THE COURT:  I think we're saying the same thing,

15    though.  In the end, it comes down to a Fourth Amendment

16    issue.

17         MR. FOTI:  Yes.  That, I agree --

18         MR. LYNCH:  This -- I'm sorry, Mr. Foti.  I

19    apologize.  I shouldn't have interrupted.  Go ahead.

20         MR. FOTI:  I think the government has, not just today

21    but in other appearances as well, framed the issue that,

22    consistent with Leon, if there was probable cause after the

23    omission of any false information, then it's a valid warrant,

24    and that potentially is dispositive of whether the

25    exclusionary rule is applicable or not.  And I don't believe,

1  under these circumstances, that would be the case because the

2  information that was omitted and some of the false information

3  has direct bearing on Fourth Amendment violations.

4          THE COURT:  I don't see Leon being applicable.

5      What I do see are the other Second Circuit cases which

6  expressly say -- and I can't remember the name of it -- but

7  when you are analyzing an issue where it's determined there's

8  information in the warrant that is either false or erroneous

9  or misrepresenting, the purpose of that is for the Court to

10  determine whether probable cause would still exist in the

11  affidavit if you removed that material which is alleged to be

12  false or misrepresenting or whatever, and that if you find

13  there's probable cause after making that excising, absent

14  something else, then the warrant is valid and not a violation

15  of the Fourth Amendment that occurs in the search.

16      The same concept and principle applies if the defense says

17  there were facts or circumstances left out of the warrant that

18  would have caused the magistrate judge, perhaps, to view it

19  differently, then the Court takes that information that the

20  defendant says existed that should have been included, and

21  then examines the affidavit with the inclusion and determines

22  whether that included material was enough to vitiate the

23  funding of probable cause.  That's the way I view it.

24          MR. FOTI:  Understood.

25          MR. LYNCH:  Thank you, Judge.

1              THE COURT:  All right.  In the meantime, Mr. Foti,

2      does the defendant acknowledge that upon the filing of his

3      motion to suppress, that caused the Speedy Trial clock to

4      stop, and that the Speedy Trial clock will remain stopped

5      until that motion has been finally resolved and, therefor, the

6      time will not be counted against the government and will be

7      excluded for purposes of the time requirements set forth in

8      the Speedy Trial Act, as well as any other statutory time

9      requirements that might be applicable?

10             MR. FOTI:  Yes, Judge.

11             THE COURT:  And that would be pursuant to Title 18 of

12     the United States Code, Section 3161(h)(1)(D).  All right,

13     gentlemen.  Thank you.

14             MR. FOTI:  Thank you, Judge.

15             MR. LYNCH:  Thank you.

16     (Proceedings concluded at 3:30 p.m.)

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF TRANSCRIBER

2

3      In accordance with 28, U.S.C., 753(b), I certify that this

4  is a true and correct record of the proceedings held in the

5  United States District Court for the Western District of New

6  York before Honorable Magistrate Judge H. Kenneth Schroeder on

7  March 22nd, 2022.

8

9

10                              s/ Megan E. Pelka, RPR

11                              Megan E. Pelka, RPR

12                              Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25